IN THE UNITED STATES DISTRICT COURT

FOR THE NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| JUST FILM, INC.; RAINBOW BUSINESS SOLUTIONS, doing business as PRECISION TUNE AUTO CARE; BURLINGAME MOTORS, INC.; DIETZ TOWING, INC.; THE ROSE DRESS, INC.; VOLKER VON GLASENAPP; JERRY SU; VERENA BAUMGARTNER; TERRY JORDAN; ERIN CAMPBELL; and LEWIS BAE, on behalf of themselves, the general public and those similarly situated,<br><br>      Plaintiffs,<br><br>  v.<br><br>MERCHANT SERVICES, INC.; NATIONAL PAYMENT PROCESSING; UNIVERSAL MERCHANT SERVICES LLC; UNIVERSAL CARD, INC.; JASON MOORE; NATHAN JURCZYK; ROBERT PARISI; ERIC MADURA; FIONA WALSHE; ALICYN ROY; MBF LEASING LLC; NORTHERN FUNDING LLC; NORTHERN LEASING SYSTEMS, INC.; GOLDEN EAGLE LEASING LLC; LEASE SOURCE-LSI, LLC; LEASE FINANCE GROUP, LLC; JAY COHEN; LEONARD MEZEI; SARA KRIEGER; BRIAN FITZGERALD; SAM BUONO; MBF MERCHANT CAPITAL, LLC; RBL CAPITAL GROUP, LLC; WILLIAM HEALY; JOSEPH I. SUSSMAN; JOSEPH I. SUSSMAN, P.C.; and SKS ASSOCIATES, LLC,<br><br>      Defendants.<br>_____/<br>AND ALL RELATED CROSS-CLAIMS<br>_____/ | No. C 10-1993 CW<br><br>ORDER GRANTING PLAINTIFFS' MOTION FOR A PRELIMINARY INJUNCTION AND DENYING DEFENDANT SKS ASSOCIATES, LLC'S MOTION TO COMPEL ARBITRATION OF PLAINTIFF ERIN CAMPBELL'S CLAIMS (Docket Nos. 208 and 253) |

On April 8, 2011, pursuant to the ex parte application of Plaintiffs Just Film, et al., the Court entered a temporary

restraining order (TRO) against Defendant SKS Associates. Plaintiffs' application was based on SKS's conduct with respect to Plaintiff Erin Campbell. Plaintiffs now seek a preliminary injunction against SKS. SKS opposes the motion and moves to compel arbitration of Campbell's claims against it. The motions were heard on June 2, 2011. Having considered oral argument and the papers submitted by the parties, the Court GRANTS Plaintiffs' motion and DENIES SKS's motion.

## BACKGROUND

Plaintiffs bring claims against twenty-seven Defendants based on alleged misconduct related to credit card processing services and equipment finance leases. Plaintiffs intend to bring this action on behalf of a class of individuals and business similarly situated.

The current motions concern only Campbell's claims against SKS. She is the only Plaintiff who has had interactions with SKS. Only the background necessary to resolve these motions is provided below.

SKS is a New York limited liability company. It was originally formed in December 2008 under the name Lease Residual Holdings (OFC), LLC. On March 11, 2011, Lease Residual Holdings changed its name to SKS Associates LLC.

SKS is allegedly owned by Defendant Northern Leasing Systems, Inc., which also purportedly owns Defendants MBF Leasing LLC; Golden Eagle Leasing LLC; Lease Source-LSI, LLC; and Lease Finance Group, LLC. Plaintiffs refer to all of these entities as the Northern Leasing Companies. Plaintiffs allege that the assets of the Northern Leasing Companies are commingled and that they are

2

alter egos of each other. According to Plaintiffs, Defendants Jay Cohen, president and chief executive officer of Northern Leasing; Leonard Mezei, chairman of the board of Northern Leasing; Sara Krieger, vice president for operations of Northern Leasing; Brian Fitzgerald, MBF Leasing's former executive vice president for business development; Sam Buono, former vice president of collections and customer service at Northern Leasing and MBF Leasing; and Joseph I. Sussman, an attorney, directed and controlled the Northern Leasing companies. Plaintiffs refer to these individuals as "Northern Leasing Companies Control Persons." 2d Am. Compl. (2AC) ¶ 36.

On or about September 12, 2002, Campbell entered into an Equipment Finance Lease (EFL) with Lease Finance Group on behalf of her business, Silicon Valley Pet Clinic. The EFL provided for a lease term of forty-eight months and required monthly payments of $79.95 per month. The EFL also included the following provisions:

> 10. NET LEASE: TAXES. You intend the rental payments hereunder to be net to us, and you agree to pay all sales, use, excise, personal property, stamp, documentary and ad valorem taxes, license and registration fees, assessments, fines, penalties and similar charges imposed on the ownership, possession or use of the Property during the term of this Lease; shall pay all taxes (except our Federal or State net income taxes) imposed on you or us with respect to the rental payments hereunder or the ownership of the Property; and, shall reimburse us upon demand for any taxes paid by or advanced by us. Unless otherwise agreed to in writing, you shall file personal property tax returns with respect to the Property. . . .
>
> 18. END OF LEASE TERM. At the expiration or earlier termination of the Lease Term, you have the following options: (1.) You shall disconnect and return the Equipment and/or Software, freight prepaid, to us in good repair, condition and working order, in a manner and to a location we designate and all Lessee's right to use the Software shall terminate. (2.) Lessor extends an option to purchase the equipment at the end of the term for fair

3

> market value, which is estimated to be 10% of the Lease term times monthly Lease payment (excluding taxes) and return the Software in accordance with option 1.
> (3.) You can extend upon all the terms and conditions as stated herein for a period of one month from its expiration date without the necessity of the execution of any further instrument or document.  At the end of this additional month, options 1, 2, and 3 are again available to you. Unless you notify us in writing 30 days prior to the expiration of the Lease Term, or monthly renewal period, you shall have been deemed to have chosen option 3 (Automatic Renewal for one month). . . .
>
> 21.   CHOICE OF LAW; ARBITRATION: Any claim or controversy including any contract or tort claim, between or among us, you or any Guarantor related to this Lease, shall be determined by binding arbitration in accordance with Title 9 of the U.S. Code and the Commercial Arbitration Rules of the American Arbitration Association.  All statutes otherwise applicable shall apply.  Judgment upon the arbitration award may be entered in any court having jurisdiction.  In event you or Guarantor Defaults, these provisions regarding arbitration shall not apply to our right to repossess the Equipment.  This Lease is made in interstate commerce.  Any arbitration shall take place in Chicago, Illinois.

Krieger Decl. in Support of Mot. to Compel Arbitration (Krieger Arbitration Decl.), Ex. 1, at 3.  In contrast to the EFLs of Plaintiffs Volker Von Glasenapp and Just Film, Terry Jordan and Dietz Towing, Lewis Bae and the Rose Dress, and Verena Baumgartner and Burlingame Motors, Campbell's EFL did not expressly provide that her obligation to pay any taxes or similar charges survived the term of the EFL.  Mirsky Decl. in Support of Opp'n to Mot. for Preliminary Injunction (Mirsky Injunction Decl.) ¶ 27.

Over the term of her lease, Campbell allegedly paid $9.78 for property taxes.  She closed her account with Lease Finance Group in June 2007.

On or about March 9, 2011, Campbell received a letter from SKS, which stated,

> Recently SKS Associates acquired all of the rights, title and interest in certain leases owned by Lease Finance

4

1
2
3
4
5
6
7
>    Group, LLC and a lease you entered into with Lease
>    Finance Group, LLC was part of that acquisition.
>
>    An audit was conducted on your account and it was
>    determined certain taxes and related fees due were either
>    not collected or under collected. In accordance with the
>    terms of your lease agreement (section Net Lease: Taxes),
>    you are required to pay all taxes and related filing
>    costs pertaining to the equipment you leased from Lease
>    Finance Group, LLC. The amount owed is $85.50, which
>    includes tax processing and filing fees. In order to
>    collect the amount owed under the lease, we intend to
>    debit your account on or about 3/15/2011. . . .

Campbell Decl., Ex. A. Thereafter, SKS attempted to debit Campbell's bank account. Because Campbell had closed the account in 2007, SKS was not able to withdraw any funds. However, Plaintiffs allege that, in early March 2011, SKS was successful in debiting "hundreds or thousands of class members' bank accounts for fraudulent sums of money, using the bank account information these class members had provided to the original lessor." 2AC ¶ 280.

SKS proffers the declaration of Jonathan Mirsky, vice president of Cucumber Holdings, Inc., which is the "manager" of SKS. Mirsky Injunction Decl. ¶ 1. According to Mirsky, in December 2010, SKS purchased assets from Northern Leasing, including Northern Leasing's "right to receive reimbursement" of taxes and administrative fees afforded under certain EFLs "identified in Schedule 1 to the Purchase Agreement." SKS paid $6 million for these assets, $100,000 of it in advance. Under the Purchase Agreement, SKS is to pay the remaining $5.9 million "from amounts collected with respect to the Tax Payments in accordance with the terms of the Servicing Agreement." Id., Ex. 1, at 6.

The Servicing Agreement provides that Lease Finance Group is charged with collecting on the leases on behalf of SKS. As compensation, Lease Finance Group receives four percent of the net

collections.  The Servicing Agreement distributes any collections received as follows: first, to Lease Finance Group to pay servicing fees; second, to Northern Leasing "until the amount of the Purchase Price outstanding has been reduced to zero;" and, finally, to SKS. Mirsky Injunction Decl., Ex. 1, at 15.

Mirsky did not include as part of his declaration Schedule 1 of the Purchase Agreement which, as noted above, listed the EFLs for which SKS purchased rights.  On April 29, 2011, counsel for SKS sent Plaintiffs' counsel a "zipped file containing Schedule 1." Simplicio Decl. in Support of Reply in Support of Mot. for Preliminary Injunction (Simplicio Injunction Decl.), Ex. E, at 2. The file consisted of 1457 pages and a table with various headings, including "Lease #."  Id., Ex. F.  On May 2, 2011, Plaintiffs proffered a printout from the file as part of their reply in support of their motion for a preliminary injunction.  In their reply, Plaintiffs noted that the file did not contain any number associated with Campbell's EFL.  On May 3, 2011, counsel for Defendants provided Plaintiffs' counsel with a new Schedule 1. According to Plaintiffs' counsel, the new Schedule 1 contained seventy-five records per page, whereas the April 29 version had only forty-five record per page.  Further, the new Schedule 1 reflected Campbell's lease.

Campbell brings claims under the Racketeer Influenced and Corrupt Organizations Act (RICO).  She charges SKS, along with the other Northern Leasing Companies and the Northern Leasing Companies Control Persons, with conducting and participating in a RICO enterprise through a pattern of racketeering activity, in violation of 18 U.S.C. § 1962(c), and conspiring to engage in a pattern of

6

racketeering activity, in violation of 18 U.S.C. § 1962(d). She alleges two predicate acts. First, she pleads that these Defendants committed mail fraud by, among other things, "advising class members of audits conducted on their account and past due property taxes, when no such audit had been conducted and no taxes were due." 2AC ¶ 560. She also pleads that these Defendants committed wire fraud by, among other things, using "old ACH withdrawal forms to withdraw amounts from merchants' bank accounts nationwide." Id. ¶ 580.

On April 8, 2011, the Court issued a TRO prohibiting SKS from "engaging in any collection of any funds, or related collection activity, based upon expired, cancelled, or otherwise terminated equipment lease agreements" and "making any reports to any credit reporting agencies regarding any collection of any funds based upon expired, cancelled, or otherwise terminated equipment lease agreements." Order of Apr. 8, 2011. Pursuant to SKS's stipulations, the TRO was extended through June 2, 2011. At the hearing on the parties' current motions, the Court extended the TRO until the date that a preliminary injunction issued.

DISCUSSION

I.  SKS's Motion to Compel Arbitration

Under the Federal Arbitration Act (FAA), 9 U.S.C. §§ 1 et seq., written agreements that controversies between the parties shall be settled by arbitration are valid, irrevocable and enforceable. 9 U.S.C. § 2. A party aggrieved by the refusal of another to arbitrate under a written arbitration agreement may petition the district court which would, save for the arbitration agreement, have jurisdiction over that action, for an order

7

directing that arbitration proceed as provided for in the agreement.  Id. § 4.  The FAA further provides that:

> If any suit or proceeding be brought in any of the courts of the United States upon any issue referable to arbitration under an agreement in writing for such arbitration, the court in which such suit is pending, upon being satisfied that the issue involved in such suit or proceeding is referable to arbitration under such an agreement, shall on application of one of the parties stay the trial of the action until such arbitration has been had in accordance with the terms of the agreement . . . .

Id. § 3.

If the court is satisfied "that the making of the arbitration agreement or the failure to comply with the agreement is not in issue, the court shall make an order directing the parties to proceed to arbitration in accordance with the terms of the agreement."  Id. § 4.

The FAA reflects a "liberal federal policy favoring arbitration agreements."  Gilmer v. Interstate/Johnson Lane Corp., 500 U.S. 20, 25 (1991) (quoting Moses H. Cone Mem. Hosp. v. Mercury Constr. Corp., 460 U.S. 1, 24 (1983)).  A district court must compel arbitration under the FAA if it determines that: (1) there is a valid agreement to arbitrate; and (2) the dispute falls within its terms.  Stern v. Cingular Wireless Corp., 453 F. Supp. 2d 1138, 1143 (C.D. Cal. 2006) (citing Chiron Corp. v. Ortho Diagnostic Sys., 207 F.3d 1126, 1130 (9th Cir. 2000)).  "Unless the parties clearly and unmistakably provide otherwise, the question of whether the parties agreed to arbitrate is to be decided by the court, not the arbitrator."  AT&T Techs., Inc. v. Commun'cs Workers of Am., 475 U.S. 643, 649 (1986) (citations omitted).

The arbitrability of a claim may depend on whether the

contract providing for arbitration has expired.  See Litton Fin. Printing Div. v. NLRB, 501 U.S. 190, 205-09 (1991); see also Operating Eng'rs Local Union No. 3 v. Newmont Mining Corp., 476 F.3d 690, 693-94 (9th Cir. 2007).  The "dead hand of a long-expired arbitration clause cannot govern forever."  Kroll v. Doctor's Assocs., 3 F.3d 1167, 1169 (7th Cir. 1993) (citing Local 703, Int'l B'hood of Teamsters v. Kennicott Brothers Co., 771 F.2d 300 (7th Cir. 1985)).  A claim "'arise[s] under the contract,' and therefore subjects the parties to arbitration, if (1) 'it involves facts and occurrences that arose before expiration,' (2) 'an action taken after expiration infringes a right that accrued or vested under the agreement,' or (3) 'under normal principles of contract interpretation, the disputed contractual right survives expiration of the remainder of the agreement.'"  Newmont, 476 F.3d at 693 (quoting Litton, 501 U.S. at 206).

Although there is a general presumption in favor of arbitrability, it does not apply "wholesale in the context of an expired . . . agreement, for to do so would make limitless the contractual obligation to arbitrate."  Litton, 501 U.S. at 209.

SKS cannot compel arbitration of Campbell's claims because they do not arise under her lease agreement, which has expired.  As noted above, the lease had a fixed term of forty-eight months, but provided for renewal on a month-to-month basis if Campbell did not notify Lease Finance Group of her intention to cancel the lease. Campbell entered into her lease in September 2002 and apparently maintained the lease until June 2007.  SKS's alleged misconduct took place in March 2011.  Campbell's RICO claims are not based on any dispute regarding the lease, but rather on SKS's allegedly

9

fraudulent attempt to extract funds from her bank account approximately four years after the lease ended.

Indeed, SKS offers no evidence that this post-expiration dispute concerns conduct that occurred before June 2007 or that Campbell's lease is implicated. There is no indication as to when Campbell incurred the $85.50 that she purportedly owes for "tax processing and filing fees." Nor does the record indicate why these fees were assessed, if they were. Campbell's lease obligated her to pay taxes and "similar charges . . . imposed on the ownership, possession or use of the Property during the term of this Lease." Krieger Decl. in Support of Mot. to Compel Arbitration (Krieger Arbitration Decl.), Ex. 1, at 3. The $85.50 SKS seeks to collect does not appear to be for taxes or related fees, nor is there evidence that this amount is for taxes or fees assessed during the lease's term. Thus, it is not apparent that the amount charged was pursuant to the lease. Notably, Mirsky points out that EFLs other than Campbell's provided that a lessee's obligation to pay taxes and processing fees persisted despite the expiration of the lease. No such provision appears in Campbell's lease.

SKS cites Sweet Dreams Unlimited v. Dial-A-Mattress International, Ltd., 1 F.3d 639 (7th Cir. 1993), for the proposition that the failure to exclude post-termination disputes from the scope of an arbitration clause demonstrates an intent to arbitrate. SKS relies on a section of Sweet Dreams which was based on Nolde Brothers, Inc. v. Local No. 358, Bakery and Confectionery Workers Union, in which the Supreme Court held that "where the dispute is over a provision of the expired agreement, the

10

presumptions favoring arbitrability must be negated expressly or by clear implication." 430 U.S. 243, 255 (1977). This rule was clarified in <u>Litton</u>, in which the Supreme Court held that the "<u>Nolde Brothers</u> presumption is limited to disputes arising under the contract." 501 U.S. at 205; <u>see also</u> <u>Homestead Lake Co. of Mo. v. Doe Run Resources Corp.</u>, 282 F. Supp. 2d 1131, 1140 n.3 (N.D. Cal. 2003). As noted above, Campbell's RICO claims do not arise from her expired lease.[1]

Accordingly, SKS's motion to compel arbitration must be denied.

II. Plaintiffs' Motion for a Preliminary Injunction

"A plaintiff seeking a preliminary injunction must establish that he is likely to succeed on the merits, that he is likely to suffer irreparable harm in the absence of preliminary relief, that the balance of equities tips in his favor, and that an injunction is in the public interest." <u>Winter v. Natural Res. Def. Council, Inc.</u>, ___ U.S. ___, 129 S. Ct. 365, 374 (2008). Alternatively, "a preliminary injunction could issue where the likelihood of success is such that serious questions going to the merits were raised and the balance of hardships tips sharply in plaintiff's favor," so long as the plaintiff demonstrates irreparable harm and shows that the injunction is in the public interest. <u>Alliance for the Wild Rockies v. Cottrell</u>, 632 F.3d 1127, 1131 (9th Cir. 2011) (citation

---

[1] Indeed, although the court held the plaintiff's claims to be subject to an arbitration clause contained in an expired agreement, it noted that it "would be presented with a different and more difficult question if the disputes had arisen a significant time after the expiration of the Agreement." <u>Sweet Dreams</u>, 1 F.3d at 643. Here, Campbell's claims are based on alleged conduct that was committed almost four years after her lease expired.

11

and internal quotation and editing marks omitted).

A court employs a sliding scale when considering a plaintiff's showing as to the likelihood of success on the merits and the likelihood of irreparable harm. Id. "Under this approach, the elements of the preliminary injunction test are balanced, so that a stronger showing of one element may offset a weaker showing of another." Id.

A. Likelihood of Success on the Merits

SKS contends that a preliminary injunction is not warranted because "Plaintiffs have not established that SKS's collections efforts are wrongful." SKS Opp'n to Pls.' Mot. for Preliminary Injunction at 7:5-6. SKS also argues that, because Campbell's claims are subject to arbitration, she cannot represent the putative class.

Plaintiffs' allegations and the current record show that Campbell has a likelihood of prevailing on her claims. Plaintiffs plead that SKS is debiting or attempting to debit numerous individuals' bank accounts for amounts not owed to it. They proffer a letter sent by SKS to Campbell stating that, pursuant to the "Net Lease: Taxes" section of her EFL, she owes SKS "$88.50, which includes tax processing and filing fees." Campbell Decl. in Support of Mot. for Preliminary Injunction, Ex. A. However, the cited EFL provision does not indicate that she is liable for such fees. Indeed, SKS apparently did not provide Campbell with a copy of her EFL when she initially requested it following receipt of SKS's letter.

Furthermore, SKS's conduct in this litigation also raises serious questions. As noted above, on April 29, 2011, SKS produced

12

to Plaintiffs' counsel Schedule 1 of the SKS-Northern Leasing Purchase Agreement, which purportedly listed all the leases for which SKS purchased rights. On May 2, 2011, Plaintiffs pointed out in their reply in support of their motion for a preliminary injunction that the document did not reflect Campbell's lease. The next day, SKS produced a new Schedule 1, which listed additional leases, including Campbell's.

Plaintiffs also establish that the balance of hardships tips sharply in Campbell's favor. Campbell represents that SKS threatened to refer her purported debt to a collection agency and that her credit report would be negatively affected. Although Mirsky now represents that SKS will not make such a report, this does not mean that, during the pendency of this action, Campbell will not be subject to SKS's collection efforts. SKS contends that it will suffer hardship because, if enjoined from collecting on the leases it purchased, it will be effectively "shut down." Mirsky Injunction Decl. ¶ 24. However, the Court's preliminary injunction will prohibit SKS only from directly debiting bank accounts of individuals with expired, cancelled or otherwise terminated equipment lease agreements; the injunction does not prohibit all collection activity. Furthermore, there is no evidence that SKS is an independent entity with employees who may be affected negatively by an injunction. Indeed, Lease Finance Group, not SKS, is the entity collecting on the leases. Based on Campbell's and SKS's respective showings, the balance of hardships favor Campbell.

Accordingly, Plaintiffs make an adequate showing with respect to the merits of Campbell's claims.

B.   Likelihood of Irreparable Harm

SKS contends that Campbell cannot suffer irreparable harm because money damages are available.  Plaintiffs argue that Campbell is likely to suffer irreparable harm because she may not be able to collect on any judgment against SKS, which they allege to be a shell company.  SKS also argues that Campbell has not suffered damage because it was unsuccessful in extracting funds from Campbell's bank account.

Although the availability of money damages generally precludes a finding of irreparable harm, this rule does not apply "when it is shown that a money judgment will go unsatisfied absent equitable relief."  Alvenus Shipping Co., Ltd. v. Delta Petroleum (U.S.A.) Ltd., 876 F. Supp. 482, 487 (S.D.N.Y. 1994) (citing Hoxworth v. Blinder, Robinson & Co., Inc., 903 F.2d 186, 205 (3d Cir. 1990)).  Here, Plaintiffs have alleged sufficient facts to support their assertion that SKS is a shell company from which Campbell and putative class members may not be able to collect.  Indeed, the Purchase and Servicing Agreements support Plaintiffs' skepticism regarding SKS's corporate status.  These documents show that, although SKS purchased the rights to the leases from Northern Leasing, Northern Leasing and Lease Finance Group, the original lessor, will nevertheless receive the monies from SKS's collection activities.  Further, Plaintiffs proffer some evidence of SKS's relationship with the other Northern Leasing Companies.  Bautista-Perez v. Keisler, 2007 WL 3037611 (N.D. Cal.), does not support SKS's position.  There, the court rejected as speculative the plaintiffs' contention that they might suffer irreparable harm because the United States government "may not have funds available

14

to pay restitution." Id. at *7. Plaintiffs do not make such a speculative argument.

That Campbell's bank account was not debited the $88.50 does not eliminate the likelihood of irreparable harm. As noted above, this action is brought on behalf of others similarly situated. These absent individuals may have monies debited from their bank accounts that they may be unable to recover. Further, in the absence of an injunction, SKS may again attempt to debit Campbell's account.

Accordingly, Plaintiffs establish a likelihood of irreparable harm justifying a preliminary injunction.

C. Public Interest

Plaintiffs contend that a preliminary injunction is in the public interest because SKS's alleged fraud is ongoing and has targeted various small businesses nationwide. SKS does not argue that the public interest prong is not met. Accordingly, the Court concludes that Plaintiffs establish that the public interest weighs in favor of issuing a preliminary injunction.

D. Bond and Scope of Preliminary Injunction

SKS asks the Court to require Plaintiffs to post a bond of $6 million in connection with their requested preliminary injunction. SKS also maintains that the scope of any preliminary injunction must be limited to Campbell.

Courts have wide discretion to require an applicant to post a bond in support of a preliminary injunction. Johnson v. Couturier, 572 F.3d 1067, 1086 (9th Cir. 2009). A court "may dispense with the filing of a bond when it concludes there is no realistic likelihood of harm to the defendant from enjoining his or her

15

conduct." Id. (citation and internal quotation marks omitted). Here, SKS has not justified the necessity of a $6 million bond. SKS proffers no evidence that it will be unable to continue its collection efforts in the event that this litigation is resolved in its favor.

Generally, preliminary injunctive relief "should be limited to apply only to named plaintiffs where there is no class certification," unless extending such relief to an absent class is necessary "to give prevailing parties the relief to which they are entitled." Easyriders Freedom F.I.G.H.T. v. Hannigan, 92 F.3d 1486, 1501-02 (9th Cir. 1996) (citations and internal quotation marks and emphasis omitted); see also L.A. Haven Hospice, Inc. v. Sebelius, 638 F.3d 644, 664 (9th Cir. 2011). Although a class has not yet been certified, the circumstances of this case support broad preliminary injunctive relief. As explained above, Plaintiffs have established a likelihood of irreparable harm to Campbell and the putative class. Accordingly, the Court provides preliminary injunctive relief. This relief will be narrowed in the event Plaintiffs are not able to justify certification of a class.

## CONCLUSION

For the foregoing reasons, the Court GRANTS Plaintiffs' motion for a preliminary injunction (Docket No. 208) and DENIES SKS's motion to compel arbitration (Docket No. 253). A preliminary injunction will issue as a separate order.

IT IS SO ORDERED.

Dated: 6/13/2011

CLAUDIA WILKEN
United States District Judge

16