**United States District Court**
For the Northern District of California

IN THE UNITED STATES DISTRICT COURT

FOR THE NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| JUST FILM, INC.; RAINBOW BUSINESS SOLUTIONS, doing business as PRECISION TUNE AUTO CARE; BURLINGAME MOTORS, INC.; DIETZ TOWING, INC.; THE ROSE DRESS, INC.; VOLKER VON GLASENAPP; JERRY SU; VERENA BAUMGARTNER; TERRY JORDAN; LEWIS BAE; and ERIN CAMPBELL, on behalf of themselves, the general public and those similarly situated,<br><br>　　　Plaintiffs,<br><br>　　v.<br><br>MERCHANT SERVICES, INC.; NATIONAL PAYMENT PROCESSING; UNIVERSAL MERCHANT SERVICES, LLC; UNIVERSAL CARD, INC.; JASON MOORE; NATHAN JURCZYK; ROBERT PARISI; ERIC MADURA; FIONA WALSHE; ALICYN ROY; MBF LEASING, LLC; NORTHERN FUNDING, LLC; NORTHERN LEASING SYSTEMS, INC.; GOLDEN EAGLE LEASING, LLC; LEASE SOURCE-LSI, LLC; LEASE FINANCE GROUP, LLC; JAY COHEN; LEONARD MEZEI; SARA KRIEGER; BRIAN FITZGERALD; SAM BUONO; MBF MERCHANT CAPITAL, LLC; RBL CAPITAL GROUP, LLC; WILLIAM HEALY; JOSEPH I. SUSSMAN; JOSEPH I. SUSSMAN, P.C.; and SKS ASSOCIATES, LLC,<br><br>　　　Defendants. | No. C 10-1993 CW<br><br>ORDER GRANTING IN PART AND DENYING IN PART PLAINTIFFS' MOTION FOR LEAVE TO FILE A THIRD AMENDED COMPLAINT (Docket No. 383), GRANTING IN PART, DENYING IN PART AND DEFERRING IN PART PLAINTIFFS' MOTION TO FILE UNDER SEAL (Docket No. 385) AND SETTING FURTHER DATES |

Plaintiffs Volker von Glasenapp, who was the sole shareholder

of Just Film, Inc. and acquired its assets when it dissolved in

2011; Rainbow Business Solutions, doing business as Precision Tune

Auto Care, and its owner Jerry Su; Verena Baumgartner, doing

business as Burlingame Motors; Dietz Towing, Inc., and its CFO and

Secretary, Terry Jordan; The Rose Dress, Inc., and its owner Lewis
Bae; and Erin Campbell, doing business as Silicon Valley Pet
Clinic, move for leave to file their proposed third amended
complaint (3AC) in this putative class action.  Defendants
Merchant Services, Inc. (MSI), National Payment Processing, Inc.
(NPP), Universal Card, Inc. (UCI), Universal Merchant Services,
LLC (UMS), Jason Moore, Nathan Jurczyk, Robert Parisi, Eric
Madura, Fiona Walshe, Alicyn Roy (collectively, the Merchant
Services Defendants), Northern Leasing Systems, Inc., MBF Leasing
LLC (MBF), SKS Associates LLC (SKS), Jay Cohen, Leonard Mezei,
Sara Krieger, and Sam Buono (collectively, the Leasing Defendants)
oppose the motion.  The motion was taken under submission on the
papers.  Having considered the papers filed by the parties, the
Court GRANTS the motion in part and DENIES it in part.  The Court
also DENIES in part Plaintiffs' motion to file under seal and
DEFERS it in part, and SETS further case management dates.

BACKGROUND

Plaintiffs allege that Defendants defrauded them and the
putative class members in a scheme involving credit and debit card
processing services and equipment.  Below, for brevity, each
individual Plaintiff's last name is used to refer to both that
Plaintiff and his or her business, where it is a separate entity.
Plaintiffs divide the Defendants into two categories: Merchant
Services Defendants and Leasing Defendants.

Plaintiffs refer to MSI, NPP, UCI and UMS collectively as the
Merchant Services Companies and allege that each of them is the
alter ego of the others.  In the proposed 3AC, Plaintiffs allege
that MSI and NPP were created to trick banks and regulators into

United States District Court
For the Northern District of California

believing the Merchant Services Companies were legitimate corporations, and that UMS and UCI were created to hide the illegal activities and proceeds thereof from banks and regulators. Plaintiffs allege the following about the individual Merchant Services Defendants: Moore is the President and in control of each of the Merchant Services Companies, the sole employee, officer, director and shareholder of MSI and NPP, and owns sixty percent of shares in UCI and one hundred percent of shares in UMS; Jurcyzk manages all operations of the Merchant Services Companies, is UCI's Vice President of Operations and holds himself out as the Vice President of MSI and NPP; Parisi owns forty percent of the shares of UCI, is UCI's Senior Vice President and holds himself out as the Senior Vice President of MSI and NPP; Madura is UCI's Manager of Corporate Operations and holds himself out as the Manager of Corporate Operations for MSI and NPP; Walshe was the Regional Sales Manager for the Merchant Services Companies and directed their San Jose, California regional office; and Roy is a Senior Account Executive for the Merchant Services Companies. Plaintiffs contend that the Merchant Services Companies are alter egos of Moore, Jurczyk and Parisi.

Leasing Defendants are entities and individuals based outside of California.  Plaintiffs allege that Northern Leasing owns MBF and controls SKS through a shell company, Pushpin Holdings, LLC. Plaintiffs refer collectively to Northern Leasing, MBF and SKS as the Northern Leasing Companies, each of which is allegedly the alter ego of the others.  The following individuals allegedly directed and controlled the Northern Leasing Companies: Cohen, Northern Leasing's President and CEO; Mezei, Northern Leasing's

Chairman of the Board; Krieger, Northern Leasing's Vice President for Operations, who holds herself out as MBF's Vice President; and Buono, Northern Leasing's former Vice President of Collections and Customer Service, who also holds himself out as MBF's Vice President. Plaintiffs allege that the Leasing Defendants, except Buono, transfer monies obtained through the alleged fraud in shell companies, such as Northern Funding LLC.

In the currently operative second amended complaint (2AC), Plaintiffs generally explain the alleged fraud as follows. Credit and debit card transactions are processed through financial networks, called interchanges, run by entities like Visa and Mastercard. Banks, as members of these interchanges, can sell card processing services directly to merchants, or indirectly through companies and individuals known as Independent Sales Organizations and Merchant Service Providers (ISOs/MSPs). 2AC ¶¶ 67-68. These ISOs/MSPs must be licensed and registered with both Visa and Mastercard, as well as with a bank or a bank-approved processing entity, called a processor. Id. at ¶¶ 67-68.

Merchants pay a fee for each credit and debit card transaction. Id. at ¶ 69. The fee is "shared among (1) the bank that issued the credit or debit card to the customer, (2) the interchange, (3) the bank through whom the merchant is accepting the card, (4) the ISO/MSP that solicited the merchant and/or provides customer service to the merchant (if any) and (5) the third party-processor (if any)." Id. Merchants may also be required to pay for credit and debit card processing equipment, such as card terminals. Id. at ¶ 70.

United States District Court<br>For the Northern District of California

Plaintiffs alleged that Merchant Services Defendants are ISO/MSPs, and Leasing Defendants provided card processing equipment.  Pursuant to a contract, Merchant Services Defendants marketed equipment leases to merchants on behalf of MBF Leasing. 2AC ¶ 133.

When marketing card processing services, the Merchant Services Companies' independent sales agents, such as Walshe, misled merchants about card transaction rates.  In particular, these sales agents used a so-called Rate Sheet, which suggested that the merchants would be charged a fixed rate of 1.79 percent for each card transaction plus a flat monthly service fee.  In fact, however, the rates for each transaction varied based on the type of credit card a consumer used.  Further, not all of the charges associated with card processing services were reflected on the Rate Sheet, even though sales agents represented they were. The Rate Sheet had a signature line for a merchant to affirm that "all fees have been sufficiently explained to my satisfaction." 2AC ¶ 212.  If a merchant decided to seek card processing services through Merchant Services Defendants, the merchant generally was asked to sign an Application for Merchant Agreement.  Sales agents were instructed to represent that the Application reflected "the entire arrangement with the Merchant Services Defendants." Id. at ¶ 257.  However, sales agents did not provide the merchant with the Merchant Card Processing Agreement (MCPA), which provided the terms for card processing services.  The Application referred to the MCPA and instructed the merchant "to review the terms and conditions of a 'Merchant Card Processing Agreement included with this application.'" Id. at ¶ 258.  According to Plaintiffs,

**United States District Court**
For the Northern District of California

although the MCPAs may have their signatures acknowledging the terms, this is because "Merchant Services Defendants create a signed version using scanners and computer programs to copy the signature . . . onto the document." <u>Id.</u> at ¶ 264.

The sales agents also misrepresented the need for and value of leasing card processing equipment from MBF Leasing. Equipment Finance Leases (EFLs) governed merchants' use of this equipment. Some Plaintiffs signed EFLs and some alleged that their signatures on those documents were forged.

Plaintiffs also complain about various fees they were charged, including for a "first and last month" deposit, which was not credited to class members' accounts, and a "cancellation fee," which the Merchant Services Defendants deducted from class members' accounts.

Plaintiffs allege that certain Defendants, without a permissible purpose, inquired into and placed negative notations on certain Plaintiffs' consumer credit reports.

Von Glasenapp, Jordan and other merchants received "letters a couple times a year informing them of their obligation to pay a personal property tax on the equipment they" leased. 2AC ¶ 274. Leasing Defendants determined the amount of this tax and debited it, along with a processing fee, from Von Glasenapp's, Jordan's and other merchants' bank accounts. However, the collected taxes "are not actually due to, nor are they remitted to, any taxing authority." Id. ¶ 278. Instead, the funds were transferred to shell companies owned by Leasing Defendants.

On November 29, 2010, the Court resolved various motions to dismiss Plaintiffs' first amended complaint and allowed Plaintiffs

to file a second amended complaint, to remedy various identified deficiencies.  Docket No. 179.

On August 29, 2011, the Court resolved various motions to dismiss the second amended complaint.  Docket No. 292.  In that order, the Court dismissed some of Plaintiffs' claims against particular Defendants without leave to amend.  The Court stated that, "to the extent that the Court denies leave to amend, it does so because Plaintiffs have failed to state claims, notwithstanding the Court's previous instructions, or because they do not suggest that the claims are not futile," but that, "if Plaintiffs obtain evidence over the course of discovery supporting any claim dismissed by the Court, they may move for leave to amend their complaint."  Docket No. 292, 41.

On February 2, 2012, the Court granted Plaintiffs' motion to dismiss the claims asserted by Plaintiff Burlingame Motors, Inc. and to file an amended pleading to clarify that Burlingame Motors is a fictitious business name of Plaintiff Baumgartner.  Docket No. 335.  Plaintiffs had sought to file a separate document entitled "Amendment No. 1 to Second Amended Complaint."  Docket No. 327.  In the order, the Court required that Plaintiffs "promptly file a third amended complaint incorporating the changes to paragraphs 4 and 8 of the 2AC contained in their proposed amendment."  Id. at 5 (citing Civil Local Rule 10-1 ("Any party filing . . . an amended pleading must reproduce the entire . . . pleading and may not incorporate any part of a prior pleading by reference.")).  Plaintiffs did not file a third amended complaint at that time, and instead have included the changes to paragraphs

United States District Court
For the Northern District of California

four and eight in the proposed third amended complaint at issue now.

On August 23, 2012, Plaintiffs filed the instant motion for leave to file a third amended complaint and simultaneously filed their motion for class certification to prosecute the claims in the proposed third amended complaint. Docket Nos. 383, 387.

On August 24, 2012, Defendants filed various motions to extend time to oppose the motion for class certification until after the motion for leave to amend was resolved. Docket Nos. 388, 389.

On August 31, 2012, the Court granted Defendants' motions to extend time. Docket No. 397. The Court vacated the briefing schedule on the motion for class certification and stated that it would be reset in the order resolving the instant motion.

LEGAL STANDARD

The case management order in this action provided that the deadline to add additional parties or claims was December 1, 2011. Docket No. 276. Under Rule 16(b), "[a] schedule shall not be modified except upon a showing of good cause and by leave of the district judge." Fed. R. Civ. Pro. 16(b). Where a schedule has been filed, a party's ability to amend the pleadings is "governed by Rule 16(b), not Rule 15(a)." Johnson v. Mammoth Recreations, Inc., 975 F.2d 604, 608 (9th Cir. 1992). Therefore, where, as here, a party seeks to amend a pleading after the date specified in a scheduling order, it must first show "good cause" for the amendment under Rule 16(b). Id.

In order to determine whether good cause exists, courts primarily consider the diligence of the party seeking the

modification.  Id. at 609; see also Coleman v. Quaker Oats Co.,
232 F.3d 1271, 1294 (9th Cir. 2000).  "[N]ot only must parties
participate from the outset in creating a workable Rule 16
scheduling order but they must also diligently attempt to adhere
to that schedule throughout the subsequent course of the
litigation."  Jackson v. Laureate, Inc., 186 F.R.D. 605, 607 (E.D.
Cal. 1999).

If good cause is shown, the party must next demonstrate that
the amendment is proper under Rule 15.  Johnson, 975 F.2d at 608.
Under that rule, courts consider five factors when assessing the
merits of a motion for leave to amend: undue delay, bad faith,
futility of amendment, prejudice to the opposing party and whether
the plaintiff has previously amended the complaint.  Ahlmeyer v.
Nev. Sys. of Higher Educ., 555 F.3d 1051, 1055 n.3 (9th Cir.
2009).  Although these five factors are generally all considered,
"futility of amendment alone can justify the denial of a motion."
Id. at 1055.

DISCUSSION

Plaintiffs contend that they discovered new facts during
discovery that support extending liability for certain claims to
other Defendants, beyond those against whom they currently have
stated claims.  Included in these are claims that this Court had
previously dismissed.  Plaintiffs also state that discovery has
revealed additional predicate acts for their RICO claims.
Defendants do not argue that Plaintiffs have acted without
diligence or with undue delay, but instead respond that the
proposed amendments would represent a fundamental change to
Plaintiffs' case, for which Defendants should be permitted to take

United States District Court
For the Northern District of California

further discovery before the class certification motion is briefed, and that the proposed amendments are deficient as a matter of law, making amendment futile.

In addition to these changes, Plaintiffs also seek to change the definitions of proposed subclasses, and add new proposed subclasses, although they keep the same overall class definition. Further, Plaintiffs seek to eliminate references to former Plaintiff Just Film, Inc., which was dissolved in late 2011 with its remaining assets being acquired by its sole shareholder, Von Glasenapp.  It does not appear that Defendants substantively oppose these changes.

I.   Reinstatement of dismissed claims and extension of existing claims

    A. Reinstatement of dismissed claims against Northern Leasing Systems, Inc.

In the August 29, 2011 order, the Court dismissed Plaintiffs' claims against Northern Leasing for RICO violations, common law fraud, breach of contract, breach of implied covenant, negligent misrepresentation, and conversion.  At that time, the Court found that Plaintiffs had not alleged sufficiently that Northern Leasing had participated directly in the alleged misconduct or could be held liable through an alter ego theory based on its relationship with MBF.  The Court described Plaintiffs' allegations of alter ego liability as boilerplate and found that they had not alleged facts to support the theory.

In the proposed 3AC, Plaintiffs seek to add new allegations against Northern Leasing, supporting its direct involvement in the improper activity, and seek to reinstate each of these dismissed claims against it.  Specifically, Plaintiffs now allege that

Northern Leasing was the entity that directed and conducted the wire transfers from class members' bank accounts and received the funds, and that Northern Leasing had instructed its banks to put in the description field the name of a shell company that it had set up, such as MBF, so that the true identity of the company making the withdrawals was obscured.  See, e.g., Proposed 3AC ¶¶ 86, 92, 462.  They also allege that Northern Leasing was in fact the entity that had performed all of the conduct that was purportedly done by MBF, including sending mailings and making phone calls to collect debts.  See, e.g., id. at ¶¶ 490, 492-99. In their reply, Plaintiffs clarify that they are not alleging that Northern Leasing should be held liable under an alter ego theory, but rather are alleging that it should be held liable directly because it was in fact the wrongdoer.  Plaintiffs assert that they learned this only in the discovery process.

Defendants do not argue that Plaintiffs have insufficiently plead the involvement of Northern Leasing in the claims for RICO violations, common law fraud, breach of contract, breach of implied covenant, negligent misrepresentation, and conversion. Instead, they argue that the new RICO predicate acts are insufficiently plead, as to Northern Leasing as well as other Defendants.  This argument will be addressed below.  Because Defendants have not shown that Plaintiffs' claims are otherwise futile, and because Plaintiffs have now alleged Northern Leasing's direct involvement in the conduct at issue in these claims, Plaintiffs may reinstate these claims against Northern Leasing.

B. Reinstatement of dismissed FCRA claims against Universal
   Card, Inc.

In the August 29, 2011 order, the Court held that "Von
Glasenapp and Bae state FCRA claims against Universal Merchant
Services, Northern Leasing and MBF Leasing."  Docket No. 292, 32.
However, the Court dismissed the FCRA claim against other
Defendants, including Universal Card, Inc. (UCI), as based on
"boilerplate alter ego allegations."  Id.

Plaintiffs seek to make the FCRA claim against Universal
Merchant Services LLC against UCI as well.  Plaintiffs allege that
Universal Merchant Services LLC was purportedly dissolved
(although they allege that the dissolution process was not done
properly and that it is still recognized as a corporate entity by
the state of California) and its assets were transferred to UCI.
Proposed 3AC ¶ 231.  Plaintiffs also allege when Moore registered
with Experian on behalf of UCI to conduct credit inquiries, he
stated that the company name was "Universal Merchant Services,"
even though that company had been purportedly dissolved, and "that
the 'Affiliated or Parent Company' of Universal Merchant Services
was 'Universal Card, Inc.'"  Id. at ¶ 423.  Plaintiffs further
allege that UCI, using the registration obtained with Experian
under the name of Universal Merchant Services LLC, conducted
multiple inquiries on Von Glasenapp's credit report, and that it
used the Universal Merchant Services name, so that, if Von
Glasenapp saw the inquiry on his credit report, he would be unable
to hold UCI responsible.  Id. at ¶ 485, 501.  Plaintiffs represent
that they learned during UCI's Rule 30(b)(6) deposition that it
was UCI that had the relationship with Experian.  Mot. at 7.

United States District Court
For the Northern District of California

Defendants have not opposed the resurrection of the FCRA claim against UCI. In fact, Defendants acknowledge that Universal Merchant Services LLC became UCI and that "UCI assumed all debts and obligations of UMS." Opp. at 13 n.12. Accordingly, Plaintiffs may amend to reinstate the FCRA claim against UCI.

C. Reinstatement of dismissed conversion claims against certain Merchant Services Defendants

In the 2AC, Plaintiffs alleged that "Defendants have used ACH withdrawal to extract sums of money from the bank accounts of Plaintiffs and the Class to which they have no right," and that the Merchant Services Defendants specifically had withdrawn "sums equivalent to the first and last month's payment on the equipment finance leases, when in fact the funds were not credited to class members accounts, but rather, counted towards Merchant Services Defendants['] own revenues." See 2AC ¶¶ 270-72, 350, 670-73.

In the August 29, 2011 order, the Court held that Plaintiffs stated a claim for conversion against MSI, which they alleged had made the actual withdrawal, but dismissed their claims against the other Merchant Services Defendants for failure to allege facts to support the alter ego theory of liability. Docket No. 292, 34.

Plaintiffs now seek to re-allege conversion claims against UCI, NPP, Jurczyk, Moore and Parisi, based on their direct involvement in the purported conversion, and to add additional allegations regarding how the conversion was carried out. Plaintiffs also seek to add a new theory of conversion, alleging that MSI, UCI, NPP, Jurczyk, Moore and Parisi used so-called "gray ACH forms" that purported to authorize "Merchant Services" or "Universal Merchants Services," unregistered fictitious entities,

**United States District Court**
For the Northern District of California

1  to make withdrawals and that the true identity of the company

2  receiving the funds obtained through these forms was never

3  disclosed to Plaintiffs and class members.  Plaintiffs aver that,

4  because the class members had no knowledge of who received the

5  funds, they could not have authorized the deductions.  See, e.g.,

6  Proposed 3AC ¶ 831.  To their theory that Defendants used the ACH

7  forms to make withdrawals that were not authorized, Plaintiffs

8  seek to add allegations that these Defendants trained their sales

9  agents to leave the amount on the gray ACH form blank and to fill

10  it in with an unauthorized "commission," typically equal to one or

11  two months of lease payments plus taxes, after the class members

12  had signed the forms.  Id. at ¶¶ 361-367.  They also ask to add

13  allegations that these Defendants wrongfully used these forms to

14  collect unauthorized cancellation fees from the class members.

15  Id. at ¶¶ 836-37.  Finally, Plaintiffs seek to allege that these

16  Defendants used gray ACH forms from before July 2007 to collect

17  from merchants fees for chargebacks and insufficient funds that

18  were not authorized specifically on those forms.  Id. at

19  ¶¶ 368-72.

20      Targeting only the allegations that these Defendants did not

21  disclose to Plaintiffs who the ACH form actually authorized to

22  make deductions, Merchant Services Defendants argue that

23  Plaintiffs' new conversion theories inadequately plead damages.

24  They argue that Plaintiffs do not dispute that they signed ACH

25  forms authorizing someone to debit their accounts and that

26  Plaintiffs have not alleged that their accounts were debited by

27  more than the amount reflected on the ACH forms or that someone

28  else tried to collect this amount again.  Defendants also contend

that UCI has registered "Merchants Services of Irvine" as a fictitious business name in Orange County.

These arguments are unavailing for a number of reasons.  That someone may have been authorized to debit Plaintiffs' accounts does not mean that Plaintiffs cannot be harmed if a different, unauthorized person or entity has done so instead.  Plaintiffs may remain obliged to make a payment to the authorized entity. Further, Plaintiffs have disputed the legitimacy of the ACH forms, including the amount written on these forms: they have alleged that the amount was blank when they signed it, so no amount was authorized to be deducted, and that Merchant Services Defendants' agents filled in these amounts after the forms were signed.  They also allege that the forms were used to collect amounts to which these Defendants were not entitled, such as invalid cancellation fees.  That they have not alleged that the amounts were collected twice is not determinative.  Further, Plaintiffs do plead that some amounts were collected again: they have alleged that Merchant Services Defendants did not credit the "commission" in the form of multiple months of lease payments to Plaintiffs' accounts, so they were responsible for making lease payments for those additional months again.  See, e.g., Proposed 3AC ¶ 366.  Finally, Plaintiffs have alleged that the ACH forms authorized "Merchant Services" or "Universal Merchant Services," not "Merchant Services of Irvine,"

United States District Court
For the Northern District of California

UCI's registered fictitious business name.[1]  As Plaintiffs have noted, none of the Defendants has registered the fictitious business names used on the forms, although others have registered "Merchant Services."  UCI's registration of a similar, but not identical, fictitious business name does not, as a matter of law, prevent Plaintiffs from being able to establish that its use of this name was misleading.  In the 2AC and proposed 3AC, Plaintiffs have alleged that Merchant Services Defendants used the name "Universal Merchant Services" to imply that it was affiliated with "the legitimate Universal Savings Bank" and the name "Merchant Services" to suggest that they were the merchant services division of numerous reputable banks, such as JP Morgan Chase and Wells Fargo.  2AC ¶¶ 166-67; Proposed 3AC ¶¶ 229-30.

Defendants also contend that Plaintiffs have continued to engage in "categorical pleading," failing to identify the specific role each entity or individual played in the alleged conversion. Plaintiffs reply that they have alleged that "in their capacity as officers of UCI, Defendants Moore, Parisi, and Jurcyzk created the 'gray ACH form,' the tool central to Defendants' ability to convert the funds; transferred the money to either UCI, NPP, MSI, or a shell company controlled by one of those defendants; and worked together to hide the responsible party."  Reply at 3 (citing Proposed 3AC ¶¶ 360-61, 461, 517, 580).  In the cited

---

[1] Defendants have asked the Court to take judicial notice of UCI's registration of "Merchant Services of Irvine," and Plaintiffs have requested that the Court take judicial notice of the results of a search of the Orange County database for fictitious business names for "Merchant Services" and "Universal Merchant Services."  Neither party objects to the other's request. The Court grants both parties' unopposed requests.

United States District Court
For the Northern District of California

paragraphs, however, Plaintiffs do not allege that Moore, Parisi, and Jurcyzk, or the entities, created these forms or took these other actions, and instead continue to group them together, with limited exceptions.  Plaintiffs do specifically allege that UCI was the one which performed the withdrawals and that Parisi was the one who ordered each withdrawal and directed that changes be made to the gray ACH form.  Thus, because they have identified specific actions taken by UCI and Parisi in furtherance of the alleged conversion, Plaintiffs may pursue this claim against these two Defendants.

Plaintiffs also argue that liability can be alleged against all of these Defendants because, although they have not alleged who received the money and instead have plead vaguely that the money was transferred to "UCI or the bank account of Parisi, Moore, Jurcyzk, MSI, NPP, UMS, or a shell company," see, e.g., Proposed 3AC ¶ 517, this is nonetheless permissible "because, as Plaintiffs allege, Defendants do not know" who received the money "either."  Reply at 3.  Although they do not cite where they made this allegation, Plaintiffs appear to be referring to paragraph 360 of the proposed 3AC in which they allege:

> Parisi testified that the entity receiving the funds was "Merchant Services," but refused to provide any more specifics.  Jurcyzk (personally and on behalf of UCI) testified that UCI would use the form to collect amounts owed to it, but would not state whether UCI was the only company that received the funds, refusing to make generalizations about the uses of the Gray ACH forms. While Moore testified that MSI and NPP do not conduct the ACH withdrawals, Jurcyzk testified that UCI often makes ACH withdrawals for monies owed to MSI and NPP.

Proposed 3AC ¶ 360.  Elsewhere in the proposed 3AC, Plaintiffs have also alleged that MSI and NPP have orally subcontracted out

to UCI their non-existent "right" to collect certain sums.  Id. at

¶ 421.  There is nothing in these allegations that supports

extending liability to Jurcyzk or Moore.  Further, it is

irrelevant that Defendants have not given Plaintiffs proof of who

received the funds; Plaintiffs are required to plead their claims

sufficiently, and ultimately have the burden of proving their

claims as to each Defendant.  However, because Plaintiffs have

alleged that UCI made at least some of the ACH withdrawals on

behalf of NPP, which authorized it to do so, Plaintiffs may pursue

this claim against NPP as well.[2]

    Accordingly, the Court grants Plaintiffs leave to amend to

add the new allegations supporting their conversion claims and to

re-allege these claims against Parisi, UCI and NPP, but not

against Jurczyk and Moore.

II.  New RICO predicate acts

    The Court has already found that Plaintiffs' RICO claims were

properly plead against the Merchant Services Defendants and the

Leasing Defendants, except Northern Leasing.  In this motion,

Plaintiffs seek leave to add additional predicate acts and

allegations to their already existing and properly plead RICO

claims, which were originally based on wire and mail fraud.

Defendants only challenge Plaintiffs' amendments that fall into

two categories: (1) misrepresentations made by the Merchant

Services Defendants to third parties, other than class members,

including alleged breaches of these third parties' regulations or

---

    [2] As noted above, the conversion claim was previously upheld
as sufficiently plead against MSI.

United States District Court
For the Northern District of California

contracts with them, as further acts of wire and mail fraud; and (2) allegations that Northern Leasing, Cohen and Mezei engaged in bribery and witness tampering, new predicate acts.  Although Defendants characterize the first of these as new claims for fraud or misrepresentation, they are alleged only as RICO predicate acts, not as a new basis for the fraud and misrepresentation claims.

A. Fraud involving third parties

In the proposed 3AC, Plaintiffs seek to add the following allegations regarding third parties.  To become an ISO/MSP, a sales company must agree to adhere to rigid rules set by Visa, MasterCard and the authorizing processors.  Proposed 3AC ¶ 67. These rules and their agreements with these entities, among other things, govern the types of fees that ISOs are allowed to charge and collect from merchants, forbid subcontracting of sales and marketing services and require ISOs to assume all liability for their employees' and agents' acts.  Id. at ¶¶ 67, 240.  MSI and NPP are registered with Visa, MasterCard and the processors, while UCI is not, but is subcontracted to perform all marketing, sales and support in connection with the Merchant Services Defendants' credit card processing, in violation of the agreements with the processors, Visa and MasterCard.  Id. at ¶¶ 70, 239-40, 275.

Moore, in concert with Parisi and Jurcyzk, allegedly has made numerous false representations to Visa, MasterCard and the processors to induce them to grant NPP and MSI the authority to market and sell credit card services, and to trick them into believing that NPP and MSI continue to be in compliance.  Id. at ¶ 240.  NPP and MSI told these entities that they were based at an

United States District Court
For the Northern District of California

United States District Court
For the Northern District of California

address in Irvine, California, which is actually UCI's address, instead of at the address in Corona del Mar, California that they have stated was theirs during this litigation. Id. at ¶¶ 241, 698. They did this because they knew that, if Visa, Mastercard or the processors ever conducted an audit, they would immediately know that the Corona del Mar location did not meet basic security standards which would reveal that these are not legitimate companies. Id. Jurcyzk regularly corresponds with the processors and holds himself out as the Vice President but does not tell them that he is the Vice President of UCI, not of NPP or MSI. Id. at ¶ 242. Moore, Jurcyzk and UCI tell the processors that NPP and MSI do business as "Merchant Services," although they have not registered this name and denied at deposition that they do business as "Merchant Services." Id. at ¶ 243. UCI, however, does do business under this name. Id. NPP and MSI do not tell the processors that the sales agents and staff of UCI are independent contractors, which cannot be used pursuant to their contracts. Id. at ¶ 245. Instead, UCI gives these agents legitimate-sounding titles, like "Account Executive," to obscure this fact. Id. UCI also requires the agents to use business cards with the logo of "Merchant Services" and a statement that "Merchant Services" is a "Registered ISO/MSP" of the processor. Id. Merchant Services Defendants entered into credit card payment processing contracts with class members on behalf of the processors and mailed, faxed and emailed these to the processors, "making the implicit representation that the contracts were secured in compliance with NPP's and MSI's contracts with the

United States District Court
For the Northern District of California

Processors, as well as governing Visa and Mastercard rules." Id. at ¶¶ 702, 722.[3]

The Merchant Services Defendants also allegedly charged merchant customers fees in violation of Visa and Mastercard's regulations and NPP's and MSI's agreements with the processors. Merchants who enroll in credit card processing services typically enter into a contract with a processor. Id. at ¶ 347. Under Visa's and Mastercard's regulations, ISOs are prohibited from directly assessing or collecting fees associated with this

---

[3] Merchant Services Defendants make several evidence-based arguments that these allegations are false and that Plaintiffs should not be allowed to amend their pleading to add them. The Court rejects these arguments for a number of reasons.

First, they argue that Plaintiffs will be unable to prove that Merchant Services Defendants concealed that NPP and MSI are located in Corona del Mar, California, because this address is a matter of public record. Opp. at 5. In support, they request that the Court take judicial notice of print-outs they have submitted from the California Secretary of State's website that shows business entity detail for NPP and MSI and lists their addresses in Corona Del Mar. Defs.' Request for Judicial Notice, Exs. A, B. However, as Plaintiffs point out, these printouts show information that was "current as of Friday, August 31, 2012" and do not show the information that was on file with the California Secretary of State throughout the class period.

Second, they state that, at recent depositions, Merchant Services Defendants themselves testified that "Visa and MasterCard do conduct regular audits of MSI and NPP, are aware of MSI and NPP's respective subcontracts with UCI, and have approved of these relationships," including in August 2011, and that neither "Visa nor MasterCard has ever indicated that MSI's or NPP's subcontract with UCI violates any terms of their agreement." Opp. at 5. Notably, Merchant Services Defendants have made only general statements about the content of their deposition testimony and have not offered it into evidence.

Finally, although such evidence may be appropriate in a motion for summary judgment to support an argument that there was no causal connection between Merchant Services Defendants' alleged misrepresentations to MasterCard, Visa and the processors and harm to class members, evidence-based arguments such as these are not appropriate at the pleading stage.

contract from the merchant.  Id.  Instead, the processor collects
fees from the merchant and pays the ISO a share.  Id.  Further,
NPP's contract with a processor, Transfirst LLC, prohibited NPP
from directly assessing merchants' bank accounts for fees
associated with the merchants' contracts with Transfirst; instead,
the merchants provided Transfirst with ACH authorization to debit
and credit their accounts for fees associated with credit card
processing, and Transfirst gave NPP a share.  Id. at ¶ 348.
Plaintiffs allege that, when Merchant Services Defendants enrolled
merchants in processing services with Transfirst, they altered
Transfirst's terms of service to contain an early termination fee,
although they did not usually show these terms to customers at
all.  Id. at ¶¶ 350-52.  Plaintiffs also allege that, when
customers cancelled their contracts with processors, Merchant
Services Defendants either used this early termination fee to
scare the customers into continuing with their contracts (if the
customers were valuable ones) or directly collected the fee from
the customers' bank accounts, using the banking information that
the customer provided when enrolling in the processing services.
Id. at ¶¶ 353-56.

    Plaintiffs also allege that the Merchant Services Defendants
improperly tried to collect monies that merchants did not pay to
the processor.  In their agreements with processors, in exchange
for being paid a higher share of revenue, MSI and NPP agreed to
accept the financial risks related to the merchants that they
enrolled; under this arrangement, if a merchant defaulted on debts
owed to the processor, the processor could deduct those fees from
the amount paid to MSI and NPP.  Id. at ¶ 420.  Although, under

United States District Court
For the Northern District of California

the Visa and Mastercard regulations, they were prohibited from

collecting directly from merchants debts owed under the agreements

between the merchants and processors, MSI and NPP have orally

purported to subcontract to UCI the non-existent "right" to

collect losses.  Id. at ¶ 421.  As a result, UCI has mailed

hundreds or thousands of collections letters to merchants,

conducted credit inquiries, reported debts to credit bureaus and

turned over debts to third party collection agencies.  Id. at

¶ 422.

Finally, Plaintiffs allege that the Merchant Services

Defendants used "fraudulent ACH forms" to represent falsely to

banks that they were authorized to deduct money from class

members' accounts.  Plaintiffs allege that these forms were

fraudulent because they listed a non-existent entity as the

recipient and merchants were never told what entity would be

receiving the funds.  See, e.g., id. at ¶¶ 358-361, 461.  Thus,

according to Plaintiffs, when "UCI, on behalf of itself, other

Defendants, or its alter-egos, make the ACH withdrawal, they are

making a false representation to the bank that that entity has

explicit authorization of the merchant to conduct the withdrawal

to induce the bank to permit them to deduct the funds from the

class member's account," which "UCI knows . . . to be false, as

the class cannot give authorization to a fictitious non-entity."

Id. at ¶ 358; see also id. at ¶ 372.  Plaintiffs also state that

Merchant Services Defendants falsely represented to the banks that

they were authorized to make the ACH withdrawals for certain sums

of money to which they were not actually entitled, including for

the improper cancellation fees and other debts under the

23

1    processing contract between the merchant and the processor that
2    are described above.  <u>See, e.g.</u>, <u>id.</u> at ¶¶ 353, 461, 481, 501,
3    517, 545, 580, 718.

4        Merchant Services Defendants argue that Plaintiffs have not
5    plead adequately that they themselves relied on these purported
6    misrepresentations to third parties.  They also contend that
7    Plaintiffs do not have standing to bring claims based on
8    misrepresentations to third parties, because they have not alleged
9    sufficiently that they suffered an injury in fact that was caused
10   by the misconduct.

11       RICO creates a private cause of action for "[a]ny person
12   injured in his business or property by reason of a violation of
13   section 1962 of this chapter."  18 U.S.C. § 1964(c).  Section
14   1962(c), in turn, makes it "unlawful for any person employed by or
15   associated with any enterprise engaged in, or the activities of
16   which affect, interstate . . . commerce, to conduct or
17   participate, directly or indirectly, in the conduct of such
18   enterprise's affairs through a pattern of racketeering activity,"
19   and § 1962(d) makes it "unlawful for any person to conspire to
20   violate" subsection (c).  "Racketeering activity" is defined to
21   encompass a variety of predicate acts that are set forth in 18
22   U.S.C. § 1961(1), including mail fraud, wire fraud, witness
23   tampering, and bribery.  A "'pattern of racketeering activity'
24   requires at least two acts of racketeering activity."  18 U.S.C.
25   § 1961(5).

26       "To have standing under civil RICO, [a plaintiff] is required
27   to show that the racketeering activity was both a but-for cause
28   and a proximate cause of his injury."  <u>Rezner v. Bayerische</u>

United States District Court
For the Northern District of California

**United States District Court**
For the Northern District of California

Hypo-Und Vereinsbank AG, 630 F.3d 866, 873 (9th Cir. 2010).  See
also Hemi Group, LLC v. City of New York, 130 S. Ct. 983, 989
(2010) (citing Holmes v. Sec. Investor Prot. Corp., 503 U.S. 258,
268 (1992)).  "When a court evaluates a RICO claim for proximate
causation, the central question it must ask is whether the alleged
violation led directly to the plaintiff's injuries."  Anza v.
Ideal Steel Supply Corp., 547 U.S. 451, 461 (2006) (emphasis
added).  There must be "'a direct causal connection' between the
predicate wrong and the harm."  Hemi Group, 130 S. Ct. at 994
(quoting Anza, 547 U.S. at 460).  "A link that is too remote,
purely contingent, or indirect is insufficient."  Id. at 989
(internal quotation marks and formatting omitted).  "In some
cases, reliance may be 'a milepost on the road to causation.'"
Poulos v. Caesars World, Inc., 379 F.3d 654, 664 (9th Cir. 2004)
(quoting Blackie v. Barrack, 524 F.2d 891, 906 n.22 (9th Cir.
1975)).

However, Merchant Services Defendants are incorrect when they
argue that Plaintiffs must allege that they themselves were aware
of, and personally relied upon, the purported misrepresentations.
In Bridge v. Phoenix Bond & Indemnity Co., 553 U.S. 639 (2008),
the Supreme Court held that first-party reliance is not an element
of a RICO claim based on mail fraud or required to establish
proximate causation, and that "a person can be injured 'by reason
of' a pattern of mail fraud even if he has not relied on any
misrepresentations."  Id. at 649-54.  In so holding, the Court
noted that plaintiffs still may be required to show that someone
had relied on the misrepresentations in order to prove proximate
causation ultimately.  Id. at 658-59 ("none of this is to say that

United States District Court
For the Northern District of California

a RICO plaintiff who alleges injury 'by reason of' a pattern of mail fraud can prevail without showing that <u>someone</u> relied on the defendant's misrepresentations") (emphasis in original).  In <u>Bridge</u>, the Court emphasized that proximate causation is "a flexible concept that does not lend itself to a black-letter rule that will dictate the result in every case."  <u>Id.</u> at 654 (internal quotation marks and citations omitted).  Instead, proximate causation is the label given to "the judicial tools used to limit a person's responsibility for the consequences of that person's own acts, with a particular emphasis on the demand for some direct relation between the injury asserted and the injurious conduct alleged."  <u>Id.</u> (internal quotation marks and citations omitted).

Further, as Plaintiffs argue, to establish standing, they are not required to show that each individual predicate act caused them an injury, but rather that the pattern of racketeering activity did.  In <u>Sedima, S.P.R.L. v. Imrex Co.</u>, 473 U.S. 479 (1985), the Supreme Court stated that the plaintiff is required to plead "compensable injury [consisting of] harm caused by predicate acts sufficiently related to constitute a pattern."  <u>Id.</u> at 497. The Seventh Circuit has explained that, after establishing that predicate acts are sufficiently related to constitute a pattern of racketeering activity, "a plaintiff need not demonstrate injury to himself from each and every predicate act making up the RICO claim."  <u>Corley v. Rosewood Care Ctr.</u>, 388 F.3d 990, 1004 (7th Cir. 2004) (discussing <u>Marshall & Ilsley Trust Co. v. Pate</u>, 819 F.2d 806, 809-10 (7th Cir. 1987)).  Instead, the plaintiff must prove only "an injury directly resulting from some or all of the activities comprising the violation."  <u>Marshall</u>, 819 F.2d at 809.

United States District Court
For the Northern District of California

See also Deppe v. Trippe, 863 F.2d 1356, 1366 (7th Cir. 1988)("no
requirement exists that the plaintiff must suffer an injury from
two or more predicate acts, or from all of the predicate acts. . .
Thus, a RICO verdict can be sustained when a pattern of
racketeering acts existed, but when only one act caused injury.");
Kearny v. Hudson Meadows Urban Renewal Corp., 829 F.2d 1263, 1268
(3d Cir. 1987) (finding that the statute required only injury from
"any predicate act," not all, and stating that a contrary holding
would mean that, "[f]or example, if an organized crime group were
to operate a protection racket, extorting money from each merchant
in a community, then each merchant's injury would be separate, and
therefore, . . . none could recover"); Edgenet, Inc. v. GS1,
AISBL, 742 F. Supp. 2d 997, 1015 n.6 (E.D. Wis. 2010) (noting that
the Supreme Court did not hold otherwise in Hemi Group); Gregory
P. Joseph, Civil RICO: A Definitive Guide 58-59 (3d ed. 2010) ("As
long as the pattern of racketeering activity has caused harm to
the plaintiff's business or property, the plaintiff has RICO
standing.  The plaintiff is not obliged to plead or prove that it
has been injured by multiple predicate acts, as long []as it has
been injured by at least one predicate act.").  Defendants cite no
cases stating that plaintiffs must plead or prove that they were
harmed by each predicate act alleged.

Here, the Court has already found that Plaintiffs have
properly plead RICO claims, which they had standing to pursue.
See Docket No. 179, 29-30.  In addition, they allege that they
have been directly injured by at least one of the new predicate
acts; Plaintiffs have alleged that Merchant Services Defendants
represented to banks and ACH providers that they were authorized

**United States District Court**
For the Northern District of California

1   to debit money from class members' accounts, even though they were

2   not entitled to collect these amounts, and that money was

3   unlawfully taken from their bank accounts as a result.  Merchant

4   Services Defendants do not contest that the new alleged predicate

5   acts are related enough to the predicate acts previously plead or

6   to each other to constitute part of the same pattern of

7   racketeering.  Accordingly, the Court finds that these are not

8   barred as a matter of law for failure to plead standing or

9   reliance.

10      Finally, Merchant Services Defendants contend that the

11  allegations of new predicate acts based on misrepresentations to

12  Visa, MasterCard and the processors do not comply with the

13  requirements of Rule 9(b).  See Edwards v. Marin Park, Inc., 356

14  F.3d 1058, 1066 (9th Cir. 2004) (the heightened pleading

15  requirements of Rule 9(b) apply to RICO predicate acts based on

16  fraud).  Defendants specifically identify paragraphs 240, 720 and

17  722 as conclusory.  However, as Plaintiffs point out, other parts

18  of the proposed 3AC give sufficient details of the fraud that they

19  claim Merchant Services Defendants perpetrated on Visa, MasterCard

20  and the processors.  For example, in paragraph 722, Plaintiffs do

21  not explain how Merchant Services Defendants purportedly made "the

22  implicit representation that the contracts were secured in

23  compliance with NPP's and MSI's contracts with the Processors, as

24  well as governing Visa and Mastercard rules."  However, elsewhere

25  in the proposed pleading, Plaintiffs have explained with

26  specificity what compliance with these rules and contracts

27  entailed and how Merchant Services Defendants allegedly had

28  violated these requirements and concealed this from Visa,

Mastercard and the processors.  Further, even if Plaintiffs had not sufficiently plead the misrepresentation to third parties, Rule 9(b)'s pleading requirement may be relaxed "where evidence of fraud is exclusively in the defendant's possession," such as where the plaintiffs themselves were not directly involved in the purportedly fraudulent conduct.  Sanford v. MemberWorks, Inc., 625 F.3d 550, 558 (9th Cir. 2010) (citing United States ex rel. Lee v. Smith-Kline Beecham, Inc., 245 F.3d 1048, 1052 (9th Cir. 2001)). Finally, even if some of the predicate acts are plead less specifically than others, there are sufficient specifically plead predicate acts to support the RICO claim.

Accordingly, the Court grants Plaintiffs' request to amend to allege new predicate acts based on Merchant Services Defendants' purported misrepresentations to third parties.

B. Anti-bribery and witness tampering claims

Plaintiffs also request leave to add allegations related to two new predicate acts against the Leasing Defendants. Specifically, Plaintiffs seek to add allegations that Northern Leasing, Cohen and Mezei committed witness tampering and bribery, which they explain as follows.  When Plaintiffs filed the 2AC in this action, they believed that SKS Associates was the entity conducting the improper ACH transactions.  Thus, they sought a preliminary injunction to prohibit SKS Associates from continuing its tax collection efforts.

According to Plaintiffs, at that time, Northern Leasing took a number of improper steps to trick the Court into believing that Northern Leasing was not involved in the transactions.  Proposed 3AC ¶ 215.  Cohen and Mezei, on behalf of themselves and Northern

Leasing, created a fake "Purchase Agreement" that purported to transfer the right to collect taxes from certain individuals from Northern Leasing to SKS Associates. <u>Id.</u> at ¶ 216. They also created a shell company to serve as SKS Associates' manager and hired Mezei's nephew, Jonathan Mirsky, to act as the shell company's Vice President. <u>Id.</u> at ¶¶ 218-19. Mezei and Cohen each took steps to have Mirsky sign a declaration, which they knew contained false and misleading information, including that the Purchase Agreement was valid, and led Mirsky to believe that the contents of the declaration were accurate. <u>Id.</u> at ¶¶ 217-20. SKS Associates then submitted the declaration to this Court in connection with its opposition to Plaintiffs' motion for a preliminary injunction and in support of its motion to compel arbitration. <u>Id.</u> at ¶ 221. Mezei allegedly paid Mirsky $20,000 for his role. <u>Id.</u> After Plaintiffs subpoenaed the shell corporation, Leasing Defendants took steps to dissolve it. <u>Id.</u> at ¶ 222.

In addition, in August 2011, the New York Attorney General subpoenaed Northern Leasing and SKS Associates to provide two witnesses to testify regarding SKS's tax collection scheme. <u>Id.</u> at ¶ 223. Plaintiffs claim that Northern Leasing persuaded Cortes Derussy, an employee without relevant knowledge, to testify. <u>Id.</u> at ¶¶ 223-25. It knowingly provided Derussy with false information in advance of his testimony in order to prevent or delay the testimony of those with actual knowledge of the fraudulent scheme and to ensure that Plaintiffs in this litigation did not learn the information. <u>Id.</u> at ¶¶ 223-26, 743.

**United States District Court**
For the Northern District of California

Plaintiffs contend that these activities constitute witness tampering in violation of 18 U.S.C. § 1512(b) and (c) and bribery in violation of 18 U.S.C. § 201(b)(3), in furtherance of the enterprise.

Leasing Defendants oppose Plaintiffs' request to add these allegations.  They argue that Plaintiffs do not have standing to allege these predicate acts because they cannot plead that their business or property has been injured by the conduct, and that they have not alleged proximate causation between these new predicate acts and the harm they have suffered.

As discussed above, Plaintiffs need not plead or prove that they have suffered harm as a result of each individual predicate act, but rather that the predicate acts are all part of a pattern of racketeering activity and that they have suffered harm as a direct result of at least one predicate act.  Defendants have not challenged that these predicate acts are alleged to be part of the same pattern of racketeering activity, and it appears that Plaintiffs have plead this adequately.  See Turner v. Cook, 362 F.3d 1219, 1229 (9th Cir. 2004) (quoting H.J. Inc. v. Nw. Bell Tel. Co., 492 U.S. 229, 239 (1989) ("A 'pattern' of racketeering activity . . . requires proof that the racketeering predicates are related and 'that they amount to or pose a threat of continued criminal activity.'").  Plaintiffs have plead that the alleged witness tampering and bribery were undertaken in order to conceal the role of Northern Leasing in the debt collection scheme and to allow it to continue, and that the predicate acts have taken place over the course of several years.

1    Thus, Plaintiffs have alleged sufficiently that the predicate

2    acts are part of the same pattern of racketeering and that they

3    have been directly harmed by at least one of the predicate acts.

4    Because they have alleged injury and standing sufficiently, the

5    Court grants Plaintiffs leave to amend to add these predicate

6    acts.

7    III. Discovery

8    Defendants argue that, if leave to amend is granted, they

9    should be permitted to "reopen class discovery with respect to any

10   permitted new claim and/or class(es), including re-opening the

11   depositions of the named plaintiffs and conducting additional

12   written discovery to investigate the new theories and new

13   classes."  Opp. at 19.  They also request that class certification

14   briefing be "adjourned until such additional discovery is

15   completed."  Id.  Defendants state that one example of the further

16   discovery they want to take is to investigate Plaintiffs'

17   "personal knowledge of the purported misrepresentations" to third

18   parties, "their supposed reliance thereon, and any resulting

19   damage."  Id.

20   The Court notes that it has not set a separate "class

21   discovery" deadline and that the fact discovery deadline is April

22   19, 2013.  See Docket Nos. 276, 367.  Accordingly, there is no

23   need to "reopen class discovery" as Defendants have requested.

24   If Defendants seek to take further depositions of individuals

25   whom they have already deposed, they shall meet and confer with

26   Plaintiffs on this topic and, if they are unable to reach an

27   agreement, they shall seek permission from the discovery

28   Magistrate Judge in compliance with her Order regarding Discovery

**United States District Court**
For the Northern District of California

32

Procedures.  See Docket No. 313.  In any discovery motion that Defendants may file on this issue, they shall clearly explain what they need to ask these individuals.  The Court notes that the example that Defendants have provided here would not justify allowing further depositions of the named Plaintiffs because, as explained above, Plaintiffs' theory regarding the misrepresentations to third parties is not that Plaintiffs themselves relied or knew about the misrepresentations but that the third parties did, to Plaintiffs' detriment.

The Court resets the briefing schedule on Plaintiffs' motion for class certification, as set forth below.

IV.  Plaintiffs' Motion to Seal

Concurrently with their motion for leave to file a 3AC, Plaintiffs filed a motion for leave to file under seal a number of documents, including portions of their motion for class certification and its supporting evidence, portions of the motion for leave to file a 3AC, and portions of Exhibit A thereto, which contained their proposed 3AC.  Docket No. 385.  In subsequent declarations filed pursuant to orders issued by this Court, Plaintiffs have represented that they requested that portions of the motion for leave to file a 3AC and of the proposed 3AC be sealed because they contain allegations, facts or arguments based on documents and testimony that were designated as confidential by either Leasing Defendants or Merchant Services Defendants.  See Simplicio Decl., Ex. A, Docket No. 411; Simplicio 1st Suppl. Decl., Ex. D, Docket No. 420.

Local Rule 79-5(d) provides that, when a party files an administrative motion seeking to submit material under seal that

United States District Court
For the Northern District of California

United States District Court
For the Northern District of California

another party to the action has designated as confidential, the
designating party must file a declaration establishing that the
information is sealable.  Civil L.R. 79-5(d).  "If the designating
party does not file its responsive declaration . . . , the
document or proposed filing will be made part of the public
record."  Id.

Leasing Defendants have filed several declarations in support
of the motion to seal.  See Nigro Decl., Docket No. 419; Nigro
Suppl. Decl., Docket No. 423; Krieger Decl., Docket No. 423.  In
these declarations, Leasing Defendants offer support for sealing
certain evidence that Plaintiffs have submitted in support of
their motion for class certification, but have not provided
reasons to seal any portion of Plaintiffs' motion for leave to
file a 3AC or of their proposed 3AC.

Merchant Services Defendants have also filed a declaration in
support of the motion to seal.  See Jurczyk Decl., Docket No. 424.
However, Merchant Services Defendants likewise do not offer
support for sealing any portion of Plaintiffs' motion for leave to
file a 3AC and provide reasons for sealing only a portion of
paragraph 541, line sixteen[4] of the proposed 3AC.

Merchant Services Defendants seek to seal a portion of a
record that is closely related to the merits of Plaintiffs'
claims.  To establish that the document is sealable, the party who
has designated it as confidential "must overcome a strong
presumption of access by showing that 'compelling reasons

_____

   [4] Although, in his declaration, Jurcyzk identifies line
fifteen of paragraph 541, see Jurcyzk Decl. 13, row 2, he appears
to refer to the monetary amount contained in line sixteen instead.

34

United States District Court
For the Northern District of California

1  supported by specific factual findings . . . outweigh the general

2  history of access and the public policies favoring disclosure.'"

3  Pintos v. Pac. Creditors Ass'n, 605 F.3d 665, 679 (9th Cir. 2010)

4  (citation omitted).  Cf. id. at 678 (explaining that a less

5  stringent "good cause" standard is applied to sealed discovery

6  documents attached to non-dispositive motions).

7     Jurcyzk explains that the relevant portion of paragraph 541,

8  line sixteen of the proposed 3AC describes "information regarding

9  compensation paid to Merchant [Services] Defendants by their

10  service providers," which gives insight into the contractual

11  pricing arrangements between these entities.  Jurcyzk Decl.

12  ¶ 6.b.i.  He states that the pricing terms "are favorable compared

13  to those generally available in the marketplace as well as those

14  secured by competitors," and that, if the pricing arrangements

15  became public, Merchant Services Defendants would lose their

16  competitive advantage because their competitors "would take steps

17  to secure similar or better pricing from their service providers."

18  Id. at ¶ 6.a.i.  Jurcyzk further states that this information

19  would provide competitors with "insight into the types of products

20  and services that Merchant [Services] Defendants have found to be

21  most successful," which could allow competitors to "adjust their

22  own strategies and models to compensate for or adopt those of

23  Merchant [Services] Defendants."  Id. at ¶ 6.b.i.

24     "'[S]ources of business information that might harm a

25  litigant's competitive standing' often warrant protection under

26  seal."  In re NCAA Student-Athlete Name & Likeness Licensing

27  Litig., 2012 U.S. Dist. LEXIS 140779, at *15 (N.D. Cal.) (quoting

28  Nixon v. Warner Commc'ns, Inc., 435 U.S. 589, 598 (1978).

Merchant Services Defendants have provided sufficient evidence that public disclosure of the compensation term in paragraph 541, line sixteen of the proposed 3AC would competitively harm them in the future.  This information, however, is not relevant to the resolution of the motion for leave to file the proposed 3AC.  Thus, the information can be redacted in the proposed 3AC and filed under seal in the final 3AC.

Accordingly, the Court GRANTS in part, DENIES in part and DEFERS in part Plaintiffs' motion to file under seal.  The request to seal portions of the motion for leave to file a 3AC is denied.  The Court finds compelling reasons to prevent public disclosure of the compensation term in paragraph 541, line sixteen of the proposed 3AC, but denies the motion to seal as to the remainder of the document.  Plaintiffs shall redact this information in the proposed 3AC and they are granted leave to file the corresponding term in the final 3AC under seal.  The Court defers ruling on the request to seal portions of the motion for class certification and its supporting evidence.

CONCLUSION

For the reasons set forth above, the Court GRANTS in part Plaintiffs' motion for leave to file a 3AC and DENIES it in part (Docket No. 383).  Plaintiffs may file the 3AC as requested, except that they may not re-allege their conversion claims against Jurczyk and Moore.

The Court GRANTS in part Plaintiffs' motion to file under seal, DENIES it in part and DEFERS it in part (Docket No. 385).  Within three days of the date of this Order, Plaintiffs shall file in the public docket their motion for leave to file a 3AC and a

redacted version of Exhibit A.  By that date, Plaintiffs shall also file a redacted version of their final 3AC in the public record and an unredacted version under seal.

The Court resets the case schedule as follows:

| Event | Date |
|-------|------|
| Deadline for Plaintiffs to file their Third Amended Complaint | Forthwith, but no later than three days after the date of this Order |
| Deadline for Plaintiffs to file, if necessary, an amended motion for class certification | Thursday, December 13, 2012 |
| Deadline for Defendants to file their opposition to Plaintiffs' motion for class certification, in one or two joint briefs, totaling no more than fifty pages. | Thursday, January 24, 2013 |
| Deadline for Plaintiffs to file reply in support of motion for class certification, in a single brief of no more than twenty pages. | Thursday, February 14, 2013 |
| Case Management Statement due | Thursday, February 28, 2013 |
| Further Case Management conference and hearing on Plaintiffs' motion for class certification | Thursday, March 7, 2013, at 2:00 p.m. |

IT IS SO ORDERED.

Dated: 12/6/2012

CLAUDIA WILKEN
United States District Judge

**United States District Court**
For the Northern District of California