GUTRIDE SAFIER LLP
ADAM J. GUTRIDE (State Bar No. 181466)
SETH A. SAFIER (State Bar No. 197427)
L. JAY KUO (State Bar No. 173293)
KRISTEN G. SIMPLICIO (State Bar No. 263291)
835 Douglass Street
San Francisco, California 94144
Telephone: (415) 336-6545
Facsimile: (415) 449-6469

Counsel for Plaintiffs

UNITED STATES DISTRICT COURT

FOR THE NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| RAINBOW BUSINESS SOLUTIONS, D/B/A PRECISION TUNE AUTO CARE, ET AL. <br><br> Plaintiffs, <br><br> v. <br><br> MERCHANT SERVICES, INC.; ET AL., <br><br> Defendants. | Case No.: CV 10-01993 CW <br><br> **PLAINTIFFS' AMENDED MOTION FOR CLASS CERTIFICATION** <br><br> **REDACTED** <br><br><br> Place: Courtroom 2, 4th Floor <br> Judge: Hon. Claudia Wilken |

# TABLE OF CONTENTS

Table of Authorities………………………………………………………………………vi

Notice of Motion…………………………………………………………………………ix

I.    Introduction...................................................................................................1

II.   Statement of Facts.........................................................................................3

    A.   Summary Of The Defendants .................................................................3

        1.   The Leasing Defendants................................................................3

        2.   The Merchant Services Defendants. ..............................................4

    B.   Summary Of The Enterprises.................................................................4

        1.   The Merchant Services/Leasing Defendants Enterprise .................5

            a.   The Equipment Finance Lease .............................................5

            b.   Defendants Designed the EFLs With Deceptive "Merchant Services" Branding. .................................................................6

            c.   Leasing Defendants Waived Their Standard Lease Rate Caps For The Merchant Services Defendants..................................6

            d.   Class Members Wound Up Paying the Full Retail Cost of Equipment Near the Outset of the Lease. .................................7

            e.   The Merchant Services-Leasing Enterprise Has Harmed Thousands of Merchants. .................................................8

        2.   The Merchant Services Enterprise ................................................8

            a.   Overview of the Credit Card Processing Sales Industry.............8

            b.   Jason Moore Created NPP and MSI to Serve as ISOs. ...............8

            c.   Merchant Services Defendants Created UCI to Fly Under the Radar of the Processors and Banks. ...........................................9

            d.   Defendants Held Themselves Out Under the Misleading Brand "Merchant Services." ...................................................10

            e.   Merchant Services Centrally Managed Its Deceptive Scheme ...................................................................................11

                (1)   Merchant Services Marketing Materials Were Approved by Jurczyk and Centrally Maintained. ...............11

                (2)   Sales Representatives Were Under the Company's Supervision and Control....................................................11

(3) Merchant Services Centralized Enrollment
Documentation and Processing. ...........................................13

3. Defendants Improperly Bundled "Services" to Enroll Unsuspecting
Merchants in EFLs and Processing Contracts...................................14

a. Merchant Services Improperly Collects Cancellation And
Other Fees, To Which It Has No Legal Right, Using Sham
ACH Paperwork. ...........................................................................15

4. The Leasing Enterprise ............................................................................17

a. Leasing Defendants Improperly Calculated Property Taxes
and ACHed Those Amounts from the Class. ..................................17

b. Leasing Defendants Improperly Charge Class Members $25
Filing Fees in Connection With Property Tax Filings. ...................17

c. Leasing Defendants Conspired To Collect Purported Back
Taxes And Fees From Over 107,000 Merchants. ...........................18

(1) Northern Leasing Generated Schedule 1 Using
Faulty Data. .........................................................................18

(2) Northern Leasing Conducted the ACH Transactions
Under the Name SKS Associates. .......................................19

(3) NLS Manufactured Evidence and Hired a Sham
Witness to Prevent Its Involvement From Going
Public. ..................................................................................20

C. The Plaintiffs Are Small Business Owners in California Who Were
Defrauded by Defendants.......................................................................21

1. The Merchant Services Customer Plaintiffs. ...........................................21

a. Merchant Services Defendants Provided Plaintiffs with the
Rate Sheet, "Merchant Services" Marketing Materials, and
Promises to Save Money ...............................................................21

(1) Von Glasenapp Was Enrolled in June 2007......................21

(2) Jerry Su and Rainbow Business Solutions Was
Enrolled in August 2008. ...................................................22

(3) Verena Baumgartner .........................................................23

(4) Dietz Towing and Terry Jordan .......................................23

b. Defendants Enrolled the Plaintiffs in Unconscionable
Leases at Rates Higher than Industry Standard. ...........................24

c. Lease Commissions Were Withdrawn from Their Accounts. ........24

d. Bogus Cancellation Fees Were Inserted In Their
Agreements. ..................................................................................25

|  |  | 2. | Credit Monitoring Plaintiffs...............................................25 |
|--|--|----|---|
|  |  |  | a. | Post-Termination Processing Inquiries ............................25 |
|  |  |  | b. | Equipment Lease Default Inquiries..................................26 |
|  |  | 3. | Property Tax Plaintiffs ...................................................26 |
|  |  |  | a. | Property Tax Equipment Cost Basis Class and Property Tax Fee Non-Disclosure Class Plaintiffs ..........26 |
|  |  |  | b. | SKS Post-Lease Expiration Plaintiff.................................27 |

III. ARGUMENT.........................................................................................27

   A.    Legal Standards for Class Certification. ..........................................27

   B.    The Proposed Classes Meet All Four Requirements of Rule 23(a). ......28

        1.   The Proposed Classes Are Sufficiently Numerous and Ascertainable.........................................................................28

        2.   This Litigation Concerns Common Questions Of Law and Fact................30

        3.   Plaintiffs' Claims Are Typical Of Class Members' Claims. ....................33

            a.   All Plaintiffs Are Typical Of The Merchant Services Customer Class and Excessive Lease Subclass. .........33

            b.   Proposed Representatives Von Glasenapp, Precision Tune, Baumgartner, Jordan, and Dietz Towing Are Typical Members Of The Property Tax Fee Non-Disclosure Class. ..........34

            c.   Proposed Representatives Von Glasenapp, Su, Precision Tune, Jordan, and Dietz Towing Are Typical Members Of The Property Tax Equipment Cost Basis Class. ............34

            d.   Proposed Representative Campbell Is Typical Of The SKS Post-Lease Expiration Class.................................34

            e.   Proposed Representatives Von Glasenapp and Bae Are Typical Members Of The Credit Monitoring Class. ....................34

        4.   The Proposed Class Representatives Will Fairly And Adequately Protect Class Interests ................................35

            a.   Plaintiffs Have No Conflicts Of Interest With Class Members.........................................................................35

            b.   The Representative Plaintiffs Will Vigorously Prosecute This Action........................................................35

            c.   Gutride Safier LLP Will Continue to Vigorously Represent the Class. ...............................................35

   C.    The Proposed Classes Meet the Requirements of 23(b)(3)....................36

PLAINTIFFS' AMENDED MOTION FOR CLASS CERTIFICATION

D.   Common Legal and Factual Issues Predominate. ......................................37

    1.   A Centralized Scheme to Defraud Predominates Over Individual Issues. ..............................................................................................37

    2.   Reliance on the RICO Scheme Can Be Inferred. ........................39

    3.   Reliance Is Not Necessary On The UCL and FAL Claims. .......42

    4.   Classwide Reliance On The Fraud and Negligent Misrepresentations Claims Can Be Inferred. ................................42

    5.   Common Legal And Factual Issues Predominate On Plaintiffs' Contract Claims. ...........................................................................43

    6.   Common Legal and Factual Issues Predominate On Plaintiffs' FCRA Claim. ...........................................................................44

E.   A Class Action Is Superior. ..............................................................44

    1.   Class Members Have No Interest In Pursuing Individual Litigation. .........45

    2.   Concurrent Litigation Should Not Preclude This Action from Proceeding. ..............................................................................46

        a.   The New York Attorney General's Lawsuit Against SKS Does Not Allege RICO Violations. ...............................46

        b.   *Simington/Teague* Should Not Defeat Superiority. ........47

        c.   Other Litigation Against Leasing Defendants Involves Different Theories. ................................................49

    3.   This Court is the Appropriate Forum for this Litigation. .............49

    4.   The Proposed Classes Are Manageable. ....................................50

IV. CONCLUSION ..................................................................................50

## TABLE OF AUTHORITIES

### CASES

*AmerisourceBergen Corp. v. Roden*, 495 F.3d 1143 (9th Cir. Cal. 2007).................................47

*Armstrong v. Davis*, 275 F.3d 849 (9th Cir. 2001) ....................................................27

*Brenner v. Future Graphics, LLC*, 258 F.R.D. 561 (N.D. Ga. 2007) ...................................30, 37

*Campbell v. PricewaterhouseCoopers, LLP*, 253 F.R.D. 586 (E.D. Cal. 2008) ......................28

*Cannon v. Nationwide Acceptance Corp.*, 1997 U.S. Dist. LEXIS 3517 (N.D. Ill., March 24, 1997)..........................................................................30

*Carnegie v. Household Int'l, Inc.*, 376 F.3d 656 (7th Cir. 2004)......................................50

*Cel-Tech Comm., Inc. v. Los Angeles Cellular Tel. Co.*, 20 Cal. 4th 163, 180 (1999)............................................................................31

*Chavez v. Blue Sky Beverage Co.*, 2010 U.S. DIST. LEXIS 60554 (N.D. Cal., June 18, 2010) ........................................................................29

*Chern v. Bank of Am.*, 15 Cal. 3d 866, 876 (1976) ........................................................32

*Comm. on Children's Television, Inc. v. General Foods Corp.*, 35 Cal. 3d 197, 211 (1983) ...........................................................................32

*Cortez v. Purolator Air Filtration Prods. Co.*, 23 Cal. 4th 163, 181 (2000) ......................31

*Culinary/Bartender Trust Fund v. Las Vegas Sands, Inc.*, 244 F.3d 1152 (9th Cir. 2001) .............................................................................45

*Friedman v. 24 Hour Fitness USA, Inc.*, 2009 U.S. Dist. LEXIS 81975 (C.D. Cal. Aug. 25, 2009) ........................................................................38

*General Tel. Co. v. Falcon*, 457 U.S. 147 (1982) ........................................................35

*General Telephone Co. of Southwest v. Falcon*, 457 U.S. 147 (1982) ................................30

*Holman v. Experian Info. Solutions, Inc.*, 2012 U.S. Dist. LEXIS 59401 (N.D. Cal. Apr. 27, 2012) ........................................................................44

*Hunter v. Up-Right, Inc.*, 6 Cal. 4th 1174 (1993) ........................................................32

*In re American Continental Corp./Lincoln Savings & Loan Securities Litigation*, 140 F.R.D. 425, 431 (D. Ariz. 1992) ...............................................................37

*In re First Alliance Mortg. Co.*, 471 F.3d 977, 991 (9th Cir. 2006) .................................37, 41

*In re Heritage Bond Litig.*, 2004 U.S. Dist. LEXIS 15386, at *38 (C.D. Cal. July 12, 2004) ...........................................................................46

*In Re Tableware Antitrust Litig.*, 241 F.R.D. 644 (N.D. Cal. 2007)................................30

PLAINTIFFS' AMENDED MOTION FOR CLASS CERTIFICATION

*In re Vioxx Class Cases*, 180 Cal. App. 4th 116 (2009) ............................................42

*In re Visa Checks/MasterMoney Antitrust Litig.*, 280 F.3d 124 (2d Cir. 2001) ........36

*Jenson v. Fiserv Trust Co.*, 256 Fed. Appx. 924 (9th Cir. 2007)................................38

*Johnson v. General Mills, Inc.*, 2011 U.S. Dist. LEXIS 103357 (C.D. Cal.
    September 12, 2011) ..............................................................................................43

*Jordan v. County of Los Angeles*, 669 F.2d 1311 (9th Cir. 1982) .......................28, 33

*Keilholtz v. Lennox Hearth Prods.*, 2010 U.S. Dist. LEXIS 14553 (N.D. Cal. Feb.
    16, 2010) ................................................................................................................28

*Keilholtz v. Lennox Hearth Products Inc.*, 268 F.R.D. 330 (N.D. Cal. 2011) ...........43

*Kennedy v. Jackson Nat'l Life Ins. Co.,* 2010 U.S. Dist. LEXIS 63604, *26-27
    (N.D. Cal. June 23, 2010) ......................................................................................40

*Kesler v. Ikea U.S., Inc.*, 2008 U.S. Dist. LEXIS 97555 (C.D. Cal. Feb. 4, 2008)....44

*Klay v. Humana, Inc.,* 382 F.3d 1241 (11th Cir. 2004) ..............................................40

*Lavie v. Procter & Gamble Co.*, 105 Cal. App. 4th 496 (2003) .................................32

*Lymburner v. U.S. Fin. Funds, Inc.*, 2010 U.S. Dist. LEXIS 5081 (N.D. Cal. Jan.
    22, 2010) ................................................................................................................45

*Lymburner v. U.S. Financial Funds, Inc.*, 263 F.R.D. 534 (N.D. Cal. 2010)............31

*Menagerie Prods. v. Citysearch*, 2009 U.S. Dist. LEXIS 108768  (C.D. Cal. Nov.
    9, 2009) ..................................................................................................................50

*Menagerie Prods. v. Citysearch*, 2009 U.S. Dist. LEXIS 108768 (C.D. Cal. Nov.
    9, 2009) ..................................................................................................................44

*Mevorah v. Wells Fargo Home Mortg.*, 571 F.3d 953 (9th Cir. 2009) ......................36

*Minter v. Wells Fargo Bank, N.A.,* 274 F.R.D. 525(D. Md. 2011) .............................41

*Moses H. Cone Mem'l Hosp. v. Mercury Constr. Corp.,* 460 U.S. 1 (1983) ..............47

*Negrete v. Allianz Life Ins. Co. of N. Am.,* 238 F.R.D. 482 (C.D. Cal. 2006) ...........41

*O'Connor v. Boeing N. Am., Inc.,* 184 F.R.D. 311 (C.D. Cal. 1998) .........................28

*Oregon Laborers-Employers Health & Welfare Trust Fund v. Philip Morris*, 188
    F.R.D. 365 (D. Or. 1998) .......................................................................................37

*Peterson v. H & R Block Tax Services, Inc.*, 174 F.R.D. 78 (N.D. Ill. 1997).............41

*Pintos v. Pac. Creditors Ass'n*, 565 F.3d 1106 (9th Cir. 2009) .................................44

*Robinson v. Countrywide Credit Indus.*, 1997 U.S. Dist. LEXIS 15712 (E.D. Pa.
    Oct. 8, 1997).........................................................................................................47

PLAINTIFFS' AMENDED MOTION FOR CLASS CERTIFICATION

*Robinson v. Fountainhead Title Group Corp,* 252 F.R.D. 275 (D. Md. 2009) ........................ 39

*Robinson v. Fountainhead Title Group Corp,* 257 F.R.D. 92 (D. Md. 2009) ......................... 40

*Saltzman v. Pella Corp.,* 257 F.R.D. 471 (N.D. Ill 2009), *aff'd,* 2010 U.S. App. LEXIS 10259 (7th Cir. Ill. May 20, 2010) ............................................................ 30

*Schaefer v. Overland Express Family of Funds,* 169 F.R.D. 124 (S.D. Cal. 1996) ................ 37

*Schulken v. Wash. Mut. Bank,* 2012 U.S. Dist. LEXIS 2005 (N.D. Cal. Jan. 5, 2012) .............................................................................................................. 31

*Soto v. Superior Telcoms., Inc.,* 2011 U.S. Dist. LEXIS 145205 (S.D. Cal. Dec. 15, 2011) .............................................................................................................. 39

*Stearns v. Ticketmaster,* 655 F.3d 1013 (9th Cir. 2011) ..................................... 36, 42

*Vasquez v. Superior Court,* 4 Cal. 3d 800 (1971) .................................................. 42

*Wal-Mart Stores, Inc. v. Dukes,* 131 S. Ct. 2541 (2011) ...................................... 30

*Yokoyama v. Midland Nat'l Life Ins. Co.,* 594 F.3d 1087 (9th Cir. 2010) ................. 46

## RULES

Fed. R. Civ. P. 23(a) ............................................................................. 28, 33

Fed. R. Civ. P. 23(b) .................................................................................... 28

Fed. R. Civ. P. 23(b)(3) ........................................................... 28, 36, 45, 46

Fed. R. Civ. P. 23(g) .............................................................................. 35, 36

## TREATISES

5 James W. Moore, Moore's Federal Practice, § 23.21[1] (2001) ............................. 28

7A Wright & Miller, Federal Practice and Procedure, § 1779 (2d ed. 1986) ............. 45

*Newberg on Class Actions* §7.24 at 7-80 to 7-81 (3d ed. 1992). ............................. 35

PLAINTIFFS' AMENDED MOTION FOR CLASS CERTIFICATION

## NOTICE OF AMENDED MOTION AND AMENDED MOTION

**TO DEFENDANTS AND THEIR COUNSEL OF RECORD:**

**PLEASE TAKE NOTICE THAT** on March 7, 2012, at 2:00 pm, or as soon thereafter as the matter may be heard, in Courtroom 2, 4th Floor of the above-entitled court, located at 1301 Clay Street, Oakland, CA 94612, Plaintiffs will, and hereby do, move, pursuant to Rule 23 of the Federal Rules of Civil Procedure, for an order certifying the following classes, appointing the named Plaintiffs set forth below as representatives of the classes, and appointing Gutride Safier LLP as class counsel.

| Subclass | Definition | Claims (Defendants) | Plaintiffs |
|---|---|---|---|
| Merchant Services Customer Class | All persons and businesses who, from March 26, 2006 to the present, were enrolled by the Merchant Services Defendants in credit card processing services. | RICO, RICO Conspiracy, Fraud, Negligent Misrepresention, UCL (Merchant Services Defendants)<br><br>False Advertising (All Merchant Services Defendants except Madura)<br><br>Conversion (MSI, NPP, UCI, UMS, Parisi, Jurczyk, and Moore) | Von Glasenapp, Su, Precision Tune, Baumgartner, Jordan, Dietz Towing |
| Excessive Lease Amount Subclass<br><br><br>[California Subclass] | All members of the Merchant Services Customer Class whose monthly lease amounts exceeded Northern Leasing's standard rate caps. | RICO, RICO Conspiracy, Fraud, (All Defendants)<br><br>UCL, Negligent Misrepresentation (Merchant Services Defendants)<br><br>[UCL, Negligent Misrepresentation (Leasing Defendants)] | Von Glasenapp, Su, Precision Tune, Baumgartner, Jordan, Dietz Towing |

| Subclass | Definition | Claims (Defendants) | Plaintiffs |
|---|---|---|---|
| SKS Post-Lease Expiration Class<br><br>[California Subclass] | All persons and businesses whose lease numbers appeared on Schedule 1. | RICO, RICO Conspiracy (Leasing Defendants)<br><br>[(UCL) (Leasing Defendants)] | Campbell |
| Property Tax Fee Non-Disclosure Class<br><br><br><br><br><br>[California Subclass] | All persons and businesses whose Equipment Finance Lease did not disclose "an administrative tax processing fee in the amount of $25" but who paid a $25 property tax administrative fee to any Leasing Defendant from March 26, 2006 to the present. | RICO, RICO Conspiracy, Fraud, (Leasing Defendants)<br><br>Breach of Contract (MBF Leasing, Northern Leasing)<br><br>[Negligent Misrepresentation, Breach of the Duty of Good Faith and Fair Dealing, UCL (Northern Leasing, MBF Leasing)] | Von Glasenapp, Precision Tune, Baumgartner, Jordan, Dietz Towing |
| Property Tax Equipment Cost Basis Class<br><br><br><br>[California Subclass] | All persons and businesses who from March 26, 2006 to the present paid any Leasing Defendants property taxes based on a cost greater than the "equipment cost." | RICO, RICO Conspiracy, Fraud, (Leasing Defendants)<br><br>Breach of Contract (MBF Leasing, Northern Leasing)<br><br>[Negligent Misrepresentation, Breach of the Duty of Good Faith and Fair Dealing, UCL (MBF Leasing, Northern Leasing)] | Von Glasenapp, Su, Precision Tune, Jordan, Dietz Towing |

PLAINTIFFS' AMENDED MOTION FOR CLASS CERTIFICATION

| Subclass | Definition | Claims (Defendants) | Plaintiffs |
|---|---|---|---|
| Credit Monitoring Class | All persons who on or after March 26, 2008, had their consumer credit reports inspected, viewed, monitored, or otherwise retrieved from a consumer credit reporting agency by any of the Merchant Services Defendants or Leasing Defendants in connection with an attempt to collect (1) amounts due on a lease whose monthly amount exceeds Northern Leasing's standard rate caps or (2) money owed after the termination of a credit card processing agreement. | FCRA (Northern Leasing, MBF Leasing, UMS, UCI)<br><br>UCL (UMS, UCI) | Von Glasenapp, Bae |
| [California Subclass] | | [UCL (Northern Leasing, MBF Leasing)] | |

This amended motion is based upon this Notice of Amended Motion and Amended Motion and Memorandum of Points and Authorities; the previously submitted Declarations of Kristen Simplicio [dkt. # 387-1], Adam Gutride [dkt. # 386], and Robyn Sands [dkt. # 387-2] filed herewith, as well as the pleadings and papers on file in this action and all matters of which this Court may take notice.

## MEMORANDUM OF POINTS AND AUTHORITIES

## I.    INTRODUCTION

Defendants misused the Automated Clearing House (ACH) system to make unauthorized withdrawals from the bank accounts of hundreds of thousands of small businesses and their owners, totaling tens of millions of dollars.  In violation of applicable MasterCard regulations, they conspired to enroll class members into non-cancellable contracts, obligating class members to pay thousands of dollars for purported "leases" of credit card equipment that could be purchased for 1/10 the price, and pocketing the difference as "commissions" and "service fees." Compounding the injury, they assessed "property taxes" on the wildly inflated lease price (the overwhelming majority of which was actually their commission) rather than the value of the equipment, then tacked on undisclosed tax-related "administrative fees," and finally initiated debits for these bogus taxes and fees from bank accounts of more than 107,000 merchants whose leases had long been expired.  To effect these schemes, they deployed a dizzying array of non-operating shell companies, lied to banks and MasterCard about their conduct, and even went as far as to bribe witnesses to submit false declarations to the Court in this litigation.

The conspiracy involved two groups of defendants: the Merchant Services Defendants and the Leasing Defendants.  Each group constituted its own RICO enterprise and engaged in conduct to defraud the class.  The groups also conspired with each other to engage in further misconduct.

The Merchant Services Defendants are entities and their control persons who market credit card processing services to small businesses.  Because the sale of such services is highly regulated by Visa and MasterCard (who control access to the credit card interchange), the Merchant Services Defendants constructed a complex scheme that would allow them to gain access to the interchange but avoid oversight.  They created two holding companies that registered with interchange members as Independent Sales Organizations ("ISOs") but then—via dubious "verbal" contracts whose terms their witnesses cannot recall—secretly "assigned" all their operations to an unregistered entity called Universal Card, Inc., which purports to do business under the unregistered fictitious business name "Merchant Services," and which in turn purported to "subcontract" its sales functions to "independent" sales agents.  Such assignments

and subcontracting arrangements are expressly prohibited by the MasterCard regulations, precisely to prevent the misconduct at issue here. "Merchant Services" then falsely held itself out as a registered ISO with ties to reputable banks and processors and told class members that they would receive "wholesale" rates on a bundle of credit card processing services by paying a flat monthly "service fee." In fact, the rates were not wholesale, but rather ordinary rates, and the service fee was actually a non-cancancellable "Equipment Finance Lease" ("EFL") with the Leasing Defendants. These acts too, were clear violations of industry regulations, which forbid the bundling of processing services with other services, as well as the shifting of "service fees" into a separate contract with a different entity.

The Leasing Defendants are a group of entities and their control persons who purport to be in the business of financing the acquisition of small-ticket items, notably credit card swipe terminals and pinpads. Not only did they ignore Merchant Services' shifty corporate structure (which had been designed to evade the MasterCard regulations), but they played two key additional roles in the scheme. First, they conspired with Merchant Services Defendants to waive industry-standard "lease caps" that could be charged for each piece of equipment. Thus, for example, a set of equipment that retailed for $358 could be "leased" for $89.99 or $129.99 or even $249.99 *per month* (well above the standard "cap" of $60, already exorbitant for a 48-month lease). The class member would typically be charged for two or three months up front—most of which was a purported "commission" due to Merchant Services—meaning the class member would pay more than the full value of the equipment within the first month or two, with another 45 or more months to go. Upon execution of the lease, Leasing Defendants immediately paid Merchant Services Defendants a lump sum of thousands of dollars, equaling about two-thirds of the expected stream of revenue from the lease, claiming that the payment was to "purchase" from Merchant Services the underlying equipment that was being leased to the class member. In fact the payment had nothing to do with the price or value of the equipment, but only the size of the revenue stream expected from the lease, based on the inflated, uncapped lease amount that Merchant Services Defendants had inserted into the lease document.

Second, Leasing Defendants conspired among themselves to steal additional monies via

ACH transaction from class members trapped in the EFLs, principally through false assessments of "property taxes" and related fees. Instead of assessing property taxes on the basis of the true equipment cost, they did so on the basis of the inflated "acquisition cost," *i.e,* the amount they had agreed to pay Merchant Services Defendants for signing up the class member, an accounting method they now admit was incorrect. They also tacked on a $25 "administrative fee" for assessing these taxes, even though such fee was not disclosed in the lease. After this lawsuit commenced, they went so far as to use the ACH system to attempt to collect alleged "unreimbursed" property taxes and administrative fees from class members who had completed their 48 month term and had paid in full years earlier. To complete the last part of the scam, Defendant Northern Leasing Systems, Inc. ("NLS") filed papers with banks under a d/b/a name of "SKS Associates," then created a separate shell company, Defendant SKS Associates LLC ("SKS") to hide the fact that NLS was behind the withdrawals. It later caused false declarations to be submitted to this Court about the scam, including (1) fabricating and backdating an alleged "purchase agreement" between NLS and SKS and (2) paying witness Jonathan Mirksy (a nephew of one of the individual Leasing Defendants) ***$20,000*** to sign a declaration in which he falsely claimed to be an officer of "Cucumber Holdings, Inc.," said that "Cucumber Holdings" was the "manager" of SKS, and attested to the purchase agreement; in fact, neither he nor "Cucumber Holdings" had anything to do with SKS, other than signing the declaration.

Plaintiffs are victims of Defendants' illegal scam. They request certification of classes and sub-classes based on Defendants' common misrepresentations, violations of credit card processing regulations, unlawful ACH withdrawals from their bank accounts, and improper credit monitoring. Because the amounts at stake for each Plaintiff range in the hundreds or thousands of dollars, a class action is the only way they will be able to obtain redress from Defendants' criminal enterprise and end their deceptive and illegal practices.

## II. STATEMENT OF FACTS

### A. Summary Of The Defendants

#### 1. The Leasing Defendants

NLS claims to provide "micro-ticket leasing services to businesses seeking to spread the

cost of utilizing credit card processing services over an extended period rather than paying the full cost of required equipment upfront."[1] NLS and other Leasing Defendants work with a network of "vendors" which in turn arrange for merchants to obtain financing from NLS on processing terminals and other small equipment.

In 2003, NLS created MBF Leasing, LLC ("MBF") as a "separate" leasing company that is in fact wholly owned by NLS. Since its inception, all leases originated by MBF have been assigned to NLS. (Declaration of Kristen Simplicio ("Simplicio Decl."), Ex. A (Buono Depo. 24-25), Ex. B (Kravic Depo. 141), Ex. C (Kulangroth Depo. 17-18).) MBF follows all policies and procedures of NLS, and NLS performs all servicing of MBF Leases, including maintaining records of all payments, withdrawing monthly lease amounts, and paying applicable sales and property taxes on all leases originated by MBF. (Id.)

### 2. The Merchant Services Defendants.

The Merchant Services Defendants are among the largest sales organization working with NLS and MBF. (Id., Ex. B (Kravic Depo. 288).) Under the direction of Jason Moore, and his co-conspirators Robert Parisi and Nathan Jurczyk, the Merchant Services Defendants market and sell credit card processing services and equipment under the name "Merchant Services." The enterprise consists of three distinct companies: the operating company known "UCI" (which purports to do business as "Merchant Services," even though no fictitious name registration has ever been filed with any governmental entity),[2] and two holding companies, Merchant Services, Inc. ("MSI") and National Payment Processing Inc. ("NPP"). (Id., Ex. D (Jurczyk Depo. 366, 404))

### B. Summary Of The Enterprises

This case involves criminal and other illegal conduct by three interrelated enterprises. The Merchant Services Defendants conspired with the Leasing Defendants to

---

[1] See http://www.northernleasing.com/services.aspx (last accessed August 23, 2012).

[2] UCI also claims to have acquired the assets of a limited liability company that had operated under the name Universal Merchant Services LLC ("UMS"). However, according to the California Secretary of State, UMS has not been dissolved.

fraudulently debit class members' back accounts for payments on bogus "leases" that offered no economic benefit. The Merchant Services Defendants also conspired among themselves to further debit class members' accounts for unauthorized cancellation fees and related fees related to credit card processing. And the Leasing Defendants conspired among themselves to further debit class members' accounts for unauthorized property taxes and administrative fees.

## 1.     The Merchant Services/Leasing Defendants Enterprise

Throughout the class period, Leasing Defendants partnered with the Merchant Services Defendants to defraud thousands of merchants through outrageously priced EFLs. The fraud consisted of a series of concerted efforts.

### a.     The Equipment Finance Lease

In a typical equipment finance lease, a business obtains financing from an equipment lessor, which has purchased the equipment from the manufacturer or retailer. Such leases make sense where a business does not wish to invest working capital in an expensive asset. But the "micro-ticket" items the Leasing Defendants finance are relatively *inexpensive* credit card terminals, pin pads, and magnetic check readers, retailing for a few hundred dollars new. (Id., Ex. E.) Moreover, Leasing Defendants do not acquire the equipment from the manufacturer or retailer, but from the company that recruits the lessee: here, Merchant Services. NLS pays this "vendor" a lump sum, purportedly for the purchase of the equipment. (Id., Ex. B (166:15-15)). But the price it pays has no relation to the actual value of the equipment (and NLS does not even consider that value in determining what to pay). (Id., Ex. F (Krieger Depo., 58:5-15).) Instead, the price is based on the expected future stream of income under the lease.[3] (Id., Ex. G, p. 2; Ex. H, p. 1.) Thus, NLS typically pays Merchant Services several thousand dollars to "purchase" each processing terminal, which is worth—and NLS could separately acquire for—only a few hundred (or even less, as NLS would be buying from the manufacturer in bulk). NLS then has a strong incentive to ensure that the class member keeps paying for the entire term of the lease, so that it can recoup its investment and make a profit.

---

[3] Notably, this is not a situation in which the vendor (Merchant Services) is initially the lessor of the equipment and then subsequently sells the lease—i.e. the chattel paper—to NLS.

### b. Defendants Designed the EFLs With Deceptive "Merchant Services" Branding.

Defendants conspired to create a special MBF lease with the "Merchant Services" appearing on the upper left hand corner. (Id., Ex. I, J, K, L.) MBF described this as a "private label" arrangement intended to assist Merchant Services with sales, (id., Ex. B. (Kravic Depo. 166:15-16)), but it had the real effect of obscuring the name of the actual leasing party, MBF. When presented with the lease, MBF's own 30(b)(6) witness was confused by the branding:

> Q.    Who is the merchant supposed to understand that the contract is between, the merchant and whom?
>
> A.    Merchant Services.
>
> Q.    And who is Merchant Services?
>
> A.    Is the vendor.
>
> Q.    Okay. So this contract is between the merchant and Merchant Services?
>
> A.    The contract is between MBF and the merchant.

(Id. at 34:1-10) Customers generally did not understand that the lease was with a different company (MBF) until after the deal was done, and even then, many remained confused.[4]

### c. Leasing Defendants Waived Their Standard Lease Rate Caps For The Merchant Services Defendants.

In its standard vendor agreements, Leasing Defendants imposed a uniform set of "rate caps" that set upper limits for monthly payments on leased equipment. (Id., Ex. O.) These caps were set based on marketplace conditions, including caps used by other leasing companies.[5] But Leasing Defendants decided to *waive* these caps for Merchant Services, making it one of only two of MBF's 500 vendors for whom the normal rules did not apply. (Id., Ex. B (Kravic Depo. 272:19-71:10).) Merchant Services could then push through much higher monthly lease

---

[4] Sometime in 2008, this misleading practice was discontinued for reasons unknown to either set of Defendants. Even after the practice stopped, however, merchants often remained confused about the relationship between "Merchant Services" and MBF.

[5] The most popular model of credit card swipers, a Nurit 2085, was capped at $60 throughout the class period. (Id., Ex. N.) Other popular pieces of equipment include the Verifone pin pads (capped at $20), Magtek check readers (capped at $30), and the Omni (capped at $70).

payments, in some cases up to three times the cap limits. Leasing Defendants never questioned how Merchant Services was, to use Leasing Defendants' words, "suckering" merchants into these deals. (Id., Ex. P; Ex. F (Krieger 41-42)).[6]

### d. Class Members Wound Up Paying the Full Retail Cost of Equipment Near the Outset of the Lease.

MBF also permitted Merchant Services to debit and retain a "deposit" from new lessees as part of its sales commission—a practice also outside the norm, according to NLS's Vice President of Customer Service and Collections, Defendant Sam Buono. (Id.,Ex. A (Buono Depo. 117-25), Ex. H.).[7] This deposit, or – in the words of Merchant Services' 30(b)(6) witness – "commission" was typically one or two months' worth of lease payments, plus sales tax. (Id., Ex. D (Jurczyk Depo. 995-96).) With lease rate caps waived, the practice often meant the merchants paid hundreds up front, with nearly four more years of payments left. For example, a merchant enrolled in a $149.99/mo lease would pay a two-month deposit of $299.98 (plus tax) to Merchant Services upon enrolling and another $149.99 to MBF that same week. But the retail price of the equipment (according to NLS) was only $358, meaning that within one month of enrolling, the merchant had already paid *more* than if the equipment had been purchased outright—with at least 45 payments to go. Thus, the so-called "leases" did not achieve either of the purposes of a lease transaction: to avoid tying up capital or spread out payments over time.

---

[6] Lina Kravic, who oversees vendor files as part of her job responsibilities, testified that she would not even know where to look to find out where rate caps for Merchant Services were kept. (Id., Ex. B (65, 68-69).) ████████████████████████████████████ ████████████████████████████████████████████████████

[7] The EFL has a space for "Payable at Signing of Lease." Merchant Services agreed with MBF Leasing to leave the space blank (Id., Ex. R) and instructed its sales representatives to do so. (Id., Ex. S and T) Defendant Walshe testified that she did not recognize the handwriting in that field on the lease she secured from Von Glasenapp. (Id., Ex. U (Walshe Depo. 126:10-14)) And while the form states that one month is payable upon signing, (Id. Ex. I), Merchant Services collected two months from Just Film and apparently many other members of the class. (Id. Ex. V, p.3; Ex. W, p.3.; Ex. X.)

### e. The Merchant Services-Leasing Enterprise Has Harmed Thousands of Merchants.

Defendants have made millions of dollars through their scheme. For example, in 2007 alone, Leasing Defendants paid more than ▮▮▮▮▮ to Merchant Services Defendants as its share of expected lease revenue. (Id., Ex. Y.) Today, Merchant Services Defendants bring in approximately 30-40 percent of new business. (Id., Ex. B (Kravic Depo. 280)) Since the beginning of the class period, more than 9,400 merchants were enrolled by Merchant Services Defendants into MBF leases. (Declaration of Robyn Sands ("Sands Decl.") at ¶ 8.) More than 2100 of these involve merchants paying $80 or more per month on their leases. (Id. at ¶ 9.) Many have defaulted, many more have continued paying due to threats to their credit.

### 2. The Merchant Services Enterprise

#### a. Overview of the Credit Card Processing Sales Industry

Visa and MasterCard have created a network through which financial transactions are processed. Member banks issue cards and sell credit card processing services to merchants and may register companies to market and sell on their behalf. These sales companies (known as ISOs) also must be registered with Visa and MasterCard as well as with a member bank or approved processing entity. ISOs enroll merchants into processing contracts that authorize banks to process card transactions, deposit the proceeds in merchants' banks accounts, and withdraw monthly processing fees from those accounts. The banks then pay to the ISO a share of the monthly processing fees in the form of "residuals." As in the case of the Merchant Services Defendants, the ISOs generally are not party to the processing contracts, which are between the merchant, the bank and the processor.

#### b. Jason Moore Created NPP and MSI to Serve as ISOs.

Jason Moore is the sole shareholder, officer, director, and employee of Defendants NPP and MSI. (Id., Ex. D (Jurczyk Depo. 27, 31, 36, 47, 62, 153, 155, 156 ).) In 2003, Moore registered NPP as an ISO with Visa and MasterCard. (Id., Ex. Z.) In February 2006, NPP registered with Columbus Bank & Trust and entered into a contract with Transfirst to market and sell credit card processing services. (Id., Ex. Z; AA.) In 2004, Moore took the same steps with respect to MSI, registering it as an ISO with Visa and MasterCard and, in 2007, registering with

Wells Fargo and entering into a contract with First Data.  (Id., Ex. Z; BB.)

NPP's and MSI's contracts with their processors expressly incorporate and reference governing Visa and MasterCard regulations and impose further requirements on NPP and MSI. (Id., Ex. AA; BB.) These rules and contractual terms require, among other things, that NPP and MSI: (1) obtain "express prior written approval" of the Processor for the collection of any fee; (2) refrain from any "separate or other agreement" between the ISO and the merchant regarding processing services; (3) refrain from subcontracting any responsibility given to them under their contracts with Processors; and (4) market and sell processing services "separately from any other goods, programs or services services" offered to merchants.  (Id., Ex. CC, §§ 7.3.10, 7.3.12, 7.4, and DD, p. 5 subsection j.)) Throughout the class period, Merchant Services Defendants have ignored each of these requirements.

**c. Merchant Services Defendants Created UCI to Fly Under the Radar of the Processors and Banks.**

Because ISOs are subject to rigorous reporting requirements, Merchant Services Defendants conducted business through Defendant UCI—which was not a registered ISO—to avoid oversight by banks, processors and regulators.  After NPP and MSI signed with the processors, they purported to "*subcontract*" their entire sales and marketing operations to UCI under the terms of a purported "verbal agreement" between the boards of the companies. (Id., Ex. D (Jurczyk Depo. 62, 176-77).)  The boards of NPP and MSI consist solely of a single person: Defendant Moore, while the board of UCI consists of two people: Defendants Moore and Parisi. Parisi testified that he did not handle these types of contracts and did not know what was in them. (Id., Ex. EE (Parisi Depo. 20-21).)  Thus, the alleged "verbal agreements" were between Moore and Moore.  But even Moore had no knowledge of their terms.  In any event, all such subcontracting was prohibited under the section 7.3.12 of the MasterCard Regulations, which states:

> A Service Provider must not subcontract, sublicense, assign, license, franchise or in any other manner extend or transfer to any third party any right or obligation the Service Provider may have in connection with performing Program Service for a Customer, and any such transfer is null and void *ab initio*.

(Id., Ex. CC, p. 12.)

### d. Defendants Held Themselves Out Under the Misleading Brand "Merchant Services."

In its interactions with class members, UCI does not use its own name, but instead uses the name "Merchant Services."[8] UCI therefore instructed and required all sales representatives to identify themselves as from "Merchant Services." (Id., Ex. FF, GG) UCI has not registered its use of this fictitious business name with any governmental entity.

The use of the term "Merchant Services" is misleading in several respects. The term "merchant services" is common in the banking and credit card processing industry—for example, a person from "Bank of America Merchant Services" works for Bank of America, providing service to customers of the banks who are merchants—i.e., to small business retailers. Defendants capitalized on the common use of the term "merchant services" to imply that they were part of larger, reputable institutions. For example, one of business cards used by Defendant Alicyn Roy bore the words "Powered by First Data" under the words "Merchant Services." (Id., Ex. HH)[9] One of the processors used by Merchant Services Defendants, First Data, cautioned them that their conduct was misleading, writing: "MSI must ensure their sales force is representing correctly in the marketplace and not giving the illusion that they are First Data direct sales or First Data employees. …. MSI must ensure the MSI logo states the true and full registered name of Merchant Services, Inc.- the Inc. being the important part here." (Id., Ex. JJ.)

Second, the term "Merchant Services" is not the true name of the company with whom merchants are dealing, which is actually UCI. So use of the term not only hides the fact that the true company is not a registered ISO, but allows its conduct to escape oversight by the processors, banks and interchange, and makes it difficult for class members to obtain redress. The email quoted above from FirstData shows that even the processors were confused, as First Data thought that the company it had contracted with—MSI—was the one with a "sales force" that needed to

---

[8] For example, in an email sent to sales representatives on in 2009, Jurcyzk instructed sales representatives to hold themselves out using the "Merchant Services" name. (Id., Ex. FF.) When asked what he meant by "Hi, I'm XXX with Merchant Services", Jurczyk confirmed he was referring to the company UCI. (Id., Ex. D (Jurczyk Depo. 400-01).)

[9] Another card used by Roy bore the words "Chase Paymentech Strategic Partner" underneath the words "Merchant Services" and contained a logo similar to the one used by Chase. (Id., Ex. II.)

-10-

be "representing correctly in the marketplace"; in fact, MSI had no sales force but had purportedly subcontracted everything to UCI, and the members of UCI's sales force were themselves purported independent contractors, all in violation of the MasterCard regulations. (Id., Ex. D (Jurczyk Depo. 31-32, 168).) Even the Defendants themselves were often confused by the relationship between "Merchant Services" and UCI. For example, neither Defendant Roy nor Defendant Walshe knew that "Merchant Services" referred to UCI. (Id., Ex. U (Walshe Depo. 60-62); KK (Roy Depo. 10:1-25).) Likewise, when presented with a banking form that he personally helped create bearing the words "Merchant Services," Defendant Parisi could not identify what company the form meant. (Id. Ex. EE (Parisi Depo. 207-218).)

### e. Merchant Services Centrally Managed Its Deceptive Scheme

#### (1) Merchant Services Marketing Materials Were Approved by Jurczyk and Centrally Maintained.

Merchant Services maintained a centralized marketing and branding strategy enforced upon all sales representatives. Jurczyk required representatives to submit all marketing materials, such as brochures and fliers, to him or his team to ensure compliance with management's standards. (Id. Ex. D (Jurczyk Depo. 411, 413-414). He oversaw the creation of all marketing materials, believing the establishment of the "Merchant Services" brand was important. (Id. 405). Contracts, leases, and other documents necessary to enroll merchants in credit card processing services were available in hard copy at the Company's headquarters and for electronic download by the sales force via a secure server. (Id. at 683-86; Ex. KK (Roy Depo. 163-64, 187-88).)

Merchant Services also controlled the design and production of business cards, which Defendant Jurczyk admitted "are clearly a tool that we use to present to businesses." (Id., Ex. D (Jurczyk Depo. 415).) These business cards stated that "Merchant Services" was a "registered ISO" with certain well known banks, which even Jurczyk admitted was false. (Id. at 400-01.)

#### (2) Sales Representatives Were Under the Company's Supervision and Control.

Despite its insistence that its sales representatives were "independent contractors" and therefore free to operate as they pleased, Merchant Services regularly sent directives that the reps were expected to follow (Id. at 408; Ex. FF, GG). It required them to use only company email

addresses when communicating with merchants (id.), and it imposed penalties on representatives who did not follow company protocol.

Merchant Services also provided its sales representatives with comprehensive training. It has produced case thousands of pages of training materials, including powerpoint presentations, brochures, instructional videos, FAQs, and homework assignments on how to complete a Rate Sheet. Indeed, MSI and NPP were required under their agreements with processors to train their sales forces, and Defendant Jurcyzk made numerous written representations to First Data describing "our sales training program" and in response to First Data's request for training materials, responded that "'sales pitch' portion of our training is (understandably) done verbally." (Id., Ex. MM.) He boasted in writing to fellow management of the company's "world class training program," and corresponded with the members of the in-house "Training Team," about "pitch talking points," "training videos" and "training materials." (Id., OO, NN.) UCI's written agreements with each of its "independent sales representatives" also stated that the company would provide "required training programs" and stated that the "ISR shall, in conformance with the Procedures, market and sell the products and services . . . as instructed by ISO." (Id., Ex. PP, p. 2; QQ, p. 2.).[10] The sales representatives themselves testified to participating in training. For example, Roy stated that training was necessary to learn how to do her job and described participating in a number of training classes over the years (including some led by Jim Grant) to learn how to read statements and perform cost comparisons.[11] (Id., KK (Roy Depo. 56-60, 119-20).) Roy also worked as a "District Mentor," training and evaluating new sales representatives

---

[10] Roy testified that they were not required, but admitted that ISRs had to sign an attendance sheet. (Id., Ex. KK (198-99).) An internal email from Jurczyk shows that those who missed meetings would risk financial penalties. (Id., Ex. SS.)

[11] Roy testified that she said it took several training sessions over the course of a few weeks to learn how to read basic credit card processing statements (which was necessary to do the cost comparison for prospective customers), and other sales agents took longer to understand. (Id. at 5) Thus every sales representative would have undergone at least *some* training in order to perform the most basic job functions, i.e. understanding a credit card processing statement. Jurczyk claimed he hired several sales representatives who had industry experience and needed no additional training, but when pressed could not name any. (Id. Ex. D, 779-80.)

on how to pitch services to merchants.[12] (Id., p. 15, 51-57.)) Walshe stated that her training was a month long and held in Irvine. (Id., Ex. UU (Walshe Depo. 16, 131-32).) And Defendant Walshe stated that the sales representatives working from San Jose were trained by the Irvine-based Jim Grant, who made multiple visits to San Jose to train new representatives. (Id., p. 161-63). Merchant Services required of ISRs weekly attendance in person or by phone, on pain of financial penalties, at centrally run Monday Morning Meetings. (Ex. RR, SS). The weekly meetings provided strategies for sales pitches and the presenting of paperwork to merchants. (Id., Ex. TT.) Some even included specific instructions on how to leave key fields in the EFL blank (Ex. T.)[13]

### (3) Merchant Services Centralized Enrollment Documentation and Processing.

After sales reps secured deals, they were required to submit paperwork to company headquarters in Irvine. The paperwork included (1) a completed "Rate Estimation Comparison Sheet" ("Rate Sheet" or Comparison Sheet) that had been shown to the customer, (2) the so-called "Gray ACH Form," (3) voided checks from the business, and (4) other contractual documents, including an application to the processor for merchant processing services and/or an equipment finance lease. (Id., Ex. UU and VV.) Merchant Services published "Paperwork Order" instructions on the proper way to submit the documentation. (Id., Ex. EE (Parisi Depo. 191-92); KK (Roy Depo. 167); WW).[14] Upon receipt of the paperwork packets, Merchant Services routed them to the appropriate departments, or to MBF and the Processors.

---

[12] Roy testified that it was possible to become an ISR without observing a more senior ISR pitch services in the field, but could not name anyone who did. (Id., Ex. KK, p. 59-60.)

[13] At deposition, the rule 30(b)(6) witness for all the Merchant Services companies, apparently hoping to manufacture individual issues about what the sales representatives may have done in the field, denied that the company ever provided "training." (Id., Ex. D (Jurczyk Depo. 431-97).) In his tortured view, "training" meant a "required" program, and no one particular course or program was ever "required," so no actual training occurred. (Id. 109). His self-serving testimony flies in the face of the documentary evidence.

[14] Defendants contend that the rate sheets were not required, but rather that the company "prefers" its reps submit them. (Id. Ex EE (Parisi Depo. 192-93).) The record and documents tell a different story; for example, the Paperwork Order documentation lists the Rate Sheet in bold as "required," and Defendant Roy testified that the Rate Sheet was part of company protocol.

### 3. Defendants Improperly Bundled "Services" to Enroll Unsuspecting Merchants in EFLs and Processing Contracts.

Merchant Services employs the Rate Sheet when enrolling merchants in EFLs. The purpose of the Rate Sheet purportedly is to "provide proper disclosure" to merchants when making a sales pitch. (Id., Ex. D (Jurczyk 691-92); Ex. EE (Parisi Depo.,195-97); Ex. XX.) The Rate Sheet allows ISRs to compare the merchants' current processing charges with an estimate of what Merchant Services allegedly could provide. ISRs are required to use the Rate Sheet when selling services and are prohibited from making alterations, as the company intends the Rate Sheet to be "a clear picture of the rates it will be charging to merchants." (Ex. XX.)

The Rate Sheet has a line item for "Service Fee/Equipment." (Ex. YY, ZZ, AAA, and BBB)[15] Sales representatives are trained to explain that this line reflects a flat fee for Merchant Services' "services," which allows Merchant Services to provide a lower "wholesale" rate for card processing, leading to overall savings. (Id., Ex. DDD (Von Glasenapp Depo. 38:34-39:8).). Training documents show that sales representatives are instructed on how to present the Rate Sheet, and are instructed to describe the rate as "wholesale." (Id., Ex. EEE and FFF.) And Jurczyk described with great detail the companies' practice of bundling their services, and rolling some costs into the equipment lease rate. (Id., Ex. D (Jurczyk Depo. 832-37).)

In fact, this "service fee" is actually a monthly lease payment amount that the ISR inserts on a separate 48-month non-cancellable lease. Merchant Services trains its personnel that their goal is to get the merchant to sign the documents without getting too specific about the lease; in a 2007 email, Jurczyk candidly described the lease as a "deal killer" and questioned whether it had to be disclosed at all. (Id. Ex. GGG.) ████████████████████████████████

████████████████████████████████████████████████ (Id., Ex. HHH).[16]

---

[15] Every version produced by Defendants includes this line, with the exception of one very old version, which does not even mention equipment. (Id. Ex. CCC)

[16] One sales representative candidly explained the "service fee" being billed as a lease to a customer as follows:

> The thing that you need to keep in mind is that the $149.99 per month is our 'service fee' being billed as a lease, which is how I explained it to Kris and all the

### a. **M**erchant Services Improperly Collects Cancellation And Other Fees, To Which It Has No Legal Right, Using Sham ACH Paperwork.

Under MasterCard regulations, no processor may delegate to an ISO the right to collect fees (such as cancellation fees) unless done in writing. Despite repeated requests, Merchant Services Defendants have been unable to produce any such writing.[17] But UCI (which was not even the contracting ISO) nevertheless collected cancellation fees directly from merchants via ACH debit. (Id., Ex. D (Jurczyk; 673, 677).) They also collected, or attempted to collect, additional fees when the initial ACH transactions were unsuccessful. (Id., Ex. MMM.)

No ACH authorization form permitting such transactions has ever been produced. It appears that Merchant Services Defendants' main method of abusing the ACH process was to use

---

merchants I meet with. I agree that $149.99 per month for just a credit card machine is ridiculous!!

(Id., Ex. III, p. 4.) 

In later versions of the Rate Sheet, Merchant Services included a tiny footnote that the "Service Fee/Equipment is billed as a 48 month non-cancellable lease . . ." The text is unreadable on nearly every version. Even Alicyn Roy was unable to read the complete sentence at deposition. (Id., Ex. KK (Roy Depo 171.))

[17] Not only is there no writing authorizing Merchant Services to *collect* cancellation fees, there is not even a writing authorizing anyone to *impose* cancellation fees, at least with regard to customers enrolled with the processor TransFirst. Two different versions of the "Merchant Card Processing Agreement" exist. The first, produced by Merchant Services, includes a provision requiring that the merchant enroll for three years, and states that the early termination fee is either a $495 or a liquidated damages provision. (Id., Ex. KKK, p. MSI049621) The second, produced by the Transfirst, does not contain those provisions and states that the term is month-to-month. (Id., LLL, p. TF00025-26.) Both versions are labeled with "V.1 4/18/2005" at the bottom of the first page. Defendants' only explanation was that Transfirst produced the wrong contract. (Id., Ex. D (Jurczyk Depo. 665)) They have not produced any evidence to show that they obtained their version from Transfirst. Even were Defendants correct, only Transfirst, and not Defendants, would have the right to collect the fee.

a generic form entitled "Authorization Agreement for Direct Payments (ACH Debits)" that they referred to internally as the "Gray ACH Form." The form stated that the merchant "authorizes [Universal] Merchant Services ('Company') to initiate a debit entry in the amount of $ ___ ( [] includes sales tax) to the checking account at the depository financial institution as indicated below ('Bank.')." (Id., Ex. V.) Sales agents were required to submit the form. (Id. UU, VV, WW) The form was then used inappropriately at the outset, to take money for the lease that was not forwarded to Leasing Defendants but rather kepy by UCI as a "commission." (Id., Ex. D Jurczyk Depo. 956) Later, if UCI wanted to make additional debits, for example for cancellation fees, it appears that it would use the same form but alter the dollar amounts.

Even the Merchant Services Defendants' 30(b)(6) witness could not explain what the gray ACH forms actually authorized them to do. (Id., p. 546-49) Rather, he insisted that he would need to see *all* of the documents associated with a given deal to determine whether the Gray ACH Form authorized the withdrawal of funds *beyond* the amount expressly stated on the document. (Id. p. 563-70.) He further was unable to say whether the form was a one-time authorization or a standing authorization, or whether the form authorized UCI to collect a cancellation fee. (Id.) He could not state unequivocally that UCI was the *only* company that received ACH funds. (Id.)[18]

████████████████████████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████ (Id., Ex. OOO) The resulting "new" forms included language purporting to authorize "Merchant Services" to deduct other funds by adding "I also authorize Merchant Services to debit this account for any fees owed due to NSF or chargebacks to

---

[18]Other Merchant Services' witnesses were evasive about the gray ACH form. Parisi testified that the receiving entity was "Merchant Services," but refused to provide a legal business name or any more specifics. Where certain forms used "Universal Merchant Services," Parisi noted that it was probably an old form, but still could not identify the company receiving the money. (Id. Ex. EE (Parisi Depo. 201-19). Moore testified that MSI and NPP do not conduct ACH withdrawals, but could not say if other companies he owned received the money. (Id. Ex. NNN (Moore Depo. 139-41)) Jurczyk testified that UCI often makes ACH withdrawals for monies owed to MSI and NPP. (Id., Ex. D. (Jurczyk Depo. 549.)

my merchant processing account." (Id., Ex.V, p. 5.). Despite drafting the form, Parisi could not say what the form did, who it authorized, or where the money went. (Id., Ex. EE, p. 201-19.)

### 4. The Leasing Enterprise

In addition to locking merchants into expensive, non-cancelable EFLs, Leasing Defendants have used the ACH system to collect hidden administrative fees, to overcharge merchants on property taxes, and collect trumped-up reimbursements from over 100,000 unsuspecting merchants long after their leases were expired.

#### a. Leasing Defendants Improperly Calculated Property Taxes and ACHed Those Amounts from the Class.

Until late 2009, Northern Leasing assessed property taxes on merchants using an "acquisition" cost basis—meaning the amount NLS paid to the vendor to secure the deal. (Id., Ex. PPP (Kulangroth Depo. 36-37).). As discussed above, that cost usually amounted to thousands of dollars for a piece of equipment only worth only a few hundred. The proper tax basis, however, should have been the actual *cost of the equipment* itself. A s NLS's 30(b)(6) witness on property tax admitted, "The basis should always have been equipment cost. We were using acquisition cost by mistake." (Id.) NLS switched to an "equipment cost" basis in late 2009, but decided not to inform any of its merchants that it had been miscalculating their property tax for years, reasoning that "there was no need to." (Id., p. 43).

The difference between the two tax bases is significant. For example, the acquisition cost for Von Glasenapp's equipment was $5,479.18 but the equipment cost only $358. (Id., Ex. E.) NLS testified that after the switch, the property tax liability for each merchant would be "much less" and in "the single digits." (Id., Ex. PPP, p. 43)

#### b. Leasing Defendants Improperly Charge Class Members $25 Filing Fees in Connection With Property Tax Filings.

NLS collects from merchants an annual "property tax administrative fee," typically $25. (Id. QQQ (Berndardone Depo. 57).) But until late 2007 or early 2008, when NLS finally updated its EFL form, NLS failed to disclose that amount. (Id., Ex. B. (Kravic Depo. 162)) Rather, the EFL form simply stated, "Lessor will add such taxes, fees, and other charges to the monthly payments hereunder including handling and administrative costs."(E.g. id., Ex. I.)  There is no

evidence that Defendants incurred "handling and administrative costs" of $25 per lessee.  The $25 was automatically debited from merchants' accounts using the authorization contained in the lease.

<blockquote>
<b>c.     Leasing Defendants Conspired To Collect Purported Back Taxes And Fees From Over 107,000 Merchants.</b>
</blockquote>

In February 2011, Leasing Defendants created a bogus tax collection scheme to defraud former lessees. Specifically, NLS decided to collect from former lessees property taxes it claimed to have paid years ago.  Through a series of misrepresentations to banks, NLS defrauded tens of thousands of merchants out of millions of dollars. In April 2012, the New York Attorney General filed suit, alleging a "gross disregard for fair and honest business practices." (Ex. RRR, p.2.)

<blockquote>
<b>(1)     Northern Leasing Generated Schedule 1 Using Faulty Data.</b>
</blockquote>

To determine what lessees to target, NLS generated a simulation about the amount of *estimated* taxes that had been paid, based on rough data it claims to have obtained by a third party. (Id., PPP (Kulangroth Depo. 163-64); QQQ (Bernardone Depo., 31-40).)  It ran the simulation even on leases that it had acquired from other leasing companies and as to which it had no direct information.  NLS used the inflated "acquisition cost" of equipment as the tax basis in its estimate, even though NLS already knew that this was a "mistake" that it had begun to address at least a year earlier.   (Id., QQQ( Bernardone Depo. 18).)  NLS further imposed a $25 administrative fee for every year it claimed that it had not collect property taxes from any given lessee, even though none of the leases from before late 2007 had disclosed the $25 fee.

From this faulty data NLS created "Schedule 1"—a list of over 107,000 leases and corresponding amounts that it would attempt to collect from them in allegedly owed fees and taxes. Schedule 1 contained more than $2 million in property taxes and more than $8 million in administrative fees, for a combined total of $10.4 million.  (Ex. RRR)  It showed that more than 25,000 merchants actually owed no taxes, but NLS still assessed them anywhere from $25-$100 in administrative fees.  (Id.)

When asked how the specific amounts were calculated, NLS's designated representative

on the topic of the creation of Schedule 1 testified that he did not know, and could not say with any certainty, if any of the data contained in Schedule 1 was accurate. (Id., Ex. QQQ (Bernardone Depo. 30.)  The witness is no longer employed with Northern Leasing.  (Id. p. 7, 70.)

### (2) Northern Leasing Conducted the ACH Transactions Under the Name SKS Associates.

In 2010, prior to initiating the SKS scam, NLS was sanctioned by NACHA, the regulatory body for the ACH network, for improper use of the ACH network, when it attempted to collect payments allegedly owed on expired leases. (Id., SSS (Cohen Depo. 79-80).) As a result, NLS's bank forbade it from doing ACH activity "outside of the original lease term."  (Id., Ex. TTT.)

Because the amounts NLS sought to collect under Schedule 1 were also outside of the original lease term, NLS found another bank to conduct the withdrawals, and decided to conduct them under a different name. NLS first entered into an agreement with ProfitStars, a third party ACH payment processor, hoping to process the SKS back-taxes scheme through it and its affiliated bank. (Id., Ex. PPP (Kulangroth Depo. 128-29), Ex.UUU)  ProfitStars ran ACH transactions using data files provided by NLS from approximately March 1 to March 15, 2011. While Northern Leasing was the entity actually ordering the ACH withdrawals, the "description" that appeared on merchants' bank statements next to the withdrawal was "SKSPMT.COM." (Id., Ex. VVV.)[19]  Because the bank was receiving dozens of complaint calls every day, ProfitStars and its bank terminated the relationship with NLS.

A week later, Northern Leasing, entered into an agreement with Teledraft, another third party processor.  (Id., Ex. WWW.)  In the application, NLS designated  "SKS Associates" as the entity to appear on merchants' bank statements. (Id.)  NLS falsely told Teledraft in a March 25, 2011, email that lessees were to receive phone calls in advance of the withdrawal, and that the accounts were not less than two years old.  Teledraft began conducting the withdrawals.

Hundreds of customers complained to their banks about the improper ACH transactions, and the banks in turn contacted the Federal Reserve, Teledraft, and its bank. (Id., Ex. XXX.) In

---

[19] SKSPMT.COM states that SKS Associates acquired the rights associated with the lease, and does not identify NLS.

response, Teledraft temporarily suspended processing for NLS on April 7, and requested additional information from Northern Leasing. (Id.) NLS responded on April 8 providing misleading information about the nature of the transaction.[20] (Ex. Id.)

Two hours after NLS sent the email, this Court granted Plaintiffs' request for a Temporary Restraining Order. NLS has not produced any evidence showing that it ever informed any bank about the TRO, or the subsequent injunction. Before the TRO and Preliminary Injunction were entered, NLS successfully collected over $3.5 million from merchants. (Id., Ex. RRR.)

**(3)**     **NLS Manufactured Evidence and Hired a Sham Witness to Prevent Its Involvement From Going Public.**

When Plaintiffs filed the Second Amended Complaint on March 18, 2011, Plaintiffs alleged that SKS was the entity that had conducted the improper ACH transactions, based on the representations made in letters to class members and descriptors on merchants' bank accounts. In response to Plaintiffs' Motion for Preliminary Injunction, NLS took a number of steps to deceive the Court into believing that it was not part of the transaction.

First, NLS created a "Purchase Agreement" which suggested that NLS had sold to SKS the rights to the Schedule 1 lessees in December 2010. (Id., YYY) The drafts of the Purchase Agreement, however, all have March 2011 dates (Id. ZZZ, AAAA, BBBB), and NLS testified that it first began taking steps to create Schedule 1, the "asset" that was "purchased" in the agreement, in January or February of 2011. (Id., QQQ (Bernardone Depo 24).) Neither Jay Cohen (the signatory for NLS) nor SKS's 30(b)(6) had an explanation for the date discrepancy.

The Purchase Agreement was attached to two declarations submitted to this Court by Jonathan Mirsky, who claimed to be Vice President of Cucumber Holdings, LLC, which he further claimed was "manager" of SKS. At deposition, however, Mirsky testified that he knew nothing about SKS or Cucumber—he could not even say whether Cucumber Holdings had a "President" or to whom he reported. (Id., Ex. DDDD (Mirsky Depo. 13.) Furthermore, he did

---

[20] For example, in response to the Arizona Processors' request for the language in the lease that Northern Leasing represented authorized the transactions, Northern Leasing submitted a 2008 version of a lease that could not have in use for any of the lessees on Schedule 1 since less than 48 months had passed.

not become actually involved until April 2011—*after* the SKS scheme had been brought to the attention of this Court—when he received a call from his uncle, Defendant Mezei. (Id. at 15.) In the call, Mezei

> had suggested that there was a -- that they wanted to -- they wanted someone to sign off on an affidavit and that -- and that they were concerned about public relations issues as related to this particular transaction. And they asked me if I would mind taking a public relations hit on their behalf.

Id.) Mirsky signed the declarations without making any changes, although he had no personal knowledge of anything contained in them. (Id. 55-75) In return, he was paid $20,000. (Id. 20.) Shortly thereafter, on April 28, 2011, Leasing Defendants submitted the Mirsky declarations to the Court, one in connection with SKS's Opposition to Plaintiff's Motion to Compel Arbitration [Dkt. # 254] and another in connection with SKS's Motion to Compel Arbitration [Dkt. #252].[21]

**C.     The Plaintiffs Are Small Business Owners in California Who Were Defrauded by Defendants.**

**1.     The Merchant Services Customer Plaintiffs.**

The six Merchant Services Customer Class Plaintiffs (Von Glasenapp, Su, Precision Tune, Baumgartner, Jordan, and Dietz Towing) were all enrolled by the Defendants in services within the class period and were all victims of Defendants unfair business practices. These Plaintiffs seek to represent the Merchant Services Customer Class and the Excessive Lease Subclass.

**a.     Merchant Services Defendants Provided Plaintiffs with the Rate Sheet, "Merchant Services" Marketing Materials, and Promises to Save Money**

**(1)     Von Glasenapp Was Enrolled in June 2007.**

Volker Von Glasenapp, a resident of Fairfax California, ran a small shop in San Francisco, Just Film, Inc.,[22] which sold photography equipment and supplies. Defendant Fiona Walshe

---

[21] SKS's Rule 30(b)(6) witness also had no knowledge of the negotiations of the Purchase Agreement, the negotiations of the Service Agreement contained in the Purchase agreement, how the assets were selected for purchase, whether SKS was capitalized, whether SKS had a bank account, and whether SKS ever received any funds in connection with the Purchase Agreement. Nor had she met Mirsky, did not know who Mirsky consulted before submitting the declaration, and did not know when Cucumber became SKS's manager. (Id., Ex. CCCC (13-14, 20, 32, 49-50, 63-69, 76-85.)

[22] Just Film, Inc. was dissolved in 2011. As its sole shareholder, Von Glasenapp acquired its remaining assets, including its causes of action here.

approached Von Glasenapp in June 2007. (Id., Ex. DD (Von Glasenapp Depo. 36-37.) Her business card identified her as a Regional Sales Manager of "Merchant Services," a "registered ISO/MSP of J. P. Morgan Chase." (Id., Ex. EEEE.) Walshe offered to save Von Glasenapp money by offering him "wholesale rates," and presented him with a cost comparison. (Id., Ex. DD (Von Glasenapp Depo. 37-40.) The Rate Sheet with the "Merchant Services" logo on it, showing savings of approximately $164.11 a month, noted that rates would be at wholesale, and identified a "Service Fee/Equipment" of $149.99. (Id. Ex. YY.) Von Glasenapp believed he was enrolling in services with J.P. Morgan Chase based on the "official-looking certification" appearing on her card and her representations that he could go direct and avoid the "middleman." (Id., Ex. DD, p. 28-82; Ex. FFFF.) He provided his bank account information to Ms. Walshe and executed several documents at her request. (Id., Ex. DD 42-46.)

**(2)**     **Jerry Su and Rainbow Business Solutions Was Enrolled in August 2008.**

Jerry Su, a resident of Cupertino, California, runs an auto repair shop, Rainbow Business Solutions, d/b/a Precision Tune Auto Care ("Precision Tune"), located in Milpitas. Su purchased Precision Tune in January 2007 and assumed the previous owner's processing contract with Transfirst and MBF lease. (Id., Ex. GGGG (Su Depo. 34.).) Shortly thereafter, Su switched processing services to a different company but continued to pay his MBF lease. (Id. 49-50.)

One of Precision Tune's customers, Derrick Yu, was also a sales representative for Merchant Services. (Id., p. 58.) Yu made several attempts to convince Su to switch processing services to Merchant Services, representing that they had a new program that would save Su money. (Id.) Yu gave Su with a Rate Sheet with the "Merchant Services" logo on it, showing savings of approximately $259.74 a month. (Id., Simplicio Decl. Ex. ZZ.) The Rate Sheet identified a "Service Fee/Equipment" of $399.99. Yu represented that he would be getting the same program as before, with lower rates and a "service fee" instead of a lease. (Id., Ex. HHHH Precision Tune Depo., 40-41.) Yu provided Su various blank forms, which Su signed. (Id., p. 32-33.) Su later learned that he had been enrolled in a lease for two new credit card terminals identical to the one he already had been leasing from MBF, for a total of three terminals. (Id. Ex.

IIII (Su Responses to Leasing Defendants Interrogatories Nos. 8 &10); Ex. JJJJ (Su Responses to Merchant Services Defendants Interrogatories No. 4.)

### (3) Verena Baumgartner

Verena Baumgartner ("Baumgartner") is the sole proprietor of Burlingame Motors, a registered business in the city of Burlingame. A sales representative for UCI, Penny, approached Baumgartner in May 2007. (Id. Ex. KKKK (Baumgartner Depo. 56-57).) She offered to save Baumgartner money, and presented her with a Rate Sheet showing savings of approximately $107.53 a month. (Id., p. 77-78; Ex. AA) The Rate Sheet contained the "Merchant Services" logo, and identified a "Service Fee/Equipment" of $129.99. (Id., Ex. AA.) Baumgartner executed the Rate Sheet that day and provided the sales representative with her bank account information. (Id., Ex. AA; KKKK (Baumgartner Depo. 61).)

### (4) Dietz Towing and Terry Jordan

Terry Jordan is the Chief Financial Officer of Dietz Towing, Inc., a family-owned business in Ontario, California. In the summer of 2007, Dietz Towing was processing transactions with Chase Paymentech, and as a matter of practice, called Paymentech periodically to ask for a lower rate. In September 2007, a representative of "Merchant Services" phoned Dietz Towing to set up an appointment. Dietz Towing believed the representative was with Chase Paymentech and agreed to meet. (Id. Ex. LLLL (Jordan Depo. 40-41; Ex. MMMM Jordan Response to Merchant Services Defendants Interrogatory No. 4).)

Defendant Alicyn Roy visited the Dietz Towing office in October 2007. (Id.) Her business card identified her as a Senior Account Executive of "Merchant Services," a "registered ISO/MSP of Chase Paymentech." (Id. Ex. II.) During the appointment, Roy offered to save Jordan and Dietz Towing money. Roy did some calculations and presented Roy with a partially completed Rate Sheet with the Merchant Services logo. (Id., Ex. LLLL 73-76.) Roy represented that she would fill in the remainder of the data when she returned to her office to crunch the numbers. (Id.) Dietz Towing executed some forms and provided Roy with banking information. Roy did not provide additional data but nevertheless initiated the service. (Id., MMMM Jordan Response to Merchant Services Defendants Interrogatory No. 4).))

**b. Defendants Enrolled the Plaintiffs in Unconscionable Leases at Rates Higher than Industry Standard.**

All of the Merchant Services Customer Plaintiffs were enrolled in 48 month non-cancellable MBF leases that exceeded the standard lease caps at the time. Von Glasenapp, Baumgartner, and Dietz Towing were all enrolled in leases for one Nurit 2085 swiper and one Verifone pin pad, at combined rates of $149.99, $129.99, and $99.99 a month, respectively. (Id. Ex. I, J, L.) MBF's standard lease caps for those pieces of equipment were a combined $80 ($60 for the swiper and $20 for the pinpad). (Id. Ex. N.) Precision Tune, who already leasing a Nurit 2085 swiper and a Verifone pin pad from MBF for $129.99 a month, was enrolled by Yu in a new lease for two Omni card swipers, and two pin pads for a total of $399.99. (Id. Ex. NNNN.) Had the lease caps applied, the total could not have exceeded $180. (Id. Ex. N.) When the Omnis did not work, Su was provided with two more Nurits, and his lease rate did not change. (Id. Ex. OOOO) The monthly payments were withdrawn directly from each of the Plaintiffs' bank accounts, and appeared on each of the Plaintiffs' bank statements as "Mbf Leasing." (Id. Ex. W, PPPP, QQQQ, RRRR)

**c. Lease Commissions Were Withdrawn from Their Accounts.**

For each of the Plaintiffs, the sales representatives completed Gray ACH Forms. The forms purportedly signed by Von Glasenapp and Baumgartner stated that they "authorized" "Universal Merchant Services" to deduct the funds, and appear to be for two months of lease payments, plus tax. The forms purportedly signed by Dietz Towing and Jerry Su stated they authorized "Merchant Services" to deduct the funds, and appear to be for one month of lease payments, plus tax. (Id. Ex. Z.)

Funds corresponding to the amounts on the Gray ACH forms were withdraw from each Plaintiff's accounts on or about the dates appearing on the form. The result was that Just Film paid over $500 on July 2, 2007 in combined "commission" and leasing payments. (Id., Ex. W.) Baumgartner also paid nearly $500 within the first week of June 2007. (Id., QQQQ) Dietz Towing paid $103 in "commission" on November 29, 2007 and $108 three days later. (Id., RRRR.) And Su had $432.99 withdrawn on May 27, 2008, just one week before NLS withdrew another $437.94. (Id., PPPP.) On each of the Plaintiffs' bank statements, the transaction was

described as "Merchant Service: Merch. Svs." (Id.)

### d. Bogus Cancellation Fees Were Inserted In Their Agreements.

All Plaintiffs were enrolled in processing agreements with Transfirst and Columbus Bank & Trust. Defendants have produced copies of the agreements for each Plaintiff that: (1) identify Transfirst; (2) do not identify any of the Merchant Services Defendants; and (3) include three year term and cancellation penalties of $495 or liquidated damages. Transfirst, however, produced Merchant Card Processing Agreements for each Plaintiff that do *not* include a three year term or cancellation fees. (Id., SSSS) No version of the agreements authorizes any activity by Merchant Services Defendants, such as activities to collect fees or enforce contractual terms.

Nevertheless, Merchant Services mailed Baumgartner a letter attempting to enforce the liquidated damages provision, informing her that she would have to pay over $26,000 to close her account. (Id. Ex. TTTT.) It attempted to withdraw funds from the accounts of Von Glasenapp and Baumgartner when they cancelled their accounts and sent communications attempting to collect these funds. (Id. Ex. JJJ, QQQQ) It then imposed $45 return item charges on the rejected ACH transactions. (Id.) It successfully withdrew a $495 cancellation fee from Dietz Towing's bank account. (Id. Ex. RRRR) When Su initially sued Merchant Services in small claims court, Madura offered to waive the $495 cancellation fee as a settlement offer, even though Merchants Services was never authorized to collect it. (Id. Ex. UUUU)

### 2. Credit Monitoring Plaintiffs

#### a. Post-Termination Processing Inquiries

After Von Glasenapp terminated his account in September 2008, he received bills from "Merchant Services" for $717. 97. (Id., Ex. MMM.) The bills were for a cancellation fee, "Month of September" and rejected ACH charges. (Id.)

Shortly thereafter, Defendants began monitoring his credit. An Experian report shows that "Universal Merchant Services LLC" retrieved Von Glasenapp's consumer credit report on October 16, 2008. (Id. Ex. VVVV) In February 2009, Von Glasenapp paid the "Month of September" charge to "Merchant Services." (Id. Ex. WWWW.) In March, Merchant Services

conducted another credit inquiry. (Id. Ex. VVVV.)[23]

**b.    Equipment Lease Default Inquiries.**

Von Glasenapp stopped paying on his lease in September 2008.  Leasing Defendants conducted a credit inquiry on February 20, 2009. (Id. Ex. VVVV)

Lewis Bae is the owner and Chief Executive Officer of The Rose Dress, Inc., a formalwear business operating in San Jose, California. Merchant Services enrolled Bae and the Rose Dress in an EFL with MBF in May 2005.  The lease was for a Nurit 2085 and pin pad, and was for $159.99, in excess of standard lease rate caps. (Id., Ex. K.) Bae defaulted shortly thereafter and was subjected to years of harassing calls and letters.  He was sued twice, first by NLS, then again by MBF Leasing, in New York.  (Id., Ex. XXXX (Bae Response to Leasing Defendants Interrogatory No. 27.)  During this time, Leasing Defendants continued to retrieve consumer credit reports on Bae.  MBF Leasing retrieved reports on December 11, 2009 and February 22, 2010 from Experian and Transunion.  (Id., Ex. YYYY).

**3.    Property Tax Plaintiffs**

**a.    Property Tax Equipment Cost Basis Class and Property Tax Fee Non-Disclosure Class Plaintiffs**

Throughout the class period, Plaintiffs Just Film and Dietz Towing were routinely assessed property tax fees using an acquisition cost basis method.  Leasing Defendants have listed the acquisition cost of Just Film's equipment at $5,429.19, and using that basis, assessed taxes and $25 fees of $81.01 and $79.84 in January and September 2008.  (Id. Ex. E., Ex. ZZZZ) Likewise, the acquisition cost for the same equipment leased by Dietz Towing was $3,686.  (Id. Ex. AAAAA.)  Using that basis, Leasing Defendants assessed $62.68 and $61.89 in taxes plus $25 fees.  (Id. Ex. BBBBB)  Von Glasenapp returned his equipment, but Dietz was assessed another $50.91 in property taxes in January 2010.  (Id.)  Northern Leasing has listed their equipment as having a value of $358. (Id. Ex. E, AAAAA.)  Neither of their leases state that a $25 fee will be imposed.  (Id. Ex. I, L.)

---

[23] Jurcyzky admitted that UCI contracted with Experian using the name "Universal Merchant Services." (Id. Ex. D (Jurczyk 816, Ex. CCCCC).)

### b. SKS Post-Lease Expiration Plaintiff

Erin Campbell is the sole proprietor of, and does business as, Silicon Valley Pet Clinic, a veterinary clinic in Santa Clara, California. Campbell was enrolled in a lease with CIT Corp in 2002. Northern Leasing acquired servicing rights, and Campbell terminated her lease in 2007. (Id., Ex. DDDDD (Campbell Responses to Leasing Defendants Interrogatory Nos. 9-10.).)

In March 2011, Erin Campbell received a letter from SKS advising her that it had "acquired all of the rights, title and interest" in a lease that she had "entered into with Lease Finance Group LLC."[24] The letter stated that an audit[25] was conducted and that Campbell owed $85.50 for "certain taxes and related fees." Finally, the letter advised Campbell that the funds would be automatically deducted from her bank account. (Id., Ex. EEEEE.)

Campbell had closed her account in the intervening years, and SKS could not access her funds. She called Defendants numerous times to try to ascertain how the $85.50 amount was calculated. Defendants refused to answer. (Id., Ex. EEEEE.)

Discovery revealed that Defendants sought to collect $35.50 in property taxes and $50 in administrative fees, despite the fact that Campbell's lease includes no such provision authorizing administrative fees. (Id. Ex. GGGGG, p. 5, lease no. 0722579A.) Defendants now admit that the amount they sought to collect from Campbell was inaccurate. (Id., Ex.QQQ (Bernardone 29-30.)

## III. ARGUMENT

### A. Legal Standards for Class Certification.

Rule 23 provides district courts with broad discretion to determine whether a class should be certified and to revisit the question of certification throughout the legal proceedings. *See Armstrong v. Davis*, 275 F.3d 849, 872 n.28 (9th Cir. 2001). A class action must satisfy all four

---

[24] Campbell never entered into a contract with Lease Finance Group LLC. Campbell's original contract was with the Lease Finance Group division of CIT Corp. In 2005, CIT sold that division to GCN Holding, of which Northern Leasing is part owner. GCN in turn, purportedly authorized Northern Leasing to service the old CIT leases. Defendants have not produced any evidence showing that Campbell's lease was ever transferred from GCN to Northern Leasing or Lease Finance Group LLC.

[25] Plaintiffs have sought all documents related to the "audit" from Leasing Defendants (who were unable to locate any) and their third-party tax processor (who stated that it has no record of any audit).

requirements in Fed. R. Civ. P. 23(a): "(1) the class is so numerous that joinder of all members is impracticable; (2) there are questions of law or fact common to the class; (3) the claims or defenses of the representative parties are typical of the claims or defenses of the class; and (4) the representative parties will fairly and adequately protect the interests of the class." In addition, the proposed class must also satisfy at least one of the three subdivisions of Fed. R. Civ. P. 23(b). Here, the proposed Class and Subclasses satisfy Rule 23(b)(3), because "questions of law or fact common to the members of the class predominate over any questions affecting only individual members, and a class action is superior to other available methods for the fair and efficient adjudication of the controversy." Fed. R. Civ. P. 23(b)(3).

**B.      The Proposed Classes Meet All Four Requirements of Rule 23(a).**

**1.      The Proposed Classes Are Sufficiently Numerous and Ascertainable.**

Rule 23(a)(1) requires that the class be so numerous that joinder of all class members is "impracticable." Fed. R. Civ. P. 23(a)(1). "Impracticable" does not mean impossible, only that it would be difficult or inconvenient to join all members of the class. *See Harris*, 329 F.2d at 913-14. Where the number of class members is large, joinder will usually be impracticable. *Jordan v. County of Los Angeles*, 669 F.2d 1311, 1319 (9th Cir. 1982), *vacated on other grounds*, 459 U.S. 810 (1982). The exact size of the class need not be known as long as general knowledge and common sense indicate that the class is sufficiently numerous. *Id.*

Rule 23(a)(1) has also been interpreted to require an "ascertainable" class, meaning "a distinct group of plaintiffs whose members can be identified with particularity." *Keilholtz v. Lennox Hearth Prods.*, 2010 U.S. Dist. LEXIS 14553 (N.D. Cal. Feb. 16, 2010), *citing Campbell v. PricewaterhouseCoopers, LLP*, 253 F.R.D. 586, 593 (E.D. Cal. 2008). "The identity of class members must be ascertainable by reference to objective criteria." *Id.*, *citing* 5 James W. Moore, Moore's Federal Practice, § 23.21[1] (2001)). A class definition is sufficient if the description of the class is "definite enough so that it is administratively feasible for the court to ascertain whether an individual is a member." *O'Connor v. Boeing N. Am., Inc.*, 184 F.R.D. 311, 319 (C.D. Cal. 1998).

Here, the requirements of Rule 23(a)(1) are easily satisfied. All the class definitions set

forth a clear date range (March, 26 2006 to the date that the class is certified) and use objective, easily identifiable criteria, such as enrollment in a service or payment of a particular fee. *See Chavez v. Blue Sky Beverage Co.*, 2010 U.S. DIST. LEXIS 60554 (N.D. Cal., June 18, 2010) ("The proposed class is defined by an objective standard of consumers who purchased a Blue Sky beverage bearing the allegedly misleading labels in violation of state law.").

The classes are also sufficiently numerous. The exact size of the Merchant Services Customer Class is not known, but it is known that Merchant Services Defendants have enrolled more than 9,400 merchants into leases during the class period; their names and addresses are set forth in the Lease Database maintained by Northern Leasing. (Sands Decl. ¶ 8.) The Excessive Lease Subclass—i.e., the members of the Merchant Services Customer Class whose lease rate exceeds the standard lease cap—comprises more than 2,100 merchants. (Id. ¶ 9.) Their identities also are shown in the Northern Leasing Database. (Id.)

The three property tax subclasses asserted against the Leasing Defendants also are sufficiently numerous and ascertainable. The approximately 107,000 members of the SKS Post-Lease Expiration Class are shown on schedule 1 to the Purchase Agreement.[26] The members of the Property Tax Fee Non-Disclosure Class—whose leases omitted the language about the $25 processing fee—can be discerned from the Lease Database and linked taxing databases, which contains the lease date, information about dates fees were imposed and their amounts, and a scanned image of each lease. (A disclosure about the fee was added to all new leases by the spring of 2008). (Simplicio Decl., Ex. B. (Kravic Depo 161-62).) The size of this class is not yet known, but is estimated to exceed 10,000. The members of the Property Tax Equipment Cost Basis Class can be discerned from the same databases, which also contains information about whether taxes were imposed based on the grossly inflated "acquisition cost" or the equipment cost. The size of this class is not yet known, but is estimated to exceed 150,000.

Even if class members could not be identified from defendants' records, they could identify themselves by looking for certain types of transactions or descriptors appearing on their

---

[26] More than 19,000 of these Class members are in California.

bank statements.[27] *See Saltzman v. Pella Corp.*, 257 F.R.D. 471 (N.D. Ill. 2009), *aff'd*, 2010 U.S. App. LEXIS 10259 (7th Cir. Ill. May 20, 2010) (notice to class members may include information necessary to conduct a self-inspection); *Keilhotlz*, 2010 U.S. Dist. LEXIS 14553 (N.D. Cal., Feb 16, 2010) at *11 ("Unnamed Plaintiffs will be able to identify the alleged offending products by viewing the exposed face of their fireplace"); *see also In Re Tableware Antitrust Litig.,* 241 F.R.D. 644 (N.D. Cal. 2007) ("[I]ndividuals would be able to determine, simply by reading the definition, whether they are members of the proposed class" of persons who purchased one or more varieties of products).[28]

## 2. This Litigation Concerns Common Questions Of Law and Fact.

Commonality requires the plaintiff to demonstrate that the class members "have suffered the same injury." *Wal-Mart Stores, Inc. v. Dukes*, 131 S. Ct. 2541, 2551 (2011) (quoting *General Telephone Co. of Southwest v. Falcon*, 457 U.S. 147, 157 (1982)). Otherwise put, class members' claims must depend upon a common contention that is "of such a nature that it is capable of classwide resolution." *Id.*

With respect to the RICO claims, common questions include whether Defendants were an association-in-fact enterprise; whether each Defendant participated, directed or controlled the conduct of the enterprise; and whether they did so through a pattern of racketeering activity. *See, e.g., Brenner v. Future Graphics, LLC*, 258 F.R.D. 561 (N.D. Ga. 2007) (certifying a class of victims of a RICO scheme). These claims as well as the conversion claim all involve the same

---

[27] Merchant Services Defendants testified that the descriptor, "Merchant Service Merch. Svs." is typically what appears on merchants bank statements in connection with their ACH transactions. (Simplicio Decl., Ex. D (Jurczyk Depo. ) Plaintiffs' monthly leasing withdrawals were labeled "Mbf leasing" on their bank statements. (Id., W) And Northern Leasing instructed that the SKS withdrawals be clearly marked with "SKS Associates." (Id., WWW.)

[28] Merchant Services Defendants have argued that many of their records are not stored electronically, but rather paper files are maintained in bankers' boxes, of which a thorough review would be unduly burdensome. [Dkt. # 364-4 Jurczyk Declaration in Support of Opposition to Plaintiffs' Motion to Compel, ¶¶ 8-13.) The absence of easily accessible records cannot be used as a basis to deny certification. *See, e.g., Cannon v. Nationwide Acceptance Corp.*, 1997 U.S. Dist. LEXIS 3517 (N.D. Ill., Mar. 24, 1997) ("Defendants' first argument conveniently relies on the insufficiency of Nationwide's record keeping…It cannot be the rule that actions based on fraud cannot be maintained as class actions unless the defrauder has kept of a record of those who he might have deceived.")

alleged wrongdoing and injury, namely impermissible ACH debits. These improper ACH debits fall into three categories: First, there is a common question as to whether the debits for monthly lease payments were improper, because the bundling of the leases violated MasterCard regulations, and the monthly lease amounts exceeded lease caps. Second, there is a common question as to whether the debits for lease property taxes and fees were improper, because they were not disclosed in the written agreement [Non-Disclosure Class], were based on the admittedly wrong cost basis [Equipment Cost Basis Class], and/or were imposed on expired leases in the name of a sham entity [SKS class]. Third, there is a common question as to whether the debits of cancellation fees and associated charges for processing services were improper, because the MasterCard regulations prohibited Merchant Services from collecting such fees. In all cases, the arguments showing impropriety are common to all.[29]

The contract claims are alleged only with regard to the Property Tax Fee Non-Disclosure Class and the Property Tax Equipment Cost Basis Class. In both cases there are common questions, because "interpretation of the form contracts [i.e., the form leases] is likely to drive the outcome." *Schulken v. Wash. Mut. Bank*, 2012 U.S. Dist. LEXIS 2005, *42 (N.D. Cal. Jan. 5, 2012), *citing Lymburner v. U.S. Financial Funds, Inc.*, 263 F.R.D. 534, 540-41 (N.D. Cal. 2010) ("[T]he Court here is asked to focus on the loan documents, not representations made to each individual class member. Therefore, there are common questions of law and fact.").

With respect to Plaintiffs' false advertising claims, UCL, misrepresentation and fraud claims against the Merchant Services Defendants, the key common questions are whether the "Merchant Services" branding, the practice of bundling credit card processing and leasing, and the use of the Rate Sheet are unfair, deceptive or misleading to reasonable people. *See Cel-Tech Comm., Inc. v. Los Angeles Cellular Tel. Co.*, 20 Cal. 4th 163, 180 (1999) (UCL prohibits conduct that is unfair or deceptive, even if it is not unlawful); *Cortez v. Purolator Air Filtration Prods. Co.*, 23 Cal. 4th 163, 181 (2000) (UCL does not require intent to injure); *Comm. on*

---

[29] The use by Merchant Services Defendants of the "Gray ACH form" to collect the first and third set of fees also presents numerous common questions, including: (1) which entity is being authorized to obtain the funds, (2) for what purpose the funds may be debited, and (3) whether the form can be used for multiple debits or only a single debit.

*Children's Television, Inc. v. General Foods Corp.*, 35 Cal. 3d 197, 211 (1983); *Lavie v. Procter & Gamble Co.*, 105 Cal. App. 4th 496, 506-07 (Dist. Ct. App. 2003) (advertisement "is judged by the effect it would have on a reasonable consumer"); *Chern v. Bank of Am.*, 15 Cal. 3d 866, 876 (1976) ("statement is false or misleading if members of the public are likely to be deceived. Intent of the disseminator and knowledge of the customer are both irrelevant."). Even if not misleading, if Plaintiffs prove that defendants violated another law in their conduct towards class members, the UCL claim is proven as to all. Another common question affecting every Class member under the fraud-based claims (including fraud and negligent misrepresentation) is whether Defendants intended to deceive or were reckless in their actions. *See Hunter v. Up-Right, Inc.*, 6 Cal. 4th 1174, 1184 (1993).

There are also common questions on the fraud, negligent misrepresentation and UCL classes against the Leasing Defendants.[30]  In addition to the common questions of intent (on the fraud claim) and illegality (on the UCL claim), common questions involve:  whether Leasing Defendants authorized Merchant Services Defendants to act on their behalf, and whether Merchant Services were acting in the scope of that agency when they made false or misleading representations to the class.

On the breach of good faith and fair duty claim, which is directed against the Property Tax Fee Non-Disclosure Class and the Property Tax Equipment Cost Basis Class, the common question is whether Defendants breached their duties to the classes when they imposed fees not authorized under the contract and miscalculated taxes using an improper accounting methods, resulting in the classes being overcharged.

The common question on the FCRA claim is whether defendants' attempt to collect monies allegedly owed for termination of processing services, or for a lease that exceeded standard lease caps, was whether Defendants had a "permissible purpose" as required by the Act.

---

[30] The fraud claim is pled against the Leasing Defendants on behalf of three classes:  the Excessive Lease Amount Subclass, the Property Tax Fee Non-Disclosure Class, and the Property Tax Equipment Cost Basis Class.  The negligent misrepresentation claim is pled on behalf of the latter two of those classes.  The UCL claim is pled on behalf of California members of all three property tax classes (i.e., including the SKS Post-Lease Expiration Class).

Plaintiffs' theory is that Merchant Services Defendants were barred by the MasterCard regulations from collecting termination-related fees, and that the leases in excess of the cap were unconscionable, rending collection efforts illegitimate. Also common to the class is whether a lease in excess of the rate caps is a "credit transaction initiated by the consumer." Proof of this theory is common to all class members.

### 3. Plaintiffs' Claims Are Typical Of Class Members' Claims.

The purpose of the "typicality" requirement of Rule 23(a)(3) is to ensure that the named representatives' interests "align" with those of the class. *See Hanon v. Dataproducts Corp.*, 976 F.2d 497, 508 (9th Cir. 1992). "[R]epresentative claims are 'typical' if they are reasonably coextensive with those of absent class members; they need not be substantially identical. Some degree of individuality is to be expected in all cases, but that specificity does not necessarily defeat typicality." *Hanlon*, 150 F.3d at 1020; *Staton*, 327 F.3d at 957. Typicality is satisfied so long as the named plaintiffs' claims stem from the same event, practice, or course of conduct that forms the base of the class claims and are based upon the same legal remedial theory. *See Jordan*, 669 F.2d at 1321.

### a. All Plaintiffs Are Typical Of The Merchant Services Customer Class and Excessive Lease Subclass.

Here, all Plaintiffs have claims typical of the Merchant Services Customer Class. All are small business owners who were enrolled in credit card processing services and sold bundled, excessively priced EFLs by an illegitimate association. All were presented the "Merchant Services" branded materials, including the Rate Estimation Sheet, that improperly bundled the lease amount as a "service fee." All were enrolled in the processing services, like every Merchant Services Customer Class member, by a purported "independent sales representative" of "Merchant Services, a registered ISO" even though (1) there is no such registered ISO and (2) the use of independent contractors is prohibited by MasterCard regulations. And all suffered from ACH withdrawals by unknown companies—such as UCI (Id., Ex. D (Jurczyk Depo. 548-49).)

All Plaintiffs also have claims typical of the Excessive Lease Subclass, as all their leases were for amounts that exceeded the standard monthly lease caps. For example, Plaintiff Von Glasenapp was leased the Nurit 2085 and Verifone pinpad at a rate of $149.99 per month,

although the standard lease cap for that equipment was $60 and $20, respectively.

**b.      Proposed Representatives Von Glasenapp, Precision Tune, Baumgartner, Jordan, and Dietz Towing Are Typical Members Of The Property Tax Fee Non-Disclosure Class.**

Each of the proposed representatives of the Property Tax Fee Non-Disclosure Class enrolled in a lease that did not disclose a $25 filing fee. All were assessed those fees via automatic debit from their bank account.

**c.      Proposed Representatives Von Glasenapp, Su, Precision Tune, Jordan, and Dietz Towing Are Typical Members Of The Property Tax Equipment Cost Basis Class.**

Each of the proposed representatives of the Property Tax Equipment Cost Basis Class was assessed property taxes, via automatic bank debit, using a tax calculation method that Defendants admit to be improper: namely applying the tax rate to the inflated "acquisition cost" the Leasing Defendants had paid the ISO, rather than the equipment cost.

**d.      Proposed Representative Campbell Is Typical Of The SKS Post-Lease Expiration Class.**

Erin Campbell, the proposed SKS representative, was personal guarantor of an expired lease listed on the SKS purchase agreement. Leasing Defendants attempted to collect purported back taxes and fees from her via an ACH transaction.

**e.      Proposed Representatives Von Glasenapp and Bae Are Typical Members Of The Credit Monitoring Class.**

Both VonGlasenapp and Bae had inquiries placed on their personal credit records by Defendants for an impermissible purpose. VonGlasenapp's credit was checked by Merchant Services Defendants after he cancelled his credit card processing services as part of their attempt to collect cancellation fees and other alleged processing-related debts. But Merchant Services Defendants are prohibited from collecting such fees from every Credit Monitoring Class member. Bae and Von Glasenapp's credit was checked by Leasing Defendants as part of their attempt to collect lease payments, even though the lease amount was excessive and not the result of a credit transaction initiated by them, but rather the result of a sham transaction from which Merchant Services Defendants acquired money by fraud, leaving Bae and Von Glasenapp to repay Leasing Defendants. Leasing Defendants are similarly prohibited from collecting such payments from

every class member.

**4.      The Proposed Class Representatives Will Fairly And Adequately Protect Class Interests**

Rule 23(a)(4) requires that the class representative "fairly and adequately protect the interests of the class."  The Ninth Circuit has established a two-prong test for this requirement: "(1) Do the representative plaintiffs and their counsel have any conflicts of interest with other class members, and (2) will the representative plaintiffs and their counsel prosecute the action vigorously on behalf of the class?"  *Staton*, 327 F.3d at 957.

**a.      Plaintiffs Have No Conflicts Of Interest With Class Members.**

The first prong of the adequacy test is closely related to the test for typicality.  Where, as here, the claims of the class members and the class representatives are reasonably co-extensive, there is presumed to be no conflict of interest.  *See General Tel. Co. v. Falcon*, 457 U.S. 147, 157-8, n. 13 (1982).  Moreover, if there are any doubts as to the adequacy of representation or potential conflicts, they should be resolved in favor of upholding the class, subject to later possible reconsideration.  *See Newberg on Class Actions* §7.24 at 7-80 to 7-81 (3d ed. 1992).

**b.      The Representative Plaintiffs Will Vigorously Prosecute This Action.**

Each of the Plaintiffs already has demonstrated a commitment to the case by (1) working with counsel to craft the allegations of the complaint and several amendments thereto, (2) providing verified answers to numerous rounds of interrogatories, (3) searching for and producing documents responsive to dozens of categories of requests, and (4) appearing for one full day (or in some cases, two full days) of deposition.  Each Plaintiff has also remained up-to-date on status of the proceedings and communicated with counsel.  (Simplicio Decl. ¶ 2.)

**c.      Gutride Safier LLP Will Continue to Vigorously Represent the Class.**

When a court certifies a class, it must also appoint class counsel unless a specific statute provides otherwise. Fed. R. Civ. P. 23(g)(1)(A).  The basic requirement is that counsel must fairly and adequately represent the interests of the class.  *See* Fed. R. Civ. P. 23(g)(1)(B).  In appointing class counsel, the court considers "the work counsel has done in identifying or investigating potential claims in the action, counsel's experience in handling class actions, other

-35-

complex litigation, and claims of the type asserted in the action, counsel's knowledge of the applicable law, and the resources counsel will commit to representing the class…." Fed. R. Civ. P. 23(g)(1)(c)(i).

Plaintiffs have engaged experienced, competent counsel—Gutride Safier LLP ("GSLLP")—to represent the Class.[31] GSLPP has considerable experience with complex class actions and has no conflicts that would prevent it from adequately representing the interests of the Class. (Gutride Decl. ¶ 6.) Moreover, GSLLP has spent considerable time and money litigating this matter to date and will continue to commit considerable resources to the prosecution of this action. (Id. ¶ 3.)

**C.     The Proposed Classes Meet the Requirements of 23(b)(3).**

Rule 23(b)(3) requires that "questions of law or fact common to class members predominate over any questions affecting only individual members, and that a class action is superior to other available methods for fairly and efficiently adjudicating the controversy." Fed. R. Civ. P. 23(b)(3). The predominance inquiry asks "whether proposed classes are sufficiently cohesive to warrant adjudication by representation. The focus is on the relationship between the common and individual issues." *Stearns v. Ticketmaster*, 655 F.3d 1013, 1019 (9th Cir. 2011) (*quoting Mevorah v. Wells Fargo Home Mortg.*, 571 F.3d 953, 957 (9th Cir. 2009) (internal quotations and citation omitted)). This criterion is normally satisfied when there is an essential common factual link between all class members and the defendant for which the law provides a remedy. *See In re Visa Checks/MasterMoney Antitrust Litig.*, 280 F.3d 124, 136 (2nd Cir. 2001). Furthermore, "[t]he answer to the question of whether common issues predominate and whether a class action is a superior method of resolving this case lies in the answer to the question of which parties' conduct is most central to this case." *Oregon Laborers-Employers Health & Welfare Trust Fund v. Philip Morris*, 188 F.R.D. 365 (D. Or. 1998) (certifying a RICO class); *see also*

---

[31] For the first year of this litigation, Plaintiffs were represented jointly by GSLLP and the McNutt Law Group. In May 2011, McNutt Law Group withdrew when counsel at the McNutt Law Group moved to Meyers Nave LLP. From that point until July 2012, Plaintiffs were jointly represented by GSLLP and Meyers Nave. Meyers Nave recently withdrew, and Plaintiffs filed a motion to withdraw. [Dkt. # 382.] Plaintiffs do not foresee any difficulties in being solely represented by GSLPP and Defendants did not file any opposition to Plaintiffs' motion.

*Brenner v. Future Graphics, LLC*, 258 F.R.D. 561 (N.D. Ga. 2007) ("the factual and legal issues that focus on the activities of the defendants rather than the activities of the plaintiffs are common to all class members…. Therefore, this court finds that with regard to the Federal and State RICO claims, common issues of law and fact predominate.").

    **D.**    **Common Legal and Factual Issues Predominate.**

        **1.**    **A Centralized Scheme to Defraud Predominates Over Individual Issues.**

Where plaintiffs have alleged centralized schemes to defraud, the existence of the scheme predominates over any individual issues that may arise from oral sales pitches: "It is the underlying scheme which demands attention." *In re American Continental Corp./Lincoln Savings & Loan Securities Litigation*, 140 F.R.D. 425, 431 (D. Ariz. 1992), cited with approval in *In re First Alliance Mortg. Co.*, 471 F.3d 977, 991 (9th Cir. 2006); *see also Schaefer v. Overland Express Family of Funds*, 169 F.R.D. 124, 129 (S.D. Cal. 1996) (citing American Continental for the proposition that "representations made to brokers or salesmen which are intended to be communicated to investors is sufficient to warrant class standing, even where the actual representations to individuals varied").

In *In re American Continental Corp.*, plaintiffs alleged a RICO scheme whereby they were duped into investing in worthless assets via a shell company using a misleading business name. The plaintiffs alleged that the sales approach was conceived by management, including using a "drawing card" representing the purportedly legitimate company name to attract customers, "thereby exploiting their trust and confidence." *Id.* at 430. The court found that the "center of gravity transcends the specific details of oral communications," because the fraud was not conceived by the sales representatives themselves. *Id.* at 431. Rather, because the plaintiffs had presented evidence of "a whole roster of deception designed to contrive a false image," as well as evidence that "misrepresentations to regulators allegedly effected and perpetuated [defendants'] very license to own and operate" the company," common issues predominated. *Id.*

A similar result was reached in *Jenson v. Fiserv Trust Co.*, 256 Fed. Appx. 924 (9th Cir. 2007). There, investors were defrauded by a Ponzi scheme and sought to hold two defendants

liable – the company that executed the Ponzi scheme, and a company through whom a subclass of investors purchased the fraudulent assets. Id. at 924. The district court granted certification, and the second defendant appealed, arguing that there was no common proof that it knew what the first defendant told each investor or that it knew the information was false. The Ninth Circuit disagreed, reasoning that "either it knew of [the] scheme to defraud and took steps substantially to advance the scheme or it didn't. Either way, its knowledge and assistance (if any) predominates as a common issue." Id. at 926.

One key part of the scheme here involves the use of the ACH system to make debits from class member accounts, so another predominant question is the scope of the class members' authorization for such debits, which is contained in common forms: the gray ACH form and the equipment lease. In Friedman v. 24 Hour Fitness USA, Inc., 2009 U.S. Dist. LEXIS 81975 (C.D. Cal. Aug. 25, 2009), a court certified a similar RICO class on the theory that the defendants had made improper ACH withdrawals. Because the ACH withdrawals there were made by the defendants without the involvement of the plaintiffs, the Friedman court explained that, "Because the injury to class members was inflicted automatically through electronic processes, as a result of the payment processors' reliance on the alleged misrepresentation, the proximate cause requirement is not a barrier to class treatment of the RICO claim." Id. at * 26. Thus, the court found a common issue as to whether defendants had made false statements to their ACH provider and banks, in that by initiating the ACH transactions, they had represented to their banks that payments were due and owing, charges were authorized, and ACH authorization had not been revoked. Id. at *6. The falsity of these statements to banks could be proven commonly, because the predicate fraud turned on warranties to the banks, not representations to individuals. Id. at *25. Thus, common issues predominated. Id. at *25-26.[32]

Another predominant issue underlying each of the fraud claims is whether Defendants

[32] Leasing Defendants here not only made similar implied misrepresentations but further overt misrepresentations when signing up for ACH processing services through ProfitStars and Teledraft in connection with the SKS scam. For example, Leasing Defendants withheld the fact that their bank had prohibited them from collecting funds outside of the original lease term and represented that they were authorized to collect these sums under the leases. (Id., Ex. UUU, WWW, XXX.)

"have properly disclosed all the fees and charges that they imposed on purchasers." *Soto v. Superior Telcoms., Inc.,* 2011 U.S. Dist. LEXIS 145205, *18 (S.D. Cal. Dec. 15, 2011). Because that question focuses on Defendants' conduct, common questions predominate. *Id.* at *19 (certifying a class for violations of the UCL and conversion).

## 2. Reliance on the RICO Scheme Can Be Inferred.

At least two sets of facts here permit an inference of classwide reliance on the RICO scheme. First, the Defendants were operating in a regulated industry in which merchants would reasonably expect them to comply with applicable regulations. In order to sell credit card processing services, an ISO is bound to follow the rules promulgated by Visa and MasterCard, which are designed to protect the integrity of the industry and by extension, its merchants and customers. Among other things, the ISO may not collect fees due to a bank or processor (such as cancellation fees) without written authorization from the bank or processor; here, collection activities took place without such authorization. (Simplicio Decl., Ex. CC, §§ 7.3.10, 7.4.2) The ISO also may not assign or subcontract any rights or obligations to others (id. § 7.3.12); here NPP and MSI offloaded all the key activities to unregistered entities like UCI and its purported "independent contractor" sales agents. And the ISO may not have a separate agreement with a merchant regarding processing activities (id. § 7.4.1); here it did so by imposing a monthly "service fee" on customers to enable a "wholesale rate," which it then "billed as a lease" in a separate EFL. Class members were directly harmed by each of these regulatory violations.

One court has addressed a similar situation where parties schemed to make illegitimate transactions appear legitimate by holding themselves out as legitimate businesses in a regulated field. The underlying facts are described at *Robinson v. Fountainhead Title Group Corp,* 252 F.R.D. 275 (D. Md. 2009) (*Robinson I*): the plaintiff alleged that several legitimate entities in the real estate business created a sham entity with the intent to violate various rules promulgated by the U.S. Department of Housing & Urban Development (HUD). *Id.* at 278. The legitimate businesses did the title work in accordance with HUD rules, but the class was billed by the sham entity for the title work, for charges in excess of what HUD permitted. *Id.* In certifying a RICO class, the *Robinson II* Court found that "it would be a reasonable inference to assume that a class

member who purchased services from [the sham entity] relied on the legitimacy of that organization in paying the rate charged." *Robinson v. Fountainhead Title Group Corp,* 257 F.R.D. 92 (D. Md. 2009) (*Robinson II*) (emphasis added), *citing Klay v. Humana, Inc.,* 382 F.3d 1241 (11th Cir. 2004). The same inference should be made here.

Second, no reasonable class member would have entered into this deal knowing the truth.[33] Upon being enrolled into a non-cancellable equipment lease, every merchant immediately had money taken via ACH transaction by both the Merchant Services Defendants (described by them as a portion of their "commission") and the Leasing Defendants (the purported first of 47 lease payments).[34] The combined amount of these debits were equal to or greater than the amount the class member could have paid to purchase the equipment outright, but the class member was then locked into making another 46 payments. In similar circumstances, in *Kennedy v. Jackson National Life Insurance Company*, this Court found that common questions predominated where a plaintiff had alleged a RICO scheme, even though the purchases (of annuities) occurred after oral sales presentations. *See Kennedy v. Jackson Nat'l Life Ins. Co.,* 2010 U.S. Dist. LEXIS 63604, *26-27 (N.D. Cal. June 23, 2010) (Wilken, J.). The plaintiff there argued that "a jury could reasonably infer reliance based on the uniform use of the term 'bonus,' the failure to disclose material information[,] and class members' purchase of annuities that are 'high cost, illiquid and poorly-performing.'" *Id.* This Court agreed, finding that if the annuities did not offer a benefit in relation to their cost, "a reasonable inference could be drawn that class

---

[33] Even if the Rate Sheet (which does not, among other things, disclose the lease "commissions", property tax fees, and cancellation fees) is a true and accurate depiction of cost savings, the deal requires that a merchant pay for the "services" for 48 months, even if they cancel their processing plan long before that.

[34] Merchant Services Defendants testified that the amount of the "commission" that they ACHed from the class's accounts varied throughout the class period. Whether they took one month, two months, or some other amount is a damages calculation. What is common to all is that every merchant enrolled in an EFL had to pay huge upfront costs ("commission" plus first monthly payment) even though a real lease – per Northern Leasing's own words – is to "spread the cost." See http://www.northernleasing.com/services.aspx (last accessed August 23, 2012). Under *Kennedy*, it is reasonable to infer a reliance on a misrepresentation when Defendants collected over $200 up front from Dietz Towing and then sought to collect $103 a month for 47 more months for a set of equipment Leasing Defendants have valued at $358.

PLAINTIFFS' AMENDED MOTION FOR CLASS CERTIFICATION

members would not have purchased them had they been fully informed about material facts." *Id.*
This Court further reasoned that while class members may have had different investment
objectives, it is unlikely that the class would have intentionally purchased annuities with the
depressed rate of return without any apparent benefit. *Id.* This Court therefore found that
common issues predominated as to causation for the plaintiff's RICO claims. *Id.; see also
Negrete v. Allianz Life Ins. Co. of N. Am.,* 238 F.R.D. 482, 491 (C.D. Cal. 2006) (finding
"common sense inference" of reliance where product offered no benefit in relation to its cost and
where no rational class member would purchase annuities upon adequate disclosure of facts,
regardless of individual circumstances); *Minter v. Wells Fargo Bank, N.A.,* 274 F.R.D. 525, 546
(D. Md. 2011) ("it is reasonable to infer that plaintiff class members would not have transacted
with Prosperity had they known Prosperity was not a legitimate lender, especially given that the
class members were using Prosperity to secure mortgages and agree to very substantial personal
liabilities."); *Peterson v. H & R Block Tax Services, Inc.*, 174 F.R.D. 78, 84-85 (N.D. Ill. 1997)
(reliance apparent where class of taxpayers were induced by standardized documents to purchase
services for which they were ineligible).

Defendants will likely point to the language of the leases or other documents to argue that
the class could not have justifiably relied on oral misrepresentations. But, where defendants
employ a fraudulent scheme to trick merchants into enrolling, the Ninth Circuit rejects the
"should have known better" argument. *See, e.g., In re First Alliance Mortg. Co.,* 471 F.3d 977,
992 (9th Cir. 2006). There, the Ninth Circuit agreed with the district court's finding that the
"whole scheme was built on inducing borrowers to sign documents without really understanding
the terms." In such a situation, the Ninth Circuit found it "unpersuasive in this case the defense
that plaintiffs should not have relied on statements that were made with the fraudulent intent of
inducing reliance." Id. at 992. Furthermore, the documents here do not reveal the fraud, but
perpetuate it. For example, the Rate Sheet, which Jurczyk described as an accurate disclosure of
costs, omits a number of charges, such as taxes and the lease "commissions." The Gray ACH
Forms do not contain any information that would warn a merchant that Defendants intended to
use the form to allow an unnamed company to withdraw whatever money it wanted, repeatedly.

The documents bearing "Merchant Services" logo certainly do not reveal that the company is purporting to exercise rights verbally assigned to it by another company, or that the company has further subcontracted obligations to yet other parties, all in violation of governing regulations. And Merchant Services Defendants instructed their agents to keep blank the last monthly payment box on the lease until after the lease had been signed, so the class member would have no way of knowing that they would be assessed large up front costs.

### 3. Reliance Is Not Necessary On The UCL and FAL Claims.

"[T]o state a claim under either the UCL or the false advertising law, based on false advertising or promotional practices, it is necessary only to show that members of the public are likely to be deceived." *Stearns*, 655 F.3d at 1020 (*quoting In re Tobacco II*, 46 Cal. 4th at 312) . In other words, "relief under the UCL is available [to absent class members] without individualized proof of deception, reliance and injury." *Stearns*, 655 F.3d at 1020 (quoting In re Tobacco II, 46 Cal. 4th at 320); *see also Steroid Hormone Cases*, 181 Cal. App. 4th at 154 ("while a named plaintiff in a UCL class action must show that he or she suffered injury in fact and lost money or property as a result of the unfair competition, once [he] meets that burden, no further individualized proof of injury or causation is required to impose restitution liability against the defendant in favor of absent class members"). *Tobacco II* thus confirmed that the only relevant inquiry under the UCL with regard to absent class members is whether Defendants' conduct was likely to mislead "reasonable" consumers. 46 Cal. 4th at 327. This serves the "statute's larger purpose of protecting the general public against unscrupulous business practices." Id. at 312.

### 4. Classwide Reliance On The Fraud and Negligent Misrepresentations Claims Can Be Inferred.

Even on claims that do require proof of reliance by absent class members, California law provides that such reliance can be presumed if the misrepresentation or omission was material. *Stearns*, 655 F.3d at 1021; *Vasquez v. Superior Court*, 4 Cal. 3d 800, 814 (1971); *Steroid Hormone*, 181 Cal. App. 4th at 156-57. Whether the misrepresentations and omissions were "material" is a common question that is judged by an objective standard of the "reasonable consumer"—that is, whether a reasonable consumer would attach importance to its existence or

non-existence in making a decision during the transaction. *Stearns*, 655 F.3d at 1025; *Wolph*, 2012 U.S. Dist. LEXIS 40159 at *7; *Keilholtz v. Lennox Hearth Products Inc.*, 268 F.R.D. 330, 343 (N.D. Cal. 2011) (where claims premised on omissions to entire class, certifying CLRA class "based on Defendants' alleged failure adequately to disclose to consumers" that product was dangerous). The predominant common questions here include whether a reasonable person would find it important to know that she was being enrolled by a company that was falsely claiming to be a registered ISO; that the lease did not actually cover any "service fees"; that normal lease caps had been waived so that defendants could jack up the rates and collect exorbitant commissions; that by enrolling in the lease, she would be debited, in a month or two, the entire actual value of the equipment; and that additional ACH debits would be made for unauthorized property taxes, administrative fees and cancellation fees.

Courts have held that even if a defendant *ultimately* could show that *some* of the included class members did not in fact rely upon the alleged misrepresentation, this showing would not rebut the presumption of reliance nor alter the common, predominant question of whether a "reasonable man would attach importance to its existence of non-existence in determining his choice of action in the transaction." *Johnson v. General Mills, Inc.*, 2011 U.S. Dist. LEXIS 103357 (C.D. Cal. September 12, 2011) at *9 (quoting *Stearns*, 655 F.3d at 1025); *see also Delarosa*, 2011 U.S. Dist. LEXIS 106248 at *36 (proof that defendant's product worked for some individuals goes to the merits not to the common question of overall efficacy of the product); *Steroid Hormone*, 181 Cal. App. 4th at 156-57 (plaintiff entitled to show that defendant's conduct caused the same damage to the class by showing the misrepresentation was material, even if defendant could show some class members would have bought the product anyway) (citing *Mass. Mut.*, 97 Cal. App. 4th at 1292-93).

### 5. Common Legal And Factual Issues Predominate On Plaintiffs' Contract Claims.

As explained above, the breach of contract claims center on common questions. With respect to the Property Tax Fee Non-Disclosure Class, the predominant issue is whether the form contract authorizes Defendants to assess a $25 administrative fee. *See Menagerie Prods. v. Citysearch*, 2009 U.S. Dist. LEXIS 108768, at *36 (C.D. Cal. Nov. 9, 2009) ("When viewed in

-43-

light of Rule 23, claims arising from interpretations of a form contract appear to present the classic case for treatment as a class action, and breach of contract cases are routinely certified as such."). Likewise, with respect to the Property Tax Equipment Cost Basis Class, the predominant question is whether Defendants charged amounts greater than property taxes actually owed, by assessing taxes using what they now admit was an improper accounting method—based on the wildly inflated "acquisition cost"—*i.e.*, the commission paid to the ISO—rather than the equipment cost.

### 6. Common Legal and Factual Issues Predominate On Plaintiffs' FCRA Claim.

The FCRA claim raises the common question for all class members of whether Defendants had a permissible purpose to access the Defendants' credit reports under 15 U.S.C. § 1681. *See, e.g., Pintos v. Pac. Creditors Ass'n*, 504 F.3d 792 (9th Cir. 2007) (although FCRA permits access to credit record to collect debt involving a credit transaction, "Not all 'debt' involves a "credit transaction."). If Merchant Services Defendants were not authorized to collect cancellation fees, chargebacks, and other fees, Plaintiffs assert that they could not have had a permissible purpose to access the credit reports in connection with those collection efforts. Likewise, if Leasing Defendants were not authorized to collect monies due under the excessive leases, Plaintiffs assert they also could not have had a permissible purpose to access the credit reports in connection with those collection efforts. *Cf., e.g., Pintos v. Pac. Creditors Ass'n*, 565 F.3d 1106 (9th Cir. 2009) (where question is fact that victim is "obliged to become associated" with debt does not mean that the victim "initiated the credit transaction"); *Holman v. Experian Info. Solutions, Inc.*, 2012 U.S. Dist. LEXIS 59401 (N.D. Cal. Apr. 27, 2012) (certifying a class of plaintiffs who were obligated to become associated with debts). There is also a predominant common question as to whether the violation of FCRA was willful. 15 U.S.C. § 1681(a); *see also Kesler v. Ikea U.S., Inc.*, 2008 U.S. Dist. LEXIS 97555, at *18 (C.D. Cal. Feb. 4, 2008) (whether Defendant's violation was willful is a predominate common question).

### E. A Class Action Is Superior.

Rule 23(b)(3) enumerates the following factors for the court to consider in its superiority analysis: (A) the interest of members of the class in individually controlling the prosecution . . .

-44-

of separate actions; (B) the extent and nature of any litigation concerning the controversy already commenced by . . . members of the class; (C) the desirability . . . of concentrating the litigation of the claims in the particular forum; and (D) the difficulties likely to be encountered in the management of a class action. Fed. R. Civ. P. 23(b)(3). In the Ninth Circuit, the ultimate test for superiority is "whether the objectives of the particular class action procedure will be achieved," which "necessarily involves a comparative evaluation of alternative mechanisms of dispute resolution." *Hanlon*, 150 F.3d at 1023, *citing* 7A Wright & Miller, Federal Practice and Procedure, § 1779 (2d ed. 1986); *see also Lymburner v. U.S. Fin. Funds, Inc.*, 2010 U.S. Dist. LEXIS 5081 (N.D. Cal. Jan. 22, 2010); *Greenwood,* 2010 U.S. Dist. LEXIS 3839 (N.D. Cal. Jan. 19, 2010).

### 1. Class Members Have No Interest In Pursuing Individual Litigation.

The first superiority factor is the interest of each class member in "individually controlling the prosecution or defense of separate actions." Fed. R. Civ. P. 23(b)(3)(A). Here, as in *Hanlon*, the alternative mechanism would be individual claims for relatively small amounts of damages. Such claims would not only burden the court system by deciding the same legal issues in a number of small cases, but they would make no economic sense for litigants or lawyers, and Defendants would be rewarded for their false and deceptive omission with millions in ill-gotten gains. *See Culinary/Bartender Trust Fund v. Las Vegas Sands, Inc.*, 244 F.3d 1152, 1163 (9th Cir. 2001) ("If plaintiffs cannot proceed as a class, some-perhaps most-will be unable to proceed as individuals because of the disparity between their litigation costs and what they hope to recover."); *Hanlon*, 150 F.3d at 1023.

Beyond the small individual damages, because of the vast and complex nature of the fraud at stake, this action is ill-suited for individual treatment. Plaintiffs have alleged a sweeping, nationwide fraudulent scheme by well-financed, shadowy operators who have abused the corporate form, hidden their names and identities, and engaged in widespread mail and wire fraud. To further the scheme, witnesses have been bribed and Defendants have lied to banks, regulators, and this Court. To uncover the full extent of the fraud, Plaintiffs have had to subpoena more than 20 third-party witnesses to obtain information that Defendants withheld, such as

identities of the parties who actually withdrew funds via ACH transactions, and proof of property tax filings.

Where issues are complex, class certification is appropriate even where individual damages are for larger amounts. *See, e.g., Yokoyama v. Midland Nat'l Life Ins. Co.*, 594 F.3d 1087 (9th Cir. 2010) (reversing finding of lack of superiority). In *Yokoyama*, a plaintiff sought to certify a class of purchasers who had paid an average price of more than $50,000 to acquire fraudulent life insurance plans. *Id.* The district court reasoned that the large purchase price created an incentive to pursue individual claims, and the existence of additional individual claims against other parties, such as brokers, meant that the case should not be adjudicated as a class action. *Id.* Reversing, the Ninth Circuit found that such factors do not "defeat the availability of a class action against the company under a statute aimed at protecting reasonable consumers from deceptive business practices." *Id.*; *see also In re Heritage Bond Litig.*, 2004 U.S. Dist. LEXIS 15386, at *38 (C.D. Cal. July 12, 2004) (finding superiority where claims ranged in the $5,000-15,000 range, noting that class litigation gives plaintiffs "a chance to obtain redress through aggregation against a well financed and organized defense [and] also promotes greater fiscal and logistical efficiency.").

## 2. Concurrent Litigation Should Not Preclude This Action from Proceeding.

The second factor to be considered, "the extent and nature of any litigation concerning the controversy already commenced," Fed. R. Civ. P. 23(b)(3)(B), by members of the classes, also supports proceeding with certification in this action.

### a. The New York Attorney General's Lawsuit Against SKS Does Not Allege RICO Violations.

On April 20, 2012, more than two years after this case had been commenced, and more than a year after Plaintiffs had obtained a temporary restraining order (and later preliminary injunction) from this Court regarding the SKS scam, the New York Attorney General filed a lawsuit in New York state court against Northern Leasing, SKS Associates, and others, alleging violations of New York law relating to the SKS scam. Leasing Defendants will likely argue that

class certification on this issue here should be denied or stayed while the New York Attorney General's lawsuit is ongoing. The argument should be rejected for at least two reasons.

First, the New York Attorney General did not bring claims under RICO, but rather only claims under New York state law. Where federal laws are at issue, federal courts do not need to cede jurisdiction to state courts. *See Moses H. Cone Mem'l Hosp. v. Mercury Constr. Corp.,* 460 U.S. 1, 26 (1983) ("the presence of federal-law issues must always be a major consideration weighing against surrender" of federal jurisdiction); *AmerisourceBergen Corp. v. Roden*, 495 F.3d 1143, 1151-52 (9th Cir. 2007) ("the Supreme Court has rejected the notion that federal courts should abstain whenever a suit involves claims or issues simultaneously being litigated in state court); *Robinson v. Countrywide Credit Indus.*, 1997 U.S. Dist. LEXIS 15712, at *13-14 (E.D. Pa. Oct. 8, 1997) (declining to preclude class certification in a RICO matter where a concurrent state court class action did not assert a RICO cause of action).

Second, Leasing Defendants withheld information from the New York Attorney General, and thus his allegations are more limited that what Plaintiffs have uncovered. For example, the Attorney General's complaint does not identify Northern Leasing as the party conducting the withdrawals in SKS's name or refer to the false representations that Leasing Defendants made to banks about the authorization to conduct the transactions. (Simplicio Decl., Ex. RRR)

### b. *Simington/Teague* **Should Not Defeat Superiority.**

In November 2010, approximately eight months after this case was filed, a class action lawsuit was filed in the Southern District of New York against Northern Leasing and other Leasing Defendants (the "*Simington*" case). A year later, another class action lawsuit was filed in the same court, by the same counsel, against Northern Leasing, other Leasing Defendants, UCI, and MSI (the "*Teague*" case.) *Simington* and *Teague* were later designated as related cases. On August 22, 2012, one day prior to the filing of this motion, the *Simington* and Teague plaintiffs jointly sought to certify a class of all merchants enrolled by the Defendants in any leases. (Case No. 11-cv-8125, Dkt. # 81.) The *Simington* and *Teague* plaintiffs moved to certify two claims under New York law for "breach of contract" (on grounds that the leases are unconscionable) and "conversion" (on grounds that monies were improperly taken). (Id. at 2-3) Portions of the briefs

were filed under seal, and Defendants have refused to provide Plaintiffs unredacted versions.[35]

Although the *Simington/Teague* proposed class action is based on parts of the same fraudulent scheme here, its existence should not defeat superiority for several reasons.

First, Plaintiffs' claims for relief and theories of certification are different. For example, Plaintiffs' claims on behalf of the Merchant Services Customer Class are more comprehensive than what is alleged in *Simington/Teague*. The plaintiffs there do not allege RICO violations, FCRA violations, or other federal claims.[36] Nor do they allege a conspiracy between Leasing Defendants and Merchant Services Defendants. Nor do those cases make any allegations about the violations of MasterCard regulations (leading to improper bundling of leases and improper collection of cancellation fees). And no claims were pled against National Payment Processing or Universal Merchant Services. Furthermore, *Simington/Teague* do not address the SKS fraud. And *Simington/Teague* have taken a different approach with respect to the improper tax collection and administrative fees, arguing that the charges are components of Defendants' unconscionable leases. In contrast, Plaintiffs' classes focus on the issues of whether the leases authorized the collection of the taxes and fees, and whether Defendants' use of the acquisition cost basis and imposition of administrative fees were a breach of a fiduciary duty and a RICO violation.

Second, Plaintiffs' case was filed first. Plaintiffs devoted enormous resource to its prosecution, including litigating four motions to compel, subpoenaing approximately 20 third parties, and deposing all eighteen defendants and several additional witnesses. The *Simington* and *Teague* plaintiffs piggybacked on that work by obtaining—pursuant to a court discovery order there—copies of every document produced by defendants and transcript of each deposition of a defense witness in this case.

Third, Defendants appear to favor the New York forum and to be forum-shopping. As the Court may recall, just a week before the *Teague* suit was filed (and a year after the *Simington* suit

---

[35] Plaintiffs filed a motion to compel to obtain these briefs. [Dkt. # 428.]

[36] The claims against the Leasing Defendants are based entirely on New York state law claims, and the complaint states just two causes of action for common law fraud and negligent misrepresentation against UCI and MSI.

was filed), Leasing Defendants filed a motion to stay this action based on concurrent litigation in the New York *state* courts.[37]  Despite passionately arguing about the unfairness of having to litigate two class actions at the same time and requesting that this action take a back seat to earlier-filed lawsuits [Dkt. # 302, 15-23], Leasing Defendants have never sought to stay *Simington* or *Teague* in light of this case.  In fact, even when UCI and MSI moved to dismiss or stay *Teague*, arguing that it was a "copycat" of this action, Leasing Defendants did not join them.  When the motion was denied, Merchant Services Defendants reversed course—arguing that the class certification briefing in Teague should be accelerated and at the same time asking Plaintiffs here to delay the briefing schedule.[38]  Defendants should not be permitted to game the system.

Fourth, the litigation has to proceed somewhere.  Certainly the "superiority" prong should not be invoked to bar both proceedings.  If a forum is to be chosen, it should be this one.

### c. Other Litigation Against Leasing Defendants Involves Different Theories.

Leasing Defendants also have been sued in other class action lawsuits, challenging their business practices on various fraud-based theories.  *Pludeman v. Northern Leasing et al.,* a state court breach of contract case, focuses on the issue of the fraudulent loss and damage waivers charged by Leasing Defendants.  *Aldrich v. Northern Leasing* brings claims for violations of the FCRA in the Eastern District of New York, but it does not do so on the basis of the fraudulent lease caps, and this Court has already declined to stay this action based on that concurrent litigation.  Neither of those lawsuits involve the Leasing Defendants' waiver of lease caps for the Merchant Services Defendants, nor do they address inappropriate tax collection methods.

### 3. This Court is the Appropriate Forum for this Litigation.

The third factor to be considered is the desirability of concentrating the litigation of the

---

[37] Plaintiffs detail more examples of Leasing Defendants' forum shopping in their opposition to that motion.  [Dkt. # 305, p. 11]

[38] One day after the *Simington/Teague* plaintiffs filed their class certification brief, counsel for Merchant Services Defendants wrote to Plaintiffs and requested up to a 135 day extension on filing their opposition to Plaintiffs' class certification motion.

claims in the particular forum. This case has been pending in this forum since 2010, and most of the Plaintiffs reside and work in the district. For the same reasons discussed regarding the second factor, the third factor supports a finding of superiority.

### 4. The Proposed Classes Are Manageable.

There is no reason to believe that the prosecution of the claims of the putative Class members in a single class action will create more management problems than the alternative, which is the prosecution of tens or hundreds of thousands of separate lawsuits by each class member. Given the number and importance of the common questions described above, the adjudication of class claims would not be significantly more burdensome than if the matter were prosecuted individually. Moreover, it is well accepted that "a class action has to be unwieldy indeed before it can be pronounced an inferior alternative . . . to no litigation at all." *Carnegie v. Household Int'l, Inc.*, 376 F.3d 656, 661 (7th Cir. 2004); *In re VisaCheck/MasterMoney Antitrust Litig.*, 280 F.3d 124, 140 (2d Cir. 2001) (mere possibility of complexity or un-manageability does not defeat a class action), *overruled on other grounds as stated in In Re IPO Securities Litigation*, 471 F.3d. 24 (2d Cir. 2006); *see also Menagerie Prods. v. Citysearch*, 2009 U.S. Dist. LEXIS 108768 at *64 (C.D. Cal. Nov. 9, 2009), *citing Negrete*, 238 F.R.D. at 494 ("The individuation of damages in consumer class actions is rarely determinative under Rule 23(b)(3).")

## IV. CONCLUSION

For the foregoing reasons, this Court should (a) certify the classes; (b) appoint Plaintiffs as representative of the various classes as set forth in the notice of motion; and (c) appoint Gutride Safier LLP as counsel for the class pursuant to Rule 23(g). Plaintiffs further requests that the Court order the parties to meet and confer and within fifteen (15) days provide to this Court a draft plan for dissemination of notice to the class.

Dated: December 13, 2012

**GUTRIDE SAFIER LLP**
/s/ Kristen G. Simplicio
Adam J. Gutride, Esq.
Seth A. Safier, Esq.
Kristen G. Simplicio, Esq.
835 Douglass Street
San Francisco, California 94114
Attorneys for Plaintiffs