1   GUTRIDE SAFIER LLP
    ADAM J. GUTRIDE (State Bar No. 181466)
2   SETH A. SAFIER (State Bar No. 197427)
    L. JAY KUO (State Bar No. 173293)
3   KRISTEN G. SIMPLICIO (State Bar No. 263291)
    835 Douglass Street
4   San Francisco, California 94144
    Telephone:  (415) 336-6545
5   Facsimile:  (415) 449-6469

6   Counsel for Plaintiffs

7

8                          UNITED STATES DISTRICT COURT

9

10                    FOR THE NORTHERN DISTRICT OF CALIFORNIA

11

12   RAINBOW BUSINESS SOLUTIONS, D/B/A          Case No.: CV 10-01993 CW
     PRECISION TUNE AUTO CARE, ET AL.
13                                              **REPLY IN SUPPORT OF
                    Plaintiffs,                 PLAINTIFFS' AMENDED MOTION
14                                              FOR CLASS CERTIFICATION**
            v.
15
     MERCHANT SERVICES, INC.; ET AL.,
16
                    Defendants.
17                                              Place:     Courtroom 2, 4th Floor
                                                Judge:     Hon. Claudia Wilken
18

19

20

21

22

23

24

25

26

27

28

## **TABLE OF CONTENTS**

I.      INTRODUCTION ....................................................................................................1

II.     LEASING DEFENDANTS ALL BUT CONCEDE CLASS CERTIFICATION ON
        THE PROPERTY TAX AND FEE CLASSES. ....................................................2

III.    THIS COURT SHOULD CERTIFY THE MERCHANT SERVICES CUSTOMER
        CLASS AND THE EXCESSIVE LEASE AMOUNT SUBCLASS. ...................4

        A.      Plaintiffs Have Established Predominant Common Questions of Law and
                Fact Regarding Defendants' Deceptive Misrepresentations And Omissions. ..........5

                1.      MS Defendants Falsely Represented That They Were a "Registered
                        ISO" to All Class Members. .....................................................5

                2.      All Class Members Were Misled by a Standardized Rate Sheet
                        Designed to Hide the True Nature of the Lease. ........................6

                3.      Merchant Services Defendants Improperly Employed the "Gray
                        ACH Form" To Withdraw Funds from All Class Members' Bank
                        Accounts........................................................................................7

                4.      Defendants Conspired to Hide the Lease Deal From Class
                        Members.........................................................................................8

        B.      Plaintiffs Can Commonly Establish Classwide Reliance. .......................................10

                1.      Reliance Can Be Inferred From the Very Nature of the Lease
                        Terms. ...........................................................................................10

                2.      Reliance on Defendants' Scheme Can Be Inferred...................12

                3.      Under the UCL, Only the Named Plaintiffs Need to Show Reliance. ........12

        C.      Defendants' Arguments on Typicality, Standing and Damages are
                Unavailing. ................................................................................................13

                3.      Individual Damages Issues Do Not Bar Class Certification. ....................14

        D.      Plaintiffs Seek to Certify A Narrower Class on Different Theories than
                *Avila*. ..........................................................................................................15

IV.     THIS COURT SHOULD CERTIFY THE CREDIT MONITORING CLASS....................16

V.      DEFENDANTS' CLAIMS OF UNIQUE DEFENSES, CHOICE OF LAW AND
        JURiSDICTIONAL DIFFRENCES CANNOT DEFEAT CERTIFICATION. ................16

        A.      Defendants' Defenses Are Not Unique And Can Be Resolved on a
                Classwide Basis.......................................................................................16

        B.      Defendants Fail to Meet Their Burden of Proving That Certification of
                Choice of Law Analysis Creates Predominant Individual Issues. .........................18

VI.     EVIDENTIARY MATTERS................................................................................20

REPLY IN SUPPORT OF PLAINTIFFS' AMENDED MOTION FOR CLASS CERTIFICATION
Case No. 4:10-cv-1993-CW

1

VII.   CONCLUSION........................................................................................................................20

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

REPLY IN SUPPORT OF PLAINTIFFS' AMENDED MOTION FOR CLASS CERTIFICATION
Case No. 4:10-cv-1993-CW

1

## **TABLE OF AUTHORITIES**

2

3

### **CASES**

4

*Apple, Inc. v. Samsung Elecs. Co.*, 2012 U.S. Dist. LEXIS 92314 (N.D. Cal. July
3, 2012) ................................................................................................................20

5

*Avila v. Lease Finance Group LLC*, 2012 LEXIS 177505 (S.D.N.Y. Dec. 14,
2012) ...................................................................................................................15

6

7

*Blackie v. Barrack*, 524 F.2d 891 (9th Cir. 1975)...................................................4, 14

8

*Bohannon-Hingston v. Brachfeld Law Group*, 2011 U.S. Dist. LEXIS 143933
(E.D. Cal. Dec. 13, 2011)....................................................................................17

9

*Bruno v. Eckhart Corp.*, 280 F.R.D. 540 (C.D. Cal. 2012) .......................................19

10

*Bullock v. Philip Morris USA, Inc.*, 198 Cal. App. 4th 543 (2011) .............................3

11

*Burch v. Regents of the University of California*, 433 F. Supp. 2d 1110 (E.D. Cal.
2006) ...................................................................................................................20

12

13

*C.I.R. v. Bosch's Estate*, 387 U.S. 456 (1967) ..........................................................18

14

*Donohue v. Apple, Inc.*, 871 F. Supp. 2d 913 (N.D. Cal. 2012) ...............................14

15

*Ewert v. Ebay, Inc.*, 2010 U.S. Dist. LEXIS 108838 (N.D. Cal. Sept. 30, 2010)......12

16

*Guido v. L'Oreal, USA, Inc.,* 284 F.R.D. 468, 478 (C.D. Cal. 2012)..........................13

17

*Herrera v. LCS Fin. Servs. Corp.*, 274 F.R.D. 666 (N.D.Cal. 2011)..........................14

18

*Hodes v. Van's Int'l Foods*, 2009 U.S. Dist. LEXIS 72193 (C.D. Cal. July 23,
2009) ...................................................................................................................15

19

*In re Amer. Contin. Corp./Lincoln Sav. & Loan Sec. Litig.*, 140 F.R.D. 425 (D.
Ariz. 1992) .............................................................................................6, 7, 12, 13

20

In re Countrywide, 277 F.R.D. 586, 600 (S.D. Cal. 2011). ...................................9, 11

21

*In re First Alliance Mortgage Co.*, 471 F.3d 977 (9th Cir. 2006) ............................5, 7

22

*In re MDC Holdings Securities Litigation*, 754 F.Supp. 785 (S.D. Cal. 1990) .........19

23

*In re POM Wonderful LLC Mktg. & Sales Practices Litig.*, 2012 U.S. Dist. LEXIS
141150(C.D. Cal. Sept. 28, 2012).....................................................................18, 19

24

25

*In re Seagate Technologies Sec. Litigation*, 115 F.R.D. 264 (N.D. Cal. 1987).........19

26

*In re Yahoo! Litigation*, 251 F.R.D. 459 (C.D. Cal. 2008) ........................................12

27

*James v. UMG Recordings*, 2011 U.S. Dist. LEXIS 126221 (N.D. Cal. Nov. 1,
2011) ...................................................................................................................12

28

*Jenson v. Fiserv Trust Co.*, 256 Fed. Appx. 924 (9th Cir. 2007)....................................................8

*Joint Equity Comm. of Investors of Real Estate Partners, Inc. v. Coldwell Banker Real Estate Corp.*, 281 F.R.D. 422 (C.D. Cal. 2012)....................................................9, 13

*Kamar v. Radio Shack Corp.*, 2008 U.S. Dist. LEXIS 108507 (C.D. Cal. Oct. 8, 2008)....................................................20

*Kearney v. Salomon Smith Barney*, 39 Cal. 4th 95 (2006)....................................................18

*Kelly v. City & County of San Francisco*, 2005 U.S. Dist. LEXIS 31113 (N.D. Cal. Nov. 19, 2005)....................................................17

*Kennedy v. Jackson Nat'l Life Ins. Co.*, 2010 U.S. Dist. LEXIS 63604 (June 23, 2010)....................................................1, 4, 10, 12

*Kwikset Corp. v. Superior Court,* 51 Cal. 4th 310 (2011)....................................................14

*Mazza v. Am. Honda Motor Co.*, 666 F.3d 581, 596 (9th Cir. 2012)....................................................12, 18, 19

*Negrete v. Allianz Life Ins. Co. of N. Am.,* 238 F.R.D. 482 (C.D. Cal. 2006) ("*Negrete I*")....................................................5

*Negrete v. Allianz Life Ins. Co.*, 2012 U.S. Dist. LEXIS 182796 (C.D. Cal. Dec 27, 2012) ("*Negrete II*")....................................................passim

*Northern Leasing Sys., Inc. v. Walton*, 36 Misc. 3d 1204A (N.Y. Civ. Ct. 2012)....................................................17

*Owens v. Kaiser Found. Health Plan, Inc.*, 244 F.3d 708 (9th Cir. 2001)....................................................17

*Pierce v. County of Orange*, 526 F.3d 1190 (9th Cir. 2008)....................................................15

*Plascencia v. Lending 1st Mortgage*, 259 F.R.D. 437 (N.D. Cal. 2009)....................................................12

*Poulos v. Caesar's World, Inc.*, 379 F.3d 654 (9th Cir. 2004)....................................................10

*Robinson v. Fountainhead Title Group Corp*, 257 F.R.D. 92 (D. Md. 2009)....................................................6

*Sanchez v. City of Fresno*, 2012 U.S. Dist. LEXIS 181924 (E.D. Cal. Dec. 26, 2012)....................................................7

*Sound Appraisal v. Wells Fargo Bank, N.A.*, 717 F. Supp. 2d 940 (N.D. Cal. 2010)....................................................18

*State Farm Mutual Automobile Ins. Co. v. Superior Court*, 114 Cal. App. 4th 434 (2003)....................................................19

*Stearns v. Ticketmaster Corp.*, 655 F.3d 1013 (9th Cir. Cal. 2011)....................................................12

*ThinkVillage-Kiwi, LLC v. Adobe Sys.*, 2009 U.S. Dist. LEXIS 106687 (N.D. Cal. Nov. 16, 2009)....................................................20

*Wal-Mart Stores, Inc. v. Dukes,* 131 S. Ct. 2541 (2011)....................................................2

*Washington Mutual Bank v. Superior Court*, 24 Cal. 4th 906, 920 (2001)....................................................18, 19

*Wershba v. Apple Computer, Inc.*, 91 Cal. App. 4th 224 (2001)....................................................18, 19

## RULES

Fed. R. Evid. 1002 ................................................................................................20

Fed. R. Evid. 702 ..................................................................................................20

## OTHER AUTHORITIES

FCRA Staff Opinion to Charles Tatelbaum (July 26, 2000),
http://www.ftc.gov/os/statutes/fcra/ tatelbaum.shtm ……………………………………………..18

REPLY IN SUPPORT OF PLAINTIFFS' AMENDED MOTION FOR CLASS CERTIFICATION
Case No. 4:10-cv-1993-CW

## I.    INTRODUCTION

Defendants' Oppositions are remarkable for what they conspicuously do *not* address. Leasing Defendants, for example, apparently concede that certification of the SKS Post-Lease Expiration Class, the Property Tax Fee Non-Disclosure Class, and the Property Tax Equipment Cost Basis Class is proper. They *admit* that tens of thousands of class members signed leases containing identical language, thus establishing a predominant question common to all three of these classes. On the SKS Post-Termination class, they offer no challenge to certification other than that Plaintiff Campbell was not damaged (ignoring her sworn testimony to the contrary) and that the claims were "settled," which is unsupported and untrue. The salient (and now uncontested) facts on these classes are as follows:

- Overstated property tax charges were never disclosed or refunded;

- Collection of "administrative fees" without any contractual basis whatsoever;

- Improper collection of property tax "reimbursements" from merchants; and

- A fraudulent set of shell companies designed to disguise criminal activity, including paying off a witness $20,000 to file false declarations with this Court.

With respect to the Merchant Services ("MS") Customer Class and the Excessive Lease Amount Subclass, Defendants are tellingly silent on key precedent. Nowhere do the MS Defendants discuss this Court's opinion in *Kennedy v. Jackson Nat'l Life Ins. Co.*, 2010 U.S. Dist. LEXIS 63604 (June 23, 2010). Nor does either Opposition even mention *Negrete v. Allianz Life Ins. Co.*, 2012 U.S. Dist. LEXIS 182796 (C.D. Cal. Dec. 27, 2012) ("*Negrete II*"), which recently distinguished the *very* case on which Defendants principally rely. Their reluctance to address these cases is understandable; they provide clear guidance on Rule 23(b)(3) predominance for fraud-based claims, even post-*Dukes*, and lead conclusively to certification.

Defendants instead predictably resort to citing Plaintiffs' testimony out-of-context to concoct typicality challenges and manufacture individual questions, even while glossing over the inconvenient, predominant facts. These facts establish a common course of conduct from which causation under Plaintiffs' RICO claim has been shown, or at the very least may be inferred:

- A common misrepresentation that Merchant Services was a "Registered ISO" and marketing materials deceptively suggesting it was affiliated with reputable banks;

- A much-touted "world class" common sales training program that Merchant Services now scrambles to disavow, despite overwhelming contrary documentary evidence;

-1-

- Common enrollment documents including the "Rate Sheet" promising "services" (because the use of "lease" was "obviously a deal killer") and the "Gray ACH Form" that illegally converted bank account funds to an unspecified entity; and

- The uniform "suckering" of merchants by hiding the true identity of the leasing party, the initial sales commissions, and that lease rate caps had been waived.

Defendants also notably do not contest superiority, adequacy, numerosity or ascertainability, and instead focus on merits and predominance under Rule 23(b)(3). But even their merits-based arguments are tacit admissions that the legal and factual questions can (and should) be resolved on a classwide basis. For example, MS Defendants contend they were authorized to collect various charges, class members were not misled or damaged, and violations of the MasterCard rules are irrelevant. But it is the common *resolution* of these questions that favors classwide treatment of the MS Customer Class. *See, e.g., Wal-Mart Stores, Inc. v. Dukes,* 131 S. Ct. 2541, 2551 (2011). Leasing Defendants similarly argue their leases charges were fair and lawful, but again this is *precisely* a common issue driving resolution of the Excessive Lease Amount Subclass.

Where Defendants cannot rely on faulty merits based arguments, they fall back on the distinguishable *Avila* case out of the Southern District of New York. There the court denied certification of an "unconscionable contract" class of over 300,000 lessees enrolled by hundreds of different ISOs into nearly 400 different form leases. By contrast, Plaintiffs do not plead an "unconscionability" claim. They also allege that class members' leases were procured by a *single* ISO (Merchant Services), using a common lease form and set of marketing materials, based on an illegal scheme to defraud. In any case, the three property tax and fee collection classes have nothing to do with independent sales agents or different forms. *Avila* is thereby inapposite.

Finally, Defendants raise a number of standing and affirmative defense arguments that are readily disposed of under existing precedent. This Court should now certify all classes/subclasses.

## II. LEASING DEFENDANTS ALL BUT CONCEDE CLASS CERTIFICATION ON THE PROPERTY TAX AND FEE CLASSES.

### A. This Court Should Now Certify the SKS Post-Lease Expiration Class.

Defendant SKS's illegal scheme with the Leasing Defendants to withdraw "property taxes" and "administrative fees" from class members' bank accounts years after the fact already has come before this Court on separate occasions. Defendants claim that the dispute has been settled, but there is at best an undisclosed, *preliminary* agreement with the New York Attorney General to settle claims

-2-

for violations of *New York's* consumer protection laws. That does not and cannot settle any class

members' RICO or UCL claims because the New York Attorney General does not represent them, no

class for these claims was or could be certified in that case, and there accordingly is no preclusion. *Cf.*

*Bullock v. Philip Morris USA, Inc.*, 198 Cal. App. 4th 543 (2011) (where class action involved

different causes of action, a punitive damages award was not barred by Attorney General settlement).

Leasing Defendants further assert that Plaintiff Campbell was not damaged. But Campbell

took several work hours out of her veterinary practice researching the claim, and she further paid an

employee to review the files to research what had previously been paid in taxes and fees on the lease.

(Declaration of Kristen Simplicio (Dkt.# 387-1) ("Simpl. Decl."), Ex. DDDDD, Rogs. 12-13.) With

no further opposition, this Court should now certify the SKS Post-Lease Expiration Class.

### B.   This Court Should Certify the Property Tax Fee Non-Disclosure Class.

With respect to the Property Tax Fee Non-Disclosure Class, Leasing Defendants contend that

they have never calculated the "per-person" cost of administering the property tax payments on their

leases, as they contract out their property tax administration to a third party vendor. (Kulangroth

Decl. (Dkt.# 460-3) ¶ 35). But this only underscores that class treatment is proper. Assuming the per-

person cost would be the total paid to the vendor for administration, divided by the number of lessees,

this raises a common question for the class members, who claim that the $25 "administrative fee" was

both undisclosed and arbitrary. Leasing Defendants also contend that the language in class members'

leases varies, yet they identify *no actual differences*. Rather, Defendants *admit* that at least tens of

thousands of class members[1] were enrolled in leases containing *identical* language, (Kravic Decl.

(Dkt.# 460-1) ¶ 26-27.)[2]  This class should be certified.

### C.   This Court Should Certify the Property Tax Equipment Cost Basis Class.

Leasing Defendants admit that, for *all* leases, they used an "acquisition cost" basis for

property tax calculations until 2009 or 2010, then switched to an "equipment cost" basis. (Simpl.

---

[1] The fact that Leasing Defendants are able to estimate the number of class members with similar terms also shows that individual inquiries are not necessary to identify the class, but rather, that the class can be ascertained through basic queries through their database.

[2] Because the class definition *excludes* persons with leases that disclose the $25 fee, Leasing Defendants' argument that the class definition is overly broad is without merit.

REPLY IN SUPPORT OF PLAINTIFFS' AMENDED MOTION FOR CLASS CERTIFICATION
Case No. 4:10-cv-1993-CW

Decl., Ex. PPP at 36-37.) This was no minor switch. Because Defendants had "rolled" so-called "service fees" into the "acquisition cost" of these leases, the acquisition cost basis became artificially inflated—thousands of dollars on a piece of equipment compared to a few hundred for the "equipment cost." That "acquisition cost" was the sum of the expected lease payments over the life of the lease—i.e., the amount of commission paid to the ISO for enrolling the class member in the lease—and has nothing to do with the actual value of the equipment. Thus, it could not form the true basis for taxation, as Leasing Defendants themselves concluded. They nevertheless elected *not* to disclose this error to the class and failed to refund the monies for such property taxes they had improperly collected for years.

On this issue, Leasing Defendants argue only that the large number of taxing jurisdictions creates individual issues. But the *number* of jurisdictions is entirely irrelevant as the predominant issues are (1) the propriety of Defendants' pre-2010 tax assessment methodology; (2) whether Defendants acquired a fiduciary obligation when assuming the duty to assess and pay taxes on behalf of the class; and (3) whether Defendants breached that fiduciary obligation when they used an inflated cost basis to assess those taxes. Even if the Court were to accept Leasing Defendants' "expert's" opinion that acquisition cost basis is an "accepted" accounting methodology, that does not establish it was appropriate *in this instance*. Here, the equipment cost is but a tiny percentage of the acquisition cost. In any event, answering the exact same questions will drive resolution for all class members, and the class accordingly should be certified.

## III. THIS COURT SHOULD CERTIFY THE MERCHANT SERVICES CUSTOMER CLASS AND THE EXCESSIVE LEASE AMOUNT SUBCLASS.

This Court's *Kennedy* opinion—all but ignored by Defendants—observed that "[c]lass certification of a fraud-based claim may be appropriate if the plaintiffs allege that an entire class of people has been defrauded by a ***common course of conduct***." 2010 U.S. Dist. LEXIS 63604 at *16 (emphasis added) (citing *Blackie v. Barrack*, 524 F.2d 891, 902 (9th Cir. 1975) (where consumers were "defrauded over a period of time by similar misrepresentations, courts have taken the common sense approach that the class is united by a common interest in determining whether a defendant's

course of conduct is in its broad outlines actionable.")[3] *Kennedy* further held that class certification is proper where a defendant employed a "centrally-orchestrated scheme to mislead." *Id.* (quoting *In re First Alliance Mortgage Co.*, 471 F.3d 977, 991 (9th Cir. 2006)). As discussed below, Defendants' misrepresentations and scheme to defraud raise common, predominant questions, the resolution of which supports classwide treatment.

### A. PLAINTIFFS HAVE ESTABLISHED PREDOMINANT COMMON QUESTIONS OF LAW AND FACT REGARDING DEFENDANTS' DECEPTIVE MISREPRESENTATIONS AND OMISSIONS.

Defendants' common misrepresentations and material omissions here predominate and support certification. *See Kennedy*, 2010 U.S. Dist. LEXIS 63604 at *19 (granting certification where misleading use of the term "bonus" and the non-disclosure of defendants' commission arrangements sufficed to establish the predominance of common questions). The principal factual and legal issues—largely ignored by Defendants in their Oppositions—are set forth below.

### 1. MS Defendants Falsely Represented That They Were a "Registered ISO" to All Class Members.

MS Defendants employed deceptive marketing materials falsely stating that Merchant Services was a "Registered ISO" affiliated with reputable banks and processors—a statement that violated the MasterCard rules governing the industry. Defendants do not dispute that MasterCard designated only MSI and NPP, and not UCI, as approved Service Providers. (Simpl. Decl., Ex. Z.) Yet "Merchant Services," the fictitious business name used by UCI, appeared on all of the business cards and other marketing materials immediately above the words "Registered ISO/MSP" (Supplemental Declaration of Kristen Simplicio ("Supp. Decl."), Ex. HHHHH (Jurczyk Depo. 400-01).) UCI further required all its agents to use standardized business cards bearing this false representation. (*Id.*) Every single MS Customer Class member was thus told that they were doing business with an entity authorized to sell processing services, when in fact they were not.

A predominant common question on Plaintiffs' RICO, fraud, and false advertising claims is therefore whether the false representation "Merchant Services--a Registered ISO/MSP" would

---

[3] Defendants protest that *Kennedy* and *Negrete* were decided pre-*Dukes*. But they refer to *Negrete v. Allianz Life Ins. Co. of N. Am.*, 238 F.R.D. 482 (C.D. Cal. 2006) ("*Negrete I*"), not *Negrete II*, which held that "the basic legal framework governing this case remains the same." 2012 U.S. Dist. LEXIS 182796 at *65.

mislead reasonable consumers to enroll with Defendants. *See In re Amer. Continental Corp./Lincoln Sav. & Loan Sec. Litig.*, 140 F.R.D. 425, 434 (D. Ariz. 1992) (plaintiffs are entitled to rely upon misrepresentations or omission to regulators that allowed improper sales to proceed); *Robinson v. Fountainhead Title Group Corp*, 257 F.R.D. 92, 95 (D. Md. 2009) (finding presumption of reliance that organization acted within the laws that regulate it, and that customers would have acted differently if they knew it was illegal).[4]

### 2. All Class Members Were Misled by a Standardized Rate Sheet Designed to Hide the True Nature of the Lease.

Defendants concede that every single member of the Excessive Lease Subclass received a "Rate Estimation Comparison Sheet," but claim that minor, immaterial differences create individualized questions. This misses the point. Plaintiffs alleges that the Rate Sheet was uniformly used by Defendants to mislead merchants into believing they were signing up for "services" rather than for an equipment lease. Defendants counter that customers had a choice between purchasing a "bundled package" for services and equipment, or purchasing just services, and that this raises individual questions that defeat class certification. On the contrary, it begs the *common* question— i.e., whether the Rate Sheet accurately informed consumers that they were enrolling in an "equipment" lease even though the Rate Sheet specified "services." The same question is true of all Rate Sheets, even if a single version contained a different (yet illegible) footnote.

To prevent exactly this type of confusion, MasterCard expressly forbids making credit card processing services contingent on the purchase of *other* services. Plaintiffs will establish that the violation of this rule with the Rate Sheet, and the bait-and-switch of "services" into a "lease," was fraudulent. Plaintiffs have also adduced evidence to show that MS Defendants, across all marketing materials and agreements, uniformly referred to "services" because the word "lease" was, according to their 30(b)(6) witness, "a deal killer." (Simpl. Decl. Ex. GGG)

Defendants next incorrectly argue that, the Rate Sheet notwithstanding, each Plaintiff had a different experience, showing that a common script was not followed. But there exists ample

---

[4] Defendants try to distinguish *Robinson* on the ground that the MasterCard rules are not government regulations. But they govern/bind the entire credit card processing industry—from the banks and processors, to the ISOs, to the businesses accepting credit cards. In any event, this too is a common question.

evidence of the use of common sales scripts by Defendants in this case. (Simpl. Decl., Ex. EEE, FFF; (Dkt.# 387. p. 14, n.16.) In any event, there is no requirement that a common script be followed. *See, e.g., American Cont.,* 140 F.R.D. at 430 (rejecting a "talismanic rule that a class action may not be maintained where a fraud is consummated principally through oral misrepresentations, unless those representations are all but identical"). It is true that, years after the fact, Plaintiffs naturally recalled different aspects of their experiences, such as the processing rate offered. Yet *all* testified to receiving the Rate Sheet, and *no Plaintiff recalled agreeing to the lease terms as later enforced against them.*[5] Importantly, all were confused by the Defendants' relationships, and none understood that they had been enrolled in two separate contracts—one for a lease and one for services—with two separate entities (neither of which were "Merchant Services"). (Supp. Decl., Ex. IIIII (p. 254-55, 280-82, 366); JJJJJ (p. 128-30); KKKKK (p. 128); LLLLL (p. 113, 115).) This uniform scheme to defraud supports class treatment. *See, e.g., First Alliance*, 471 F.3d at 992 (certifying class where the "whole scheme was built on inducing borrowers to sign documents without really understanding the terms").

### 3.    Merchant Services Defendants Improperly Employed the "Gray ACH Form" To Withdraw Funds from All Class Members' Bank Accounts

MS Defendants' "Gray ACH Form" is yet another key in a common scheme to convert funds improperly from MS Customer Class members' accounts, again in violation of the MasterCard rules. Defendants argue, in a footnote, that Plaintiffs cannot assert "third party reliance" when their clams are based on false representations to the Class. But courts have allowed mixed claims based in part on false representations to the class and in part on other theories of proximate causation. *See, e.g., Negrete II*, 2012 U.S. Dist. LEXIS 182796, *74-75. In any event, misrepresentations to the Class are not relevant to Plaintiffs' conversion claim, where reliance is not an element. *Cf. Sanchez v. City of Fresno*, 2012 U.S. Dist. LEXIS 181924, *30 (E.D. Cal. Dec. 26, 2012) (elements of conversion are plaintiffs' ownership, defendants' wrongful act or disposition of property rights, and damages).

Defendants further argue that the ACH allegations raise individual inquiries regarding *Class members*' understanding of "which company" would debit from their accounts, presumably because

---

[5] No Plaintiff knew that the lease cost over a $100 per month  for 48-months, was non-cancelable, involved a upfront payment to MS Defendants, and resulted in steep taxes and fees. (Supp. Decl., Ex. IIIII (p. 41, 47, 73); JJJJJ (p. 76, 246, 251-52); KKKKK (p. 73, 132, 144-45, 160); LLLLL (p. 70-71); MMMMM (p. 320).)

no one, including Defendants' witnesses, seems to know *which* of the Merchant Services companies receives the funds. But this too is a manufactured issue. Again, the only relevant question for conversion is *Defendants'* improper actions. In that context, MS Defendants admit there is no contractual privity with class members, and therefore their authority to debit directly from merchant accounts derives from (1) authorization from the merchant (which Defendants argue lies in the Gray ACH form), or (2) from merchants' contracts with the Processor or with the leasing company, MBF.[6] Plaintiffs allege that no actual authorization exists, and as such *every* ACH transaction is void. The common, predominant question for the MS Customer Class therefore is whether MS Defendants had *any* legal authority to make the withdrawals. Class certification accordingly is appropriate.

### 4. Defendants Conspired to Hide the Lease Deal From Class Members.

The evidence suggests Defendants jointly undertook several steps to perpetuate the fraud upon Excessive Lease Amount Subclass members and that Leasing Defendants knew about the fraud. For example, Kravic testified that Defendants agreed to replace the name of the leasing party (MBF) on the lease with the *non-party* "Merchant Services." (Supp. Decl., Ex. NNNNN (Kravic Depo. at 38, 253-55).) At deposition, Kravic herself expressed confusion over which party was indicated as the contracting party and why. (Id. at 34.) Further, a key email shows that Defendants jointly agreed to leave the amount of the last month's deposit *blank* (Simpl. Decl., Ex. R) *to be filled in later* (Id., Ex. U (Walshe Depo. 126:10-14)), presumably for additional debits using the ACH form. Finally, Leasing Defendants agreed to *waive* normal lease cap rates for MS leases—an extraordinary exception—thus permitting MBF Leasing to fund the fraud. (Id., Ex. B (Kravic Depo. 65, 271-73).)

Leasing Defendants argue that, because they were not present during the sales pitches, they cannot be held liable. But this confuses merits questions with predominance under Rule 23(b)(3). Either Leasing Defendants knew that MS Defendants were engaging in misleading sales pitches to enroll merchants into sham leases, or they did not. But in either case, the issue remains common.[7]

---

[6] Defendants falsely state that Plaintiffs have "disavowed" their allegations on pages 15-16 of their class certification brief challenging Defendants' authority to collect cancellation fees under the merchants' agreement with TransFirst. (Dkt.# 474, p. 4, n. 14) Plaintiffs have done no such thing, as the TransFirst Declaration is silent on that issue, making the issue ripe for classwide resolution.

[7] *See, e.g., Jenson v. Fiserv Trust Co.*, 256 Fed. Appx. 924, 926 (9th Cir. 2007) (finding that investment company "either knew of [its brokers'] scheme to defraud and took steps substantially to advance the

-8-

Leasing Defendants further argue they cannot be found liable because there was no duty to disclose information to the class in order to remedy MS Defendants' omissions and false representations. But this too is a predominant—and contested—question common to all class members that supports rather than defeats certification. *See, e.g. Jenson*, 256 Fed. Appx. at 929.

Leasing Defendants cite only one case on this point, and it is distinguishable. *In re Countrywide* analyzed whether a duty to disclose arose and found in *that* case that it was a fact-intensive, individualized inquiry. 277 F.R.D. 586, 600 (S.D. Cal. 2011). Plaintiffs had alleged that a portion of the class should have received federally mandated disclosures about their mortgages. But no such mandate existed for every member of the class (which included investors and commercial borrowers), and class members obtained those mortgages through over *40,000* independent mortgage brokers. The court thus found that the different nature of the relationships between the class the defendants, and the different rules governing the borrowing process, would necessitate different types of inquiries. *Id.* Leasing Defendants do not explain why this instance (where every class member leased the *same* equipment under the *same* lease through *a single* intermediary) would raise the types of individual inquiries in *Countrywide*.[8]

Defendants also argue at length that leases in excess of the rate caps are not illegal. This, too, misses the point. Plaintiffs do not allege that Defendants had a legal obligation to adhere to industry rate caps, but rather that every lease procured by Defendants in excess of those caps was the result of fraud. Whether or not they are liable for exceeding the lease rate caps is not the inquiry but rather an *objective tool to define the class*.[9] Otherwise put, after being misled about the terms and nature of the lease, class members paid thousands of dollars over a 48-month period for a $300 terminal. Courts

---

scheme or it didn't. Either way, its knowledge and assistance (if any) predominates as a common issue."); *Joint Equity Comm. of Investors of Real Estate Partners, Inc. v. Coldwell Banker Real Estate Corp.*, 281 F.R.D. 422, 435 (C.D. Cal. 2012) (question of whether one assists in the commission of a tort is predominant "because questions of assistance and knowledge focus on [the defendant], not the alleged victims").

[8] Even if no duty to disclose existed, Leasing Defendants may still be liable under other theories if their actions proximately caused damage to the class.

[9] Defendants even introduce an "expert" who himself tacitly admits that the lease cap issue is one that can be decided on a classwide basis. (Dkt.# 460-4, p. 3.)

have certified classes under similar theories. *See, e.g., Negrete II*, 2012 U.S. Dist. LEXIS 182796,

*76 (certifying RICO class misled into purchasing annuities worth less than the price paid).

### B.   PLAINTIFFS CAN COMMONLY ESTABLISH CLASSWIDE RELIANCE.

In *Kennedy*, this Court analyzed specifically whether classwide treatment was appropriate for

a RICO claim. It noted, *inter alia*, that causation was an element of RICO, but that reliance provides a

"key causal link" between the misrepresentations and class members' injuries. *Id*. at *23 (citing

*Poulos v. Caesar's World, Inc.*, 379 F.3d 654, 666 (9th Cir. 2004)). It further held that RICO

plaintiffs may prove reliance (and thus causation) by proceeding on two distinct theories—either that

class members received "materially similar documents" (forming a direct causal link) or by inference

through circumstantial evidence. *Id*. at *24-25; *see also Negrete II*, 2012 U.S. Dist. 182796 at *68-69

(discussing two-pronged approach to establishing reliance under *Poulos*).

The materially similar documents and common fraudulent scheme in this case are sufficient to

establish a "causal link" for reliance on Plaintiffs' RICO claim under the first prong of *Poulos*. But

even if, standing alone, these facts were somehow insufficient, Plaintiffs still provide ample

*circumstantial* evidence to establish reliance as Defendants' misrepresentations were the "common

sense" or "logical explanation" for class members' decisions to enroll. *Kennedy*, 2010 U.S. Dist.

LEXIS 63604 at *26; *Negrete II*, 2012 U.S. Dist. LEXIS 182796 at *69.

### 1.   Reliance Can Be Inferred From the Very Nature of the Lease Terms.

In *Negrete II*, plaintiffs alleged a scheme to defraud the class through the sales of inferior

annuities. Sales agents were required to provide a brochure and obtain a signature from the customer

acknowledging receipt and understanding of the materials. 2012 U.S. Dist. LEXIS 182796 at *8-9.

The brochure, however, did not disclose that the annuities were poorly performing, that huge bonuses

would be paid to sales representative, or other misleading information about the transaction. *Id*.

Because the annuities were alleged to be so inferior to comparable investments, and every class

member received the same brochure, the court found a common sense inference of reliance. *Id.* at *69

(holding that individuals are "nearly certain to rely on prominent . . .features of a product which they

purchase, particularly where there are not otherwise compelling reasons for purchasing a product

allegedly worth less than the purchase price.") (internal citations omitted).

Like *Negrete II,* every class member here was presented with, and signed, a common Rate Sheet, which uniformly hid the key components of the lease deal. The excessive leases were of little to no value, and astronomically more expensive relative to leasing through other ISOs or even purchasing the equipment outright. As in *Negrete II,* there is no compelling reason why any person would make such a decision—i.e., to lease a piece of equipment worth a few hundred dollars for thousands and thousands of dollars—other than because they were misled. Like *Negrete II,* the only "common sense" explanation is a deceptive, fraudulent scheme.

Defendants again counter with *In re Countrywide,* in which the court found common sense explanations for why some class members would elect subprime mortgages. There, however, defendants presented extensive evidence that many of the 500,000+ class members had obtained mortgages for investment purposes, and introduced government papers discussing the suitability of the subprime mortgages for certain types of borrowers. 277 F.R.D. at 604-605. Defendants here only speculate, with no evidentiary support, that class members might value the convenience of "one-stop shopping" enough to pay thousands of dollars to rent a piece of equipment worth only $300.[10] This explanation ignores the fact that this equipment is not specialized, but rather is widely available for purchase at Staples, Costco, etc. They similarly argue that class members might enjoy cost savings from "bundling" of services. But MS Defendants are not permitted by MasterCard to have side agreements for services, and thus these "savings" are in fact not only illusory, but actually forbidden. Moreover, even if Defendants could advance some colorable reason why a class member would enter such a lop-sided deal, such speculation does not defeat certification.[11]

---

[10] Leasing Defendants' "expert" offers canned justifications that appear copied from Northern Leasing's website. He cites "benefits" to leasing that might make the "nominal" cost of leasing better than alternatives. But the benefits he describes—e.g. the avoidance of upfront costs—were not benefits any class member actually received; they all paid huge up-front fees that approximated the value of the equipment. (Dkt.# 387 24, 40-41.) It is no wonder that Leasing Defendants' management admitted that merchants were being "suckered." (Simpl. Decl. Ex. P.) Further, Defendants offer no such explanation for why a merchant concerned about cash flow would not simply purchase a $300 machine on a credit card, instead of agreeing to pay $200 or more upfront and financing the remaining $100 balance at a 1500 percent interest rate. Finally, Leasing Defendants contend many people simply agreed to the lease, but only offer, in support, six unauthenticated phone conversations *with people who are not members of the class*, and who leased equipment at much lower rates, such as $39.99 a month. (Dkt.# 460 (Nigro Decl.), Ex. 29)

[11] The only concrete example Defendants present is to point to Jerry Su, who testified that he only agreed to listen to the sales pitch because the sales representative was a customer of his. This in no way defeats his reliance. Notably, Su did not say that he chose to enroll in the "services" for this reason. *Cf. Plascencia v.*

-11-

### 2.      Reliance on Defendants' Scheme Can Be Inferred.

In *Kennedy* and *Negrete II*, both courts inferred reliance based on the existence of an overall deceptive scheme deployed by defendants. *See also Amer. Continental Corp.*, 140 F.R.D. at 431 (where a showing is made that defendants "repeatedly emphasized predominant interrelated themes, which originated from management," one can infer reliance on a fraudulent course of conduct). Here, Defendants fail to address any of the evidence that they conspired to perpetrate the fraud, uniformly designed the rate sheet to bury the lease and enable agents to market it as a "service fee," and commonly employed misleading "Merchant Services" materials to gain the confidence of merchants. From this course of conduct, reliance may, too, be inferred.

### 3.      Under the UCL, Only the Named Plaintiffs Need to Show Reliance.

Defendants counter that a class may not be certified under the UCL because Plaintiffs' cannot show classwide reliance. This misstates the law.[12] The Ninth Circuit has expressly held that "relief under the UCL is available without individualized proof of deception, reliance and injury." *Stearns v. Ticketmaster Corp.*, 655 F.3d 1013, 1020 (9th Cir. Cal. 2011). Defendants nevertheless argue that *Stearns* is inapplicable because a presumption of reliance does not arise when class members "were exposed to quite disparate information from various representatives of the defendant." *Mazza v. Am. Honda Motor Co.*, 666 F.3d 581 (9th Cir. 2012). But in *Mazza,* unlike here, it was "likely that many class members were never exposed to the allegedly misleading advertisements." *Id.* at 595. Defendants further do not provide any evidence of any "disparate information" that was provided to the class; on the contrary, they concede that a common set of marketing materials was deployed to,

---

*Lending 1st Mortgage*, 259 F.R.D. 437, 448 (N.D. Cal. 2009) (Wilken, J.) ("It is not necessary that the plaintiff's reliance upon the truth of the fraudulent misrepresentation be the sole or even the predominant or decisive factor influencing his conduct. It is enough that the representation has played a substantial part, and so had been a substantial factor, in influencing his decision.").

[12] Defendants argue that, because they are not "consumers," Plaintiffs' UCL and FAL claims "fail as a matter" of law. This ignores the plain language and legislative history of the UCL, decades of cases law, and Plaintiffs' clear allegations regarding public injury in the operative complaint. *See, e.g., James v. UMG Recordings*, 2011 U.S. Dist. LEXIS 126221 (N.D. Cal. Nov. 1, 2011) (rejecting argument that business could not bring UCL claim where plaintiff adequately allege a "connection to the protection of the public.")*; see also In re Yahoo! Litigation*, 251 F.R.D. 459, 475 (C.D. Cal. 2008) (rejecting motion to dismiss UCL claims for small, relatively unsophisticated businesses); *Ewert v. Ebay, Inc.*, 2010 U.S. Dist. LEXIS 108838, at *25 (N.D. Cal. Sept. 30, 2010) (certifying UCL class that included corporations or other business entities). Defendants also wrongly assert that Plaintiffs do not seek injunctive relief. This is contradicted by the complaint. Indeed, Plaintiffs already obtained an injunction with respect to the SKS fraud.

and received by, all class members. *Cf. Guido v. L'Oreal, USA, Inc.*, 284 F.R.D. 468, 478 (C.D. Cal. 2012) (declining to follow *Mazza* where defendants did not contend that the misrepresentations were contained in limited advertisements to which many class members would not have been exposed).

### C. DEFENDANTS' ARGUMENTS ON TYPICALITY, STANDING AND DAMAGES ARE UNAVAILING.

#### 1. Plaintiffs are Typical of The Classes and Subclasses.

Defendants argue that the MS Customer Class is overbroad because it includes customers who did not lease equipment, or whose lease amounts were lower than the rate caps.[13] But the Class claims relate to issues common to all customers. Plaintiffs and all other class members were enrolled in credit card processing services by "Merchant Services," which was never a "Registered ISO," and thus not an entity authorized to market and sell those services. Plaintiffs would not have enrolled had they known that "Merchant Services" was acting outside the MasterCard rules. Defendants' only response is that Plaintiffs do not have standing to assert claims stemming from Defendants' breach of contract with MasterCard. But this argument misses the point: The predominant question remains whether it was misleading for Defendants to represent themselves to be something that they are not. *See In re Amer. Continental Corp.*, 140 F.R.D. at 434; *Joint Equity Comm.,* 281 F.R.D. at 432 (certifying class where sham entities violated Coldwell franchise rules and investors relied on association with Coldwell).[14] Further, every class member received a "Gray ACH Form" used to collect initial "commissions" on the leases and other charges. These withdrawals were not authorized by any contract or by any class members, and Plaintiffs' conversion claims do not depend on whether they signed or did not sign leases, or whether those leases were above or below the industry rate caps.

#### 2. All Class Members Sustained Injury and Have Article III Standing

Defendants also argue that, because they have not conducted any ACH transactions in many years, *some* class members were not injured[15] and thereby do not have standing.[16] This argument has

---

[13] Defendants state that there are "many" people in the third group, but offer no evidence as to what the actual number is. The first two groups combined comprise at least 9,400 people. (Sands Decl., ¶ 8)

[14] MSI and NPP subcontracted responsibilities to UCI, and the MasterCard rules hold such delegation void; class members thus could elect to have their processing agreements rescinded and their leases revoked.

[15] Contrary to Defendants' assertions, Plaintiffs do allege that the ACH form was used to take more money than what is specified on the form (see, e.g., Dkt. # 427 ¶¶ 357-74, 481, 484, 558, 604).

already been rejected by this Court. (Dkt. #425, 13-16.)  Every member in the class, at a minimum, maintains a property interest in obtaining injunctive relief because Defendants still are in possession of the ACH Forms and bank information. *See, e.g. Donohue v. Apple, Inc.*, 871 F. Supp. 2d 913 (N.D. Cal. 2012) (diminishment of "a present or future property interest" is enough to satisfy UCL's standing requirement), citing *Kwikset Corp. v. Superior Court,* 51 Cal. 4th 310, 323 (2011).

MS Defendants further argue that because some members of the class may have elected to process or lease beyond the term, they have ratified their contracts and they have not been injured. They point to Plaintiff Su, who processed credit card transactions through October 2012.[17]  But as Su's testimony makes clear, he believed the term of the contract was for 48 months because, after he tried to cancel in 2008 and 2009, Defendants repeatedly told him that the lease was non-cancelable. (Supp. Decl. Ex. Ex. LLLLL (195-96); MMMMM (219-221). That Su processed for a few months after the 48-month mark only highlights his confusion, not that he was satisfied or without injury. In any case, Defendants have submitted no evidence of such "ratification," and the mere possibility of this as a defense does not raise individual issues sufficient to defeat class certification.[18]

### 3.    Individual Damages Issues Do Not Bar Class Certification.

MS Defendants argue that the individualized or complex damages should be a bar to class certification. But it is well settled that individualized damages alone are insufficient grounds to deny class certification. *See Blackie*, 524 F.2d at 905 ("The amount of damages is invariably an individual question and does not defeat class action treatment."). In any event, damages calculations are common in most instances, and all easily determined. For example, Plaintiffs seek damages for

---

[16] This argument also misstates testimony. Jurczyk stated that *UCI* stopped debiting funds via ACH relating to equipment leases a few years ago, but he did not state that other Defendants did not resume the practice, nor that UCI stopped debiting funds for other purposes. Indeed, Defendants automatically debited funds from Dietz Towing's bank account in May 2010, so the practice continued until at least then.

[17] Defendants also argue that Su is inadequate and atypical because of unique defenses stemming from that Su's case in small claims court. Defendants do not identify any of these purported unique defenses, and Su's suit was dismissed *without prejudice.* (Simpl. Decl. Ex. UUUU)  In any event, as discussed infra, unique defenses are not a bar to class certification.

[18] That some merchants continued to process may very well have been because they were threatened with exorbitant cancellation fees, like Baumgartner. (Id. Ex. TTTT.)  This defense is neither unique, nor like most affirmative defenses an impediment to certification. *See Herrera v. LCS Fin. Servs. Corp.*, 274 F.R.D. 666, 681 (N.D.Cal. 2011) (that some class members may have released claims does not bar class certification.)

amounts associated with the MS Defendants wrongful ACH withdrawals and for all amounts associated with the leases.[19] Nearly all of the disputed transactions were performed via ACH using easy-to-identify descriptors such as "Merch. Svc." or "Mbf leasing."[20] (Simpl. Decl., Exs. W, PPPP-RRRR). Leasing Defendants also maintain searchable computer records of each lease and each transaction, including tax and fee assessments. (Kravic Decl., ¶ 20, 45-52.) Finally, at a minimum, class members will be able to calculate them using their own records.[21]

### D. PLAINTIFFS SEEK TO CERTIFY A NARROWER CLASS ON DIFFERENT THEORIES THAN *AVILA*.

Defendants rely heavily on *Avila v. Lease Finance Group LLC*, 2012 LEXIS 177505 (S.D.N.Y. Dec. 14, 2012), which denied a motion for class certification against some of the same Defendants. While *Avila* contained some of the same factual allegations, the theories underlying class certification are vastly different. The *Avila* plaintiffs moved to certify on *unconscionability*, which *Avila* found required individual inquiries. Defendants understandably try to twist this case into *Avila* by arguing that Plaintiffs' "unconscionability" theory fails as a matter of law. But Plaintiffs do not advance such a theory, and the mere use of the word "unconscionable" in their opening brief does not convert Plaintiffs' legal theories into equitable ones. Plaintiffs consistently have focused on a RICO scheme and other tort-based claims commonly decided on a classwide basis. Further, the class in *Avila* involved nearly 300,000 lessees secured by hundred of different ISOs using their own marketing materials, resulting in 400 different form leases with different language for property tax assessments. Here there was a single ISO with centralized, common marketing materials, with

---

[19] Other than the cancelation fees, amounts paid under the processing contracts were taken by the processors and not by Defendants. Thus, Plaintiffs seek an order declaring the processing contracts voidable and injunctive relief to prevent the collection of cancellation fees.

[20] A small portion of transactions were paid by check, which can also be determined through bank records. There is no evidence that any class members paid any amounts in cash, distinguishing this from Defendants' main case, *Hodes v. Van's Int'l Foods*, 2009 U.S. Dist. LEXIS 72193 (C.D. Cal. July 23, 2009) (denying class certification because "[t]he likelihood that tens of thousands of class members saved their receipts as proof of their purchase of Van's waffles is very low.").

[21] The other cases cited by Defendants are irrelevant as none involve a situation where there is any sort of paper trail listing every single disputed transaction and cost associated with it, let alone multiple paper trails. *See, e.g. Pierce v. County of Orange*, 526 F.3d 1190 (9th Cir. 2008) (decertifying a class of 180,000 detainees with civil rights claims).

REPLY IN SUPPORT OF PLAINTIFFS' AMENDED MOTION FOR CLASS CERTIFICATION
Case No. 4:10-cv-1993-CW

1    virtually identical leases. Plaintiffs have further separated out the issue of the property taxes and

2    administrative fees into different classes reflecting the language of the lease and the specific wrong

3    alleged. Finally, the leases in *Avila* spanned from just a few to hundreds of dollars a month and did

4    not control for the number of pieces of equipment leased, while the Excessive Lease Amount

5    Subclass is limited only to those leases that exceed certain rate caps, tying those rates to the number

6    of pieces of equipment leased. In sum, *Avila* has no applicability here.

7    **IV.    THIS COURT SHOULD CERTIFY THE CREDIT MONITORING CLASS.**

8         Defendants argue that individual questions subsume common ones regarding the proposed

9    credit monitoring class. This is mistaken. The predominant question driving resolution of the Credit

10   Monitoring Class is whether Defendants were collecting on a debt.[22] For example, if the MS

11   Defendants were never authorized by TransFirst to collect funds owed by merchants under their

12   processing agreements, then they never had the right to inspect credit reports to collect bogus debts.

13   And if class members are found to have been enrolled fraudulently, then a common, classwide

14   question is whether those lessees ever "initiated the transaction," or whether they were merely

15   obligated to be "associated with" the repayment of Leasing Defendants' fraudulent commissions and

16   bounties to the MS Defendants. *See Pintos v. Pac. Creditors Ass'n*, 565 F.3d 1106 (9th Cir. 2009).

17   **V.    DEFENDANTS' CLAIMS OF UNIQUE DEFENSES, CHOICE OF LAW AND
             JURISDICTIONAL DIFFRENCES CANNOT DEFEAT CERTIFICATION.**

18

19        **A.    DEFENDANTS' DEFENSES ARE NOT UNIQUE AND CAN BE RESOLVED
                  ON A CLASSWIDE BASIS.**

20        Leasing Defendants claim that there are individualized defenses to which thousands or more

21   class members are subject. But if thousands of class members are subject to the same defense,

22   individual issues do not predominate. *See Negrete II*, 2012 U.S. Dist. LEXIS 182796 at *41 (class

23   certification upheld where "thousands of potential class member claims are potentially subject to

24   ───────────────────────
     [22] Defendants also argue that because the underlying transactions are commercial, they are except from
25   complying with FCRA. This is an argument better suited for summary judgment, as it is predominant to all
     class members. In any event, Defendants are wrong. *See* FCRA Staff Opinion to Charles Tatelbaum (July
26   26, 2000), available at http://www.ftc.gov/os/statutes/fcra/ tatelbaum.shtm (last accessed Feb. 8, 2013)
     (where the inquiry "is a report on the *personal* credit and other history of the individual who is a principal,
27   owner, or officer of the entity that is undertaking the commercial loan (or who is serving as a guarantor) . . .
     the overwhelming weight of authority is that such a report is a 'consumer report.'"), citing cases. Plaintiffs
28   more fully brief this matter in their Opposition to Defendants' Motion to Dismiss. (Dkt.# 262, p. 29-32.)

-16-

these same legal defenses"). Here, tens of thousands of class members, including Plaintiffs Su and Precision Tune, were enrolled in leases that contain a class action waiver, a jury trial waiver, and a one-sided, one-year statute of limitations provision. (Kravic Decl. ¶¶ 35-43.) Plaintiffs, and absent class members, also similarly contend that portions of the agreements were forged.[23] Thus, there are common, predominant questions of defenses based on terms that Plaintiffs contend are unenforceable.

The Leasing Defendants next claim that because they have filed suits (and obtained judgments) against an *astonishing* 7,842 class members, these class member claims are subject to individualized *res judicata* defenses. They similarly contend that 1,218 class members "*released*" unspecified claims. Even if these defenses later present some individual issues, they are not an impediment to certification. *See Negrete II*, 2012 U.S. Dist. LEXIS 182796 at *41.

In any event, Leasing Defendants have not met their burden to show that res judicata or a release apply. For example, res judicata only bars subsequent litigation "whenever there is (1) an identity of claims, (2) a final judgment on the merits, and (3) identity or privity between parties." *See Owens v. Kaiser Found. Health Plan, Inc.*, 244 F.3d 708, 713 (9th Cir. 2001). Defendants, however, provide no information to determine any of these facts.[24] Without this information, it is impossible to determine what issues these defenses create; as such, this Court may presume that they can be treated commonly. *See Kelly v. City & County of San Francisco*, 2005 U.S. Dist. LEXIS 31113 (N.D. Cal. Nov. 19, 2005) (finding that common evidence will be almost certainly be involved in the analyzing defendant's laches defense).

_____

[23] Defendants argue, for different reasons, that forgery related issues defeat certification, but they are mistaken, as all class members present the same issues regarding how the agreements are presented and signed or not signed.

[24] Recently a judge in New York granted a lessee's motion to vacate a default judgment on the grounds that she was not aware of the litigation. In doing so, the court noted that the "allegations are substantially the same or similar to scores of cases involving [Northern Leasing] and other out-of-state residents that have come before this judge in this court." *Northern Leasing Sys., Inc. v. Walton*, 36 Misc. 3d 1204A (N.Y. Civ. Ct. 2012). Even where *res judicata* could bar claims against one party, the privity requirement means that it is unlikely it could bar claims against all 18 Defendants in this litigation. *See, e.g. Bohannon-Hingston v. Brachfeld Law Group*, 2011 U.S. Dist. LEXIS 143933, *13 (E.D. Cal. Dec. 13, 2011) (res judicata inappropriate where suit filed against party not named in prior suit). Thus, the defense will not predominate.

REPLY IN SUPPORT OF PLAINTIFFS' AMENDED MOTION FOR CLASS CERTIFICATION
Case No. 4:10-cv-1993-CW

### B. DEFENDANTS FAIL TO MEET THEIR BURDEN OF PROVING THAT CERTIFICATION OF CHOICE OF LAW ANALYSIS CREATES PREDOMINANT INDIVIDUAL ISSUES.

Defendants, again relying almost exclusively on *Mazza*, 666 F.3d 581, argue that a choice of law analysis for each absent class member is required and that therefore individual issues predominate. Defendants' conclusions are legally mistaken and factually incomplete. California's choice-of-law analysis[25] requires a defendant to show that: (1) first, the relevant law is different across jurisdictions "with regard to the particular issue in question"; (2) an analysis of each jurisdiction's interest in the application of its own law "under the circumstances of the particular case" reveals that a "true conflict exists"; and (3) a weighing of each jurisdiction's interest in the application of its own law reveals which state's interest would be more impaired by not having its law applied.[26] *See Kearney v. Salomon Smith Barney*, 39 Cal. 4th 95 (2006). This Court need only "proceed to the second step" of the test if it "finds the laws are materially different." *See Washington Mutual Bank v. Superior Court*, 24 Cal. 4th 906 (2001). Defendants fail to carry their burden on even the first step.

Defendants contend that the purported differences in limitations periods, including "triggering and accrual standards," satisfy the first step of the test. But Defendants only present purported differences for the fraud, conversion and negligent misrepresentation claims, ignoring Plaintiffs' RICO and FRCA claims, which are undeniably identical for all class members. They also fail to establish material conflicts relating to Plaintiffs' UCL, false advertising, breach of contract, and breach of the covenant of good faith and fair dealing claims. Thus, Defendants' failure to show

---

[25] Where, as here, a federal court sits in diversity jurisdiction, the court must follow substantive "state law as announced by the highest court of the State," even when "the application of a federal statute is involved." *C.I.R. v. Bosch's Estate*, 387 U.S. 456, 465 (1967).

[26] The MS Defendants further argue that Plaintiffs do not assert that California has significant contacts with this litigation. This is incorrect. (See, e.g. Dkt. # 427 ¶¶ 9-19, 37, 112, 141-42, 247, 259, 403, 411, 413, 482, 486, 571). Hundreds of thousands of dollars were wired in and out of the state from Irvine, California. (Id. ¶ 457, 512, 541, 578)  Every sales representative was trained in Irvine and was instructed on how to pitch the Rate Sheet (Id. ¶ 249, 257-270). Defendants also maintain telemarketers who place hundreds of calls to merchants from Irvine. (Id. ¶ 271, 273)  Business cards represent that the company is based in California. (Id. ¶ 245, 248, 505, 526, 571) In that context, courts almost invariably find sufficient contacts. *See, e.g., Wershba v. Apple Computer, Inc.*, 91 Cal. App. 4th 224, 241-42 (2001); *Sound Appraisal v. Wells Fargo Bank, N.A.*, 717 F. Supp. 2d 940, 945 (N.D. Cal. 2010); *In re POM Wonderful LLC Mktg. & Sales Practices Litig.*, 2012 U.S. Dist. LEXIS 141150, at *12 (C.D. Cal. Sept. 28, 2012).

differences across the affected jurisdictions "*with regard to the particular issue in question*" ends the inquiry for all classes and subclasses, as they concern causes of actions other than fraud, conversion and/or negligent misrepresentation.[27] *See, e.g., Bruno v. Eckhart Corp.*, 280 F.R.D. 540, 549 (C.D. Cal. 2012) (refusing to decertify nationwide class where "Defendants provide[d] no law from any jurisdiction for the Court to consider").

Even with regard to the purported differences for the fraud, negligent and conversion claims, Defendants fail to explain how the differences concerning the limitations periods "make a difference in this litigation." *Mazza*, 666 F.3d at 590-91. Instead, they simply attach three appendices. This very practice has been held to be insufficient; it also further distinguishes this case from *Mazza* where, unlike here, defendant had "exhaustively detailed" material differences in laws and convincing argued "that the law of other states conflicted with California law *as applied to this particular case.*" *See Bruno,* 280 F.R.D. at 500 (emphasis in original); *see also In re POM Wonderful*, 2012 U.S. Dist. LEXIS 141150, at *13 (rejecting similar argument and certifying nationwide class because "nowhere does [defendant] apply the facts of this case to those laws or attempt to demonstrate, beyond citation to *Mazza*, that a true conflict exists.").[28]

---

[27] As the Leasing Defendants "provide[d] no law from any jurisdiction for the Court to consider," the nationwide classes/subclasses against them may be certified. *See In re MDC Holdings Securities Litigation*, 754 F. Supp. 785, 803-04, 808 (S.D. Cal. 1990) (applying California law to nationwide class because defendant "has not made any attempt to satisfy the [California] three-part governmental interest test"); *In re Seagate Technologies Sec. Litigation*, 115 F.R.D. 264, 269, 274 (N.D. Cal. 1987) (applying California law to nationwide class because "[a]bsent the defendant carrying [its] burden, California law would govern the foreign state plaintiffs' claims" and noting several other decisions reaching this conclusion).

[28] Even if Defendants had presented materially different laws, they would still fail the second step because "there is still no problem in choosing the applicable rule of law where only one of the states has an interest in having its law applied." *Washington Mutual*, 24 Cal. 4th at 919. The MS Defendants are entirely based in California, where their scheme was hatched. There is thus no state whose interests would be "more impaired" if California law were applied. Defendants argue that the alleged wrongs "took place in all 50 states." But this is irrelevant: Where a defendant's wrongful conduct emanated from this state, courts have almost universally concluded that California's laws apply to non-California residents. *See, e.g., State Farm Mutual Automobile Ins. Co. v. Superior Court*, 114 Cal. App. 4th 434 (2003); *Wershba*, 91 Cal. App. 4th at 241-42.

## VI.    EVIDENTIARY MATTERS

Plaintiffs object to paragraphs 3-68 of the Declaration of Jennifer Nigro.[29]  Finally, this Court should overrule Defendants' objections to the Sands Declaration.[30]

## VII.    CONCLUSION

For the foregoing reasons, this Court should (a) certify the classes and subclasses; (b) appoint Plaintiffs as representative of the various classes as set forth in the notice of motion; and (c) appoint Gutride Safier LLP as counsel for the class pursuant to Rule 23(g). The Court should also strike portions of the Nigro Declaration and overrule Defendants' objections to the Sands Declaration. Finally, Plaintiffs request that the Court order the parties to meet and confer and within twenty (20) days provide to this Court a draft plan for dissemination of notice to the class.

Dated:  February 14, 2013             **GUTRIDE SAFIER LLP**
                                      /s/ Kristen G. Simplicio
                                      Adam J. Gutride, Esq.
                                      Jay L. Kuo, Esq.
                                      Kristen G. Simplicio, Esq.

---

[29] These paragraphs contain biased summaries of testimony, mental impressions, and arguments and should be stricken. *See* Fed. R. Evid. 901 (holding that evidence must be authenticated by "evidence sufficient to support a finding that the matter in question is what its proponent claims."); *Burch v. Regents of the University of California*, 433 F. Supp. 2d 1110, 1119 (E.D. Cal. 2006) ("[S]tatements in declarations based on speculation or improper legal conclusions, or argumentative statements, are not facts and likewise will not be considered . . . Objections on any of these grounds are simply superfluous in this context."); *Kamar v. Radio Shack Corp.*, 2008 U.S. Dist. LEXIS 108507 (C.D. Cal. Oct. 8, 2008) (sustaining objection to counsels' summaries of the deposition testimony, as better evidence existed); Fed. R. Evid. 1002. As such, they are directly aimed at circumventing this Court's page limits. *See, e.g., Apple, Inc. v. Samsung Elecs. Co.*, 2012 U.S. Dist. LEXIS 92314, *19 (N.D. Cal. July 3, 2012) (stating "declarations are to serve as evidence" not as means for circumventing briefing page limits"); *ThinkVillage-Kiwi, LLC v. Adobe Sys.*, 2009 U.S. Dist. LEXIS 106687, *20 (N.D. Cal. Nov. 16, 2009) (same). Plaintiffs have not yet had an opportunity to depose Paul Bent, and may later seek to object to his testimony as well.

[30] Ms. Sands, an expert in Oracle databases, performed queries on the database Defendants provided, and did not create any data, but instead relied exclusively on what Defendants provided. (Sands Decl. ¶¶ 5-6) The results were used to establish the numerosity and ascertainability of the classes. Even though Defendants do not contest these elements and have provided the Kravic Declaration, **which comes to nearly identical conclusions,** Defendants challenge her conclusions. Because their objections do not "help the trier of fact to understand the evidence or to determine a fact in issue," Fed. R. Evid. 702, they should be denied.   Their remaining "objections" are of their own doing. Despite having six months to take discovery, ***Defendants never asked for the database.*** Rather, Defendants' eleventh hour subpoena sought undefined "documents" and the transport and production of her desktop computer for inspection and the *installation of software on it.* (Id., Ex. OOOOO.)  Defendants refused to meet and confer. (Id. ¶ 10, Ex. PPPPP.) With respect to the so-called "corrupted" database, Plaintiffs' counsel informed Defendants that some of the files in the database were corrupted in July 2012. Defendants replaced the files and did not express any concern about the integrity of the database as a whole at that time. (Id., ¶ 11, QQQQQ.)

-20-