GUTRIDE SAFIER LLP
ADAM J. GUTRIDE (State Bar No. 181446)
SETH A. SAFIER (State Bar No. 197427)
KRISTEN SIMPLICIO (State Bar No. 263291)
835 Douglass Street
San Francisco, California 94114
Telephone: (415) 336-6545
Facsimile:  (415) 449-6469

Attorneys for Plaintiffs

UNITED STATES DISTRICT COURT

FOR THE NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| RAINBOW BUSINESS SOLUTIONS, D/B/A PRECISION TUNE AUTO CARE, ET AL.<br><br>Plaintiffs,<br><br>v.<br><br>MERCHANT SERVICES, INC.; ET AL.,<br><br>Defendants. | Case No.: CV 10-01993 CW<br><br>**DECLARATION OF ADAM GUTRIDE IN SUPPORT OF PLAINTIFFS' MOTION FOR FINAL APPROVAL OF CLASS ACTION SETTLEMENT AND APPLICATION FOR ATTORNEYS' FEES, COSTS AND INCENTIVE AWARDS**<br><br>Date:       November 21, 2013<br>Time:      2:00 p.m.<br>Place:      Courtroom 2, 4th Floor<br>Judge:     Hon. Claudia Wilken |

I, Adam Gutride, declare as follows:

1.      I am a member of this Court and attorney of record for Plaintiffs in this action.  I make this declaration of my own personal knowledge and could testify competently to the facts stated herein.

2.      I make this declaration in support of Plaintiffs' motion for final approval of class action settlement and application for attorneys' fees, costs and incentive awards ("Motion").  In that regard, I discuss, in the following order: (a) the history of this litigation which includes a summary description of the legal services provided by my law firm, Gutride Safier LLP ("GSLLP") and our co-counsel in this litigation to date; (b) a summary of the settlement negotiations and Settlement; (c) the risks borne by GSLLP; (d) the time, rate, expenses and other data underlying this Motion; and (e) GSLLP's continuing obligations in this litigation and under the Settlement Agreement.

3.      GSLLP initiated this litigation with the assistance of Michael Sweet, a partner at the McNutt Law Group LLP ("McNutt"), which was co-counsel of record for Plaintiffs.  In May 2011, Mr. Sweet joined Meyers Nave LLP ("Meyers Nave"), which agreed to substitute for McNutt as co-counsel of record for Plaintiffs.  In January 2012, Meyers Nave stopped performing work on the matter, and in July 2012, a formal motion to withdraw was filed.  Since January 2012, GSLLP has been the sole firm performing work on this case.

**A.      History of the Litigation.**

**Investigation and Early Stages of Litigation**

4.      On March 26, 2010, GSLLP and McNutt filed a nationwide class action complaint entitled *Just Film, Inc., et. al v. Merchant Services, Inc., et al* in the Superior Court of California, City and County of San Francisco, Case No. CGC-10-498225.  The Complaint was filed on behalf of two businesses and their owners against 35 entities and individuals in the credit card processing and equipment leasing industry, including Merchant Services, Inc.; Universal Card, Inc.; National Payment Processing, Inc.; Universal Merchant Services, LLC; Jason Moore; Nathan Jurczyk; Robert Parisi; Alicyn Roy; Eric Madura; and Fiona Walshe (the "Settling Defendants").

5.     In the Complaint, Plaintiffs pled the following statutory and common-law claims: violations of the Racketeer Influenced and Corrupt Organizations Act ("RICO"); fraud, deceit and/or misrepresentation; negligent misrepresentation; breach of contract; breach of the duty of good faith; false advertising under California Business and Professions Code sections 17500, *et seq.*; breach of contract; false advertising; and unfair business practices under California Business and Professions Code sections 17200, *et seq*.

6.     Prior to drafting, filing and serving the Complaint, GSLLP spent time communicating with the Plaintiffs concerning their claims, gathering their documentation and negotiating retainer agreements with them.  GSLLP also undertook extensive pre-filing investigation, including without limitation, communicating with other business owners and reviewing their documentation; researching, tracking and analyzing Defendants' agreements and marketing materials; and analyzing the lengthy terms and conditions associated with the multiple contracts for each business.  GSLLP also conducted extensive investigation into understanding the interchange, the system of electronic payments put in place and regulated by Visa and MasterCard.  McNutt assisted with some of this work.  Throughout this litigation, GSLLP has continued to monitor, research and review such materials.

7.     GSLLP also undertook extensive research into Defendants' identities, true corporate names, locations of operation, and relationships to one another.  For example, because Settling Defendants' advertising materials merely identified themselves as "Merchant Services," Plaintiffs' counsel needed to analyze and compare information regarding dozens of entities with similar names to determine which "Merchant Services" was the proper defendant, where its registered agent was located, and where it operated.  As a result, effecting service of all 35 Defendants was a time consuming and expensive process.

8.     On May 11, 2010, several of the defendants removed this case from state court, pursuant to the Class Action Fairness Act of 2005, 28 U.S.C. § 1332(d), *et seq*.  (Dkt.# 1.) GSLLP and McNutt reviewed Defendants' notice of removal and supporting evidence.  GSLLP additionally researched, but did not file a motion to remand.

9.     GSLPP and McNutt then negotiated and drafted case management stipulations and

1    an electronic service agreement with counsel for many of the Defendants.  These stipulations

2    were the first of dozens of stipulations that GSLLP drafted, negotiated and/or filed in this

3    litigation.

4         10.    Following removal, nearly all Defendants, including all but one of the Settling

5    Defendants, moved to dismiss.  (Dkts.## 41, 45-52, 55, 58-61, 66-71.)  GSLLP reviewed those

6    motions.   It then conducted extensive research regarding the arguments set forth in the motions.

7    McNutt assisted with some of this research.  GSLLP also continued to investigate the claims, and

8    interviewed witnesses, including several former sales representatives of the Settling Defendants.

9    In addition, by this point, GSLLP started to be contacted by many putative class members who

10   sought help and representation as well as by other persons with knowledge of the allegations and

11   Defendants' conduct.  Based on the new information obtained from these persons and other

12   witnesses, Plaintiffs filed an 89-page First Amended Complaint ("FAC"), including a new claim

13   for fraudulent conveyance, in response to the pending motions to dismiss.  (Dkt.# 91.)  In the

14   FAC, three additional businesses and their owners were added to the lawsuit, as named

15   representatives.  Plaintiffs also withdrew some defendants, but added additional Defendants.

16        11.    Settling Defendants and other defendants again moved to dismiss portions of the

17   FAC.  (Dkts.## 108-16, 120-24.)  Many of the Settling Defendants, however, did not move to

18   dismiss a number of Plaintiffs' claims, including their RICO claims.  In addition, the payment

19   processors, and their affiliated entities (the "TransFirst Defendants"), moved to compel

20   arbitration.  GSLLP researched, drafted, and filed a consolidated opposition to those motions.

21   McNutt assisted with some of this work.

22        12.    On September 16, 2010, the Court held a hearing on the motions to dismiss and

23   motion to compel arbitration, as well as a case management conference.  The Court ordered

24   discovery on issues relating to corporate relationships and forgery, and set a briefing scheduling

25   on the TransFirst Defendants' motion to compel arbitration.  The Court also granted the motions

26   to dismiss, with leave to amend, and suggested that the parties work together to resolve Plaintiffs'

27   concerns about difficulties identifying responsible parties, and further suggested that certain

28   Defendants consider entering into tolling agreements with Plaintiffs.  (Dkt.# 179.)

13.     Around this time, GSLPP and McNutt researched and drafted preliminary discovery requests and propounded them on all remaining Defendants.

14.     When Defendants responded, GSLLP and McNutt reviewed the responses, and engaged in a lengthy meet and confer process.  As part of this process, McNutt filed a motion to compel against Settling Defendant Fiona Walshe.  That motion was granted.

15.     In the fall and winter of 2010 and 2011, GSLLP researched and drafted a proposed amended complaint, a draft of which was circulated to Defendants in November 2010.  McNutt assisted with some of this work.  GSLLP also began negotiating tolling agreements with certain Defendants in exchange for limited discovery.  After Plaintiffs obtained key discovery from the TransFirst Defendants and dismissed them from the action, the Merchant Services Defendants sought to enforce the arbitration provision in the Plaintiffs' purported contracts with TransFirst. They also moved for summary judgment on the question of whether Plaintiffs' contracts had been forged in March 2011.  (Dkt.## 195-99.)  As a result, GSLLP engaged in additional research and investigation and drafted oppositions to the motions.  The Court denied the motions.  (Dkt.# 200.)

16.     In March 2011, GSLLP prepared and filed a 120-page second amended complaint ("SAC"), which re-pled all of the above claims except the claim for fraudulent conveyance.  The SAC added common law claims for conversion and abuse of process, and claims under the Fair Credit Reporting Act ("FCRA").  (Dkt.# 207.)

17.     In response to the Second Amended Complaint, Settling Defendants filed a second motion to compel arbitration.  (Dkt.## 221-24.)  GSLPP researched, drafted, and filed an opposition.  GSLLP also prepared for, and attended, oral argument.  The Court denied Settling Defendants' second motion to compel arbitration.  (Dkt.# 292.)  Defendants Northern Leasing Systems, Inc.; MBF Leasing, LLC; SKS Associates, LLC; Northern Funding LLC; Jay Cohen; Leonard Mezei; Sara Krieger; and Sam Buono (the "Leasing Defendants") also filed a motion to compel arbitration, which this Court denied (Dkt.# 253), a decision that was subsequently upheld by the Ninth Circuit.  While that appeal was pending, the Leasing Defendants twice moved to stay the litigation.  (Dkt.## 283, 303.)  GSLLP researched and prepared oppositions to both those motions.  (Dkt.## 287, 305.)  Both motions to stay were ultimately denied by this Court.  (Dkt.##

293, 322.)  McNutt assisted with some of this work.

18.    Settling Defendants and other defendants also moved to dismiss portions of the SAC.  (Dkt.## 245-49.)  GSLLP devoted a significant amount of time toward researching and drafting an opposition to these motions.  McNutt assisted with some of this work.  The Court granted the motions to dismiss in part, dismissing in entirety the abuse of process claim, and permitting each of the other above-listed claims to remain pending against one or more of the Defendants.  (Dkt.# 292.)  GSLLP reviewed that order.

19.    On September 30, 2011, Defendants answered the SAC.  GSLLP reviewed the answers.

**Written Discovery and Motion Practice**

20.    On October 11, 2011, GSLLP drafted and served Plaintiffs' initial disclosures.  GSLLP produced documents in conjunction with Plaintiffs' initial disclosures.  GSLLP also reviewed Defendants' initial disclosures.  Meyers Nave assisted with this work.

21.    GSLLP drafted Plaintiffs' first requests for the production of documents and first set of interrogatories for all 18 Defendants.  GSLLP also drafted and noticed 30(b)(6) depositions for all eight of the entity defendants.  GSLLP drafted electronic search terms, and counsel for all parties communicated extensively about electronic search terms.  Meyers Nave assisted with this work.

22.    In November 2011, most of the Defendants provided discovery responses.  At that same time, certain of the Leasing Defendants sought to stay the litigation, sought a protective order, and moved to transfer the matter to New York.  GSLLP researched and prepared the opposition to that motion, which was resolved in Plaintiffs' favor in January of 2012.  (Dkt.# 322.)

23.    GSLLP and Meyers Nave reviewed the discovery responses from the 18 Defendants and drafted meet and confer letters.  Numerous meet and confer sessions occurred and much correspondence was exchanged on the matter.  GSLLP eventually researched and briefed two motions to compel and supporting replies (Dkt.## 341, 342), which were resolved favorably for Plaintiffs in a court-ordered meet-and-confer session on the day of the hearing.  (Dkt.## 355,

356.)

24.    In February 2012, GSLLP propounded a second set of requests for production. GSLLP reviewed Defendants' objections and engaged in lengthy meet-and-confer process. GSLLP briefed a successful motion to compel against the Leasing Defendants.  GSLLP also briefed numerous other motions to compel and a motion for sanctions against Leasing Defendants.  Some of the evidence obtained through these motions was used to build the case against the Settling Defendants.

25.    As a result of this work, Plaintiffs received and reviewed well over a million pages of documents and 30GB of databases from Defendants, including more than 300,000 pages of documents from the Settling Defendants.  GSLLP invested significant time reviewing these documents.  In addition, GSLLP also spent time meeting-and-conferring with Defendants about redactions, privilege issues, and other production concerns.

26.    Settling Defendants and Leasing Defendants also served documents requests and interrogatories on all the Plaintiffs.  GSLLP worked extensively with the Plaintiffs, and then drafted and served responses to Defendants' discovery requests.  Meyers Nave assisted with some of this work.

**Third Party Discovery**

27.    GSLLP also prepared and served third party discovery on approximately 20 third parties.  For example, GSLLP prepared and served subpoenas on Visa, MasterCard, payment processors such as TransFirst LLC and FirstData Corporation, and all three major credit bureaus. Meyers Nave assisted with some of this work.

28.    GSLLP spent time negotiating with these and other third parties about document production.  GSLLP reviewed the document production for all of these third parties.

29.    GSLLP also spent time interviewing witnesses to Defendants' conduct.  For example, GSLLP had numerous conversations with former employees and contractors (including sales representatives) of the Defendants.   GSLLP also discussed this litigation with several payment processing experts.  McNutt assisted with some of this work.

30.    GSLLP also had one-on-one conversations, by phone and email, with dozens of

putative class members who contacted the firm (with new inquiries coming every week, and often several times per week).   GSLLP communicated to these persons information regarding the status of the litigation.  It also obtained information from them about their experiences regarding Defendants' sales pitches, customer service practices, and debt collection efforts.

**Depositions**

31.     GSLLP also prepared Plaintiffs for their depositions, and defended them during ten days of depositions.  Meyers Nave assisted with some of this work, attending all preparation sessions and appearing at five of the ten Plaintiffs' depositions.

32.     GSLLP engaged in lengthy negotiations regarding the number of depositions that Plaintiffs would be permitted to take.  Defendants initially refused to produce more than 10 witnesses for deposition.  After weeks of negotiations, a stipulation was reached.  Later, Defendants stated they would not abide by it.  GSLLP then engaged in more negotiations, but the negotiations were unsuccessful.  GSLLP accordingly drafted and filed a motion to compel.  Soon thereafter, Defendants agreed that Plaintiffs could depose all Defendants, and GSLLP negotiated a stipulation resolving the issue.

33.     In May, June, and July of 2012, GSLLP spent eighteen days deposing Defendants and other witnesses in San Francisco, Irvine, Los Angeles, and New York.  Because of the complicated nature of the case, the need to keep track of a large number of documents that could be used as deposition exhibits, and the fact that the depositions were scheduled back-to-back, two attorneys from GSLLP attended and conducted all depositions.

34.     In January 2013, Defendants deposed Plaintiffs' database expert, Robyn Sands. GSLLP prepared her for the deposition, and defended it.  GSLLP also spent significant time negotiating the timing and scope of the deposition and meeting and conferring on other discovery matters relating to that deposition.

**Other Key Motions and Events**

35.     In the spring of 2011, GSLLP researched and moved for a temporary restraining order and preliminary injunction to enjoin a debt collection scheme by the Leasing Defendants. GSLLP spent considerable time investigating the claims before filing.  McNutt assisted with

some of this work.  This Court granted that motion.  GSLLP then successfully opposed Leasing Defendants' appeal on the issue.  Finally, GSLLP has spent time monitoring compliance with the injunction and communicating to class members about it.

36.     In February 2012, Settling Defendants filed a second motion for summary judgment, which this Court denied on June 4, 2012.  (Dkt.## 337, 379.)  GSLLP spent significant time researching the law underlying that motion, which involved issues surrounding statements made by a named Plaintiff in a bankruptcy proceeding; it also prepared an opposition.  After the Court issued the order denying the motion, GSLLP reviewed that order.

37.     On August 23, 2012, Plaintiffs filed a comprehensive 50-page motion for class certification, which contained nearly 150 exhibits. (Dkt.## 386-87.)  GSLLP later researched, briefed, and filed a reply memorandum in support of class certification.

38.     In August 2013, GSLLP prepared a 189-page third amended complaint ("TAC"), which set forth new predicate acts under RICO and also sought to reinstate certain claims against certain Defendants. (Dkt.# 383.)  In conjunction with drafting the TAC, GSLLP synthesized information obtained during the many depositions and extensive document review, and conducted research into new legal theories.  GSLLP then attempted to negotiate a stipulation with Defendants regarding leave to file the TAC.  Because agreement could not be reached, GSLLP prepared a motion for leave to amend.  After some procedural motions regarding the timing of the hearing on that motion, the Court instructed Defendants to include any Rule 12(b)(6) arguments in opposition to the motion for leave to amend.  (Dkt.# 397.)  They did so.  (Dkt.# 401.)  GSLLP then researched and briefed many 12(b)(6) type questions when drafting and filing the reply in support of leave to amend.  On December 6, 2012, the Court granted Plaintiffs' motion for leave to amend.  (Dkt.# 425.)  GSLLP revised and filed the TAC to comply with that order.

**Other Administrative Motions and Case Management Responsibilities**

39.     The schedule on several of Plaintiffs' motions were extended multiple times, requiring GSLLP to draft, negotiate and file several stipulations relating to briefing schedules on dispositive motions and class certification.

40.     GSLLP also researched, drafted and filed a number of administrative motions,

1    including a number of motions to seal, and several motions to shorten time.

2        41.    GSLLP drafted and negotiated three joint case management statements.

3        42.    GSLLP also drafted, negotiated and filed a stipulated protective order.

4        43.    In conjunction with all of the above work, GSLLP spent a great deal of time

5    involved in internal strategy discussions.  For example, over the course of this litigation, my

6    associate, Kristen Simplicio sent and received more than 15,000 emails regarding this litigation.

7    GSLLP also spent a great deal of time meeting and conferring with Defense counsel on numerous

8    issues.   It also spent time following other cases against the Settling Defendants and Leasing

9    Defendants that were pending around the Country and conferring with counsel in those cases.

10                    **B.    Settlement Negotiations and Settlement**

11        44.    The proposed Settlement was reached following many rounds of arms-length talks

12    stretching over many months.  Settlement discussions began in the late summer of 2012, after

13    Plaintiffs filed their opening class certification brief and before Defendants had filed their

14    oppositions.

15        45.    In conjunction with that process, GSLLP spent time negotiating with Defendants

16    regarding available mediators.  The parties eventually agreed to mediate before Antonio Piazza.

17        46.    In preparation for the mediation with Mr. Piazza, GSLLP researched, drafted and

18    prepared a comprehensive mediation statement.  GSLLP also prepared a presentation.

19        47.    In addition to preparing the mediation brief and presentation, GSLLP spent a

20    significant amount of time strategizing for the mediation session, including researching and

21    reviewing certain class benefit proposals.

22        48.    The first all-day mediation was held on November 7, 2012 in San Francisco,

23    California.  Plaintiffs reached a tentative agreement with the Settling Defendants, but over the

24    next several months, the parties were unable to resolve all concerns.  Before that happened,

25    GSLLP spent significant time drafting and negotiating a draft settlement agreement.  While these

26    negotiations were ongoing, GSLLP also negotiated various stipulations surrounding the class

27    certification briefing schedule and Defendants' timing for responding to Plaintiffs' TAC.

28        49.    Following the filing of Defendants' opposition to plaintiffs' renewed motion for

class certification and Plaintiffs' reply, the Parties agreed to proceed to mediation again.

50.     The second all-day mediation was held on March 20, 2013, in San Francisco, California.  Late in the afternoon, the Plaintiffs and Settling Defendants reached agreement in principle on all of the material terms of settlement, including notice and the class benefit.

51.     In the mediations, GSLLP insisted that no fee negotiations occur until the Parties had finalized all of the substantive aspects of the settlement.   At the time, I also knew that the fee request would be evaluated in light of the benefits negotiated for the Settlement Class, and Defendants had every incentive to negotiate as low a fee as possible to decrease its overall costs.

52.     Plaintiffs were not able to reach agreement with the Leasing Defendants, and they were accordingly excluded from the Settlement.

53.     Following the reaching agreement in principle, GSLLP spent many hours preparing, reviewing and negotiating the settlement agreement and corresponding exhibits.

54.     GSLLP then prepared and filed a motion for preliminary approval of class action settlement.  Several days after those papers were filed, the Ninth Circuit rendered the *Radcliffe v. Experian* decision, which contained guidance relevant to the parties' settlement agreement.  In light of that case, GSLLP and Settling Defendants renegotiated certain provisions in the Settlement Agreement, and an amended agreement was filed on April 26, 2013.  (Dkt.# 500.)

55.      GSLLP also prepared for and attended that hearing on May 2, 2013.   During that hearing, Court expressed some concerns and proposed certain revisions to the agreement.  Among other things, the Court was concerned with exclusions from the settlement class, the claims process, and the form of notice.

56.     GSLLP then spent a great deal of additional time negotiating with Settling Defendants on a further amended settlement.  A new agreement was reached, which enlarged the size of the settlement class, made the claims process easier, and improved the notices.  After all those terms had been negotiated, the parties proceeded to renegotiate the matter of attorneys fees and expenses for which GSLLP could apply.  The parties eventually agreed to an "up to" amount for such fees and expenses, that Settling Defendants would not oppose and would pay if approved by the Court, which was *lower* than the amount that had been proposed in the earlier settlement

submitted for preliminary approval.  GSLLP filed the further amended settlement agreement and renewed request for preliminary approval on June 6, 2013.  (Dkt.# 519.)

57.     Based on my and my colleagues' familiarity with the factual issues in this litigation, I believe that GSLLP was able to negotiate a fair settlement taking into account the costs and risks of continued litigation.  It is my opinion that counsel for both Parties had full knowledge of the strengths and weaknesses of all Parties' claims due to the extensive discovery and motion work that had preceded the settlement talks.  The final settlement was the result of serious, informed and non-collusive negotiations.

58.     On June 24, 2013 the Court entered an order preliminarily approving this Settlement.  (Dkt.# 524.)

59.     Following the entry of the order of preliminary approval, GSLLP has spent time working toward final approval of the Settlement.  GSLLP's efforts have included, without limitation, reviewing the class notices and the Settlement Website; corresponding with and reviewing reports by the Claims Administrator; reviewing, testing and troubleshooting the Settlement Website and online claim form process, and recommending and supervising changes to it; reviewing changes to the Settlement Notice and proofreading for final publication; and corresponding with and responding to telephone inquiries from Class Members, including persons who had questions regarding the settlement and class benefits.

60.     GSLLP has also researched and drafted Plaintiffs' motion for final approval and application for an award of attorneys' fees and costs and incentive awards.

61.     GSLLP will spend additional time drafting the final approval reply papers, a joint status report on opt-outs, and responding to any objections that are filed.  GSLLP will also prepare for and attend the final approval hearing, and continue working with class members and the claim administrator to facilitate the settlement.

62.     After engaging in all of the aforementioned tasks, as a partner with GSLLP, I am in a unique position to evaluate this Settlement.  Indeed, in advising the Representative Plaintiffs whether or not to enter into the Settlement Agreement, I was very cognizant of the risks involved in protracted litigation.  I was also cognizant of Defendants' size and financial resources.

63.     When considering the risks and costs associated with proceeding to trial against the nature of the benefit that was being offered by Defendants, it was clear that the Settlement is in the best interests of the class.  Indeed, with this Settlement, Plaintiffs have achieved his desired goal in this litigation—i.e., obtaining cash refunds for class members.  In addition, Settling Defendants have agreed to changed practices, including improved disclosures in their sales pitches.  Based on my evaluation of the facts and legal issues presented, I believe that the settlement is fair, adequate and reasonable.

64.     Plaintiffs are each requesting an incentive award of $7,500.  They (as both individuals and as small businesses) took on the risk of the possibility of bearing Settling Defendants' costs in a losing effort.  Indeed, Settling Defendants questioned them at length regarding their ability to pay those costs at deposition.  They worked with my firm and our co-counsel to provide a number of declarations and other information throughout the three and a half year litigation.  They all conducted lengthy searches of their personal records and their business records.  For example, all Plaintiffs turned over several years of their businesses' bank statements and other sensitive, private financial documents for inspection and questioning.  They also spent a good deal of time as follows:

a.  Ms. Baumgartner was deposed for a full day.  She answered questions and provided assistance when GSLLP had discovered a pleading error, whereby her sole proprietorship and d/b/a, "Burlingame Motors" had been identified as "Burlingame Motors."  She responded to 45 interrogatories, 124 requests for production of documents, and an additional 23 interrogatories on behalf of Burlingame Motors.  She was available for consultation during both mediation sessions.

b.  Ms. Jordan was deposed for two full days, once personally, and once in connection with her business, Dietz Towing, Inc., travelling to San Francisco from her home in Ontario, California.  She also attended the deposition of Pearl Pannone, the president of Dietz Towing.  She responded to 48 interrogatories, 124 requests for production of documents, and an additional 47 interrogatories and 124 requests for

production on behalf of Dietz Towing.  She again travelled to San Francisco a to attend one of the mediation sessions, and was available for consultation during the other mediation.

    c.   Mr. Von Glasenapp was deposed for two full days, once personally, and once in connection with his now-dissolved business, Just Film, Inc.  He also answered questions and provided assistance when Settling Defendants sought partial summary judgment on his claims.  He responded to 48 interrogatories, 126 requests for production of documents, and responded to an additional 23 interrogatories and 44 requests for production on behalf of Just Film, Inc.  He also attended one of the mediation sessions and was available for consultation during the other.

    d.   Mr. Su was deposed for two full days, once personally, and once in connection with his business, Rainbow Business Solutions.  He responded to 48 interrogatories, 126 requests for production of documents, and an additional 47 interrogatories and 127 requests for production on behalf of Rainbow Business Solutions.  He also attended one of the mediation sessions and was available for consultation during the other.

65.    All Plaintiffs have been actively involved in the litigation prior to and after this Settlement.  They continue to remain actively involved in the ongoing litigation against the Leasing Defendants.  In my opinion, all Plaintiffs' participation in this litigation has been exemplary.

**C.**    **The Risks Borne By GSLLP.**

66.    In accepting this case, GSLLP bore considerable risk in litigating this case wholly on a contingent basis and advancing costs.  From the outset, GSLLP recognized, among other things, that it would be contributing a substantial amount of time and advancing significant costs in prosecuting a nationwide class action, with no guarantee of compensation or recovery, in the hopes of prevailing against a well-funded defense.

67.    GSLLP originally agreed to handle this case with the assistance of Michael Sweet

at McNutt.  GSLLP believed that McNutt would assist in what it anticipated would be a long, and expensive litigation.  During the first year of the litigation, GSLLP performed most of the work in the case.

68.     In May 2011, Michael Sweet left McNutt, and joined Meyers Nave, which agreed to assist GSLLP in the litigation.  In January 2012, however, Meyers Nave informed GSLLP that it intended to withdraw from the litigation immediately, in part, because of the high risk that it would be years, if ever, before it got paid.  While the withdrawal was filed and approved by this Court in July 2012, Meyers Nave stopped performing work for this litigation in late January 2012, when only a small fraction of discovery had been completed.  Because of this, GSLLP had to devote internal resources to litigating the case that it had not anticipated.  For example, in the months that followed Meyers Nave's decision to withdraw, attorney Kristen Simplicio billed in excess of 200 hours a month on this matter, and therefore was not available to work on other matters.

69.     During the course of the litigation, GSLLP in fact has turned away other cases due to its involvement with this matter.  Among these were cases that were subsequently filed by other firms.

70.     The risk in this litigation was heightened in large part due to concern that even if Plaintiffs were ultimately successful, collecting against the Defendants would be expensive, difficult, and perhaps impossible.  Because of Defendants' complicated corporate structure, GSLLP had concerns throughout the litigation that the named companies were empty shells, and the funds taken from the class had been transferred to unknown entities outside this court's jurisdiction.  During GSLLP's lengthy investigation, attorneys on the case spoke with witnesses who suggested that GSLLP's concerns were well founded. Motivated in part by these concerns, GSLLP, with the assistance of McNutt, sought to place *lis pendens* on residential property of one of the named Defendants to try to secure some assets to ensure money would be available to recover for the class if ultimately successful.  Early in this litigation, however, this Court granted that Defendant's motion to dismiss the claim for fraudulent conveyance, and GSLLP and McNutt had to withdraw the *lis pendens*, increasing the risk that collection would be difficult.

71.     Because Settling Defendants were represented by a top litigation firm—*i.e.*, Jones Day—there was further risk that Plaintiffs would lose on a motion to dismiss or motion to compel arbitration, would be denied class certification or would receive a verdict for the Defense after a prolonged trial.

### D.     Lodestar and Expenses for GSLLP

72.     Attached to my declaration in support of Plaintiff's motion for preliminary approval of class action settlement (Dkt.# 496-1) as Exhibit 2 is a true and correct copy of the firm resume of GSLLP.

73.     Based on the time records of GSLLP, it has spent approximately 5418 hours prosecuting this litigation through September 30, 2013.[1]  The total number of hours, as well as the lodestar computed at our current rates is as shown in the following table:

| Attorney | Hours | Rate | Total |
|---|---|---|---|
| Adam J. Gutride | 762.50 | $700.00 | $533,750.00 |
| Seth A. Safier | 174.00 | $675.00 | $117,450.00 |
| Jay Kuo | 645.50 | $625.00 | $403,437.50 |
| Kristen Simplicio | 3836.00 | $450.00 | $1,726,200.00 |
| **TOTAL** | 5418.00 | $513.26 (blended) | $2,780,837.50 |

74.     The hourly rates shown for the attorneys at GSLLP are the same as the regular rates charged for their services in other litigation.

75.     The rates requested here were recently approved in another case, and our similar

---

[1] All time worked by GSLLP on this litigation has been billed to a single client-matter, and timekeepers have not separately tracked hours for work against the Settling Defendants or Leasing Defendants.  It would be extremely difficult if not impossible to have done so, or to divide up the time in retrospect, because in all or nearly all aspects of the case—motion practice, discovery, case management, factual investigation and development—the work had an effect on the case against all Defendants.  For example, documents and testimony obtained from one group were frequently used to inform part of the case against the other group.  Likewise, legal research typically applied to claims against many different defendants or arguments raised by defendants in joint filings.

rates in prior years have also been repeatedly approved.  On August 1, 2013, Judge Dale S. Fischer approved rates of $700 per hour for me, $675 for Seth Safier, $625 for Jay Kuo and $450 for Kristen Simplicio, in *Mancini, et al v Ticketmaster, et al*, Case No. 07-cv-01459-DSF-JTL (C.D. Cal).  On June 1, 2012, Judge Jeffrey White approved rates of $650 per hour for me, $625 for Seth Safier and Jay Kuo and $400 for Kristen Simplicio, in *Chavez v. Blue Sky Beverage, et al*, Case No. 06-cv-6609 (N.D. Cal.).  On February 14, 2012, Judge James Ware approved rates of $625 per hour for me, $600 for Seth Safier and Jay Kuo and $375 for Kristen Simplicio, in *Embry v. Acer America Corporation*, Case No. 5:09-cv-1808 (N.D. Cal.).[2]  On November 30, 2011, Judge James F. Holderman approved rates of $600 per hour for Adam Gutride, and $575 per hour for me in *In Re: Kentucky Grilled Chicken Coupon Marketing & Sales Practices Litigation*, Case No. 1:09-cv-07670 (ND. Ill.).[3]  On November 22, 2011, Judge John Munter approved rates of $625 per hour for Adam Gutride, $600 per hour for Jay Kuo, $375 per hour for Kristen Simplicio, and $600 per hour for me in *Gauss v. Millennium Products, Inc*., Case No. CGC-10-503347.   On December 24, 2009, rates of $550 for Adam Gutride and $525 for myself were approved by Judge Richard A. Kramer in *Deaton et al v. Hotwire*, Case Number CGC-05- 437631. On August 20, 2008, rates of $525 for Mr. Gutride and $500 for myself were approved by Judge Charlotte Walter Woollard in *Nelsen v. PeoplePC*, Case Number 07-460240.  On April 30, 2008, rates of $475 for Mr. Gutride and $450 for myself were approved by Judge Charlotte Walter Woolard in *Howard et al. v. Betz & Sons*, Case Number CGC-03-422529.  On April 14, 2008, rates of $450 for Mr. Gutride and $425 for myself were approved by Judge Mary E. Wiss in *Cho v. Seagate*, Case Number CGC-06-453195.  On February 5, 2008, rates of $475 for Mr. Gutride and $450 for myself were approved in by Judge William Alsup in *Siemers v. Wells Fargo*, Case No. 3:05-cv-04518-WHA (N.D. Cal.).  On November 20, 2006, rates of $450 for Mr. Gutride and $425 for myself were approved by Judge Richard A Kramer in *Vroegh v. Dane Electric et al.*, Case No. CGC-04-428953.

---

[2] GSLLP requested approval of its 2011 rates in that case.

[3] GSLLP requested approval of its 2010 rates in that case.

76.     I am a 1994 graduate from Yale Law School.  Mr. Kuo is a 1994 graduate from Boalt Hall Law School.  Mr. Safier is a 1998 graduate from Harvard Law School. Ms. Simplicio is 2007 graduate of the American University, Washington College of Law.

77.     I and Mr. Safier were previously attorneys at the law firm of Orrick Herrington & Sutcliffe.  Jay Kuo was previously with Howard Rice Nemerovski Canady Falk & Rabkin, and Keker & Van Nest.  It is my understanding that attorneys at those firms in the litigation departments, with the same number of years of experience as myself and Messrs. Kuo and Safier are currently billing at hourly rates in excess of $900 for law school graduates from 1994 and 1998 and in excess of $600 per hour for 2003 graduates.  I also believe the rates paid by Defendants to their firms in this case far exceed the rates requested for GSLLP.  I believe that my firm's hourly rates are below market for attorneys with similar backgrounds and experience.

78.     Expenses are accounted for and billed separately and are not duplicated in my firm's professional billing rates.  GSLLP has not received reimbursement for expenses incurred in connection with this litigation.   As of September 30, 2013, my firm had advanced a total of $97,301.31 in unreimbursed actual third-party expenses in connection with the prosecution of these cases.  The actual expenses incurred in the prosecution of these cases are reflected on the computerized accounting records of my firm prepared by bookkeeping staff, based on receipts and check records and accurately reflect all actual expenses incurred.  The expenses incurred are as follows:

DECLARATION OF ADAM GUTRIDE IN SUPPORT OF MOTION FOR FINAL APPROVAL
Case No. 4:10-cv-1993-CW

| Expense | Total |
|---|---|
| Auto Mileage | $169.85 |
| Experts | $10,979.05 |
| Copying, Reproduction, and Document Processing | $5570.80 |
| Deposition/Transcripts Cost | $35,030.21 |
| Filing/Witness Fees | $920.00 |
| Meals | $2900.64 |
| Mediation Fees (2 full day mediations) | $20,000.00 |
| Parking | $154.26 |
| Postage/Delivery | $190.87 |
| Process Serving | $7,401.13 |
| Research (PACER charges) | $433.33 |
| Travel (airfare, hotel, local transportation) | $13,551.22 |
| **TOTAL** | **$97,301.36** |

79.    I am informed that McNutt had incurred a lodestar of $185,048 and costs of less than $5000 in association with this case.

### E.    GSLLP's Continuing Obligations to Class Members

80.    Since the filing of this lawsuit, Plaintiffs' Counsel has been contacted every few days by customers of the 18 Defendants in this litigation, and has established standardized procedures to ensure that all inquiries from these persons and other Class Members were timely and accurately handled.  Plaintiffs' Counsel also worked the Claim Administrator to assure that Settlement Website functioned properly, was easy to use and properly designed.  I received weekly updates from the Claims Administrator regarding the administration of the Settlement.

81.    On September 25, 2013, I was informed by the Claims Administrator that 1 person had opted out of the settlement.  I also determined that, as of that date, no objections have been filed with the Claim Administrator or via ECF.  I also understand that approximately 7366 postcards were mailed to class members.   Further evidence regarding these facts will be submitted by Settling Defendants and/or the Claims Administrator no later than November 7, 2013.  GSLLP will continue in this capacity should the Settlement be finally approved.

82.    GSLLP will also prepare for and appear at the fairness hearing.  If the Settlement is approved and fees awarded, GSLLP also will oppose any appeals that may be filed.  Based on

my experience with class actions, I additionally anticipate that there will be another 50–75 hours of work before this settlement is entirely complete and an estimated 175-250 hours if this Court's judgment is appealed.

83.     I believe that the Settlement is in the best interests of the class in light of the risks of continued litigation as described in this declaration and the benefits being provided to class members in settlement.  At the time the Settlement was reached, the Plaintiffs' motion for class certification was pending.  The litigation had been highly contentious, and the parties strongly disagreed on Plaintiffs' ability to certify a class and prove liability and damages.  With this Settlement, Plaintiffs have achieved their desired goal in this litigation—i.e., obtaining for class members a refund of $350, as well as changed business practices.   In light of the risks, I believe that the recovery provided by the Settlement is fair wand reasonable when compared to the the likely recovery after trial, appeal and collection efforts.

This declaration was executed this 3rd day of October, 2013, at San Francisco, California. I state the foregoing under penalty of perjury under the laws of the United States.


/s/ Adam Gutride

Adam Gutride, Esq.