GUTRIDE SAFIER LLP
ADAM J. GUTRIDE (State Bar No. 181446)
SETH A. SAFIER (State Bar No. 197427)
KRISTEN SIMPLICIO (State Bar No. 263291)
100 Pine Street, Suite 1250
San Francisco, California 94111
Telephone: (415) 336-6545
Facsimile: (415) 449-6469

Attorneys for Plaintiffs

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

OAKLAND DIVISION

| | |
|---|---|
| RAINBOW BUSINESS SOLUTIONS, D/B/A PRECISION TUNE AUTO CARE; DIETZ TOWING, INC.; THE ROSE DRESS, INC.; VOLKER VON GLASENAPP; JERRY SU; VERENA BAUMGARTNER; TERRY JORDAN; ERIN CAMPBELL; AND LEWIS BAE on behalf of themselves, the general public and those similarly situated,<br><br>            Plaintiffs,<br><br>     v.<br><br>MBF LEASING LLC; NORTHERN LEASING SYSTEMS, INC.; JAY COHEN; LEONARD MEZEI; SARA KRIEGER; SAM BUONO; AND SKS ASSOCIATES, LLC,<br><br>            Defendants. | CASE NO. CV 10-01993 CW<br><br>**PLAINTIFFS' MOTION FOR FINAL APPROVAL OF CLASS ACTION SETTLEMENT AND APPLICATION FOR ATTORNEYS' FEES, COSTS AND INCENTIVE AWARDS**<br><br>DATE:        November 28, 2017<br>TIME:        2:30 p.m.<br>CTRM:      TBD<br>JUDGE:     Hon. Claudia Wilken |

# TABLE OF CONTENTS

**NOTICE OF MOTION AND MOTION** ..................................................................................vi

**MEMORANDUM OF POINTS AND AUTHORITIES** ...........................................................1

I.     INTRODUCTION ..........................................................................................................1

II.     BACKGROUND FACTS AND DETAILS OF SETTLEMENT ...........................................2

    A.    Litigation History........................................................................................................2

       1.     Overview of The Certified Classes..........................................................................2

       2.     The Litigation Was Lengthy and Complex. ............................................................3

       3.     Related Litigation by the New York Attorney General.............................................5

    B.    Settlement Negotiations...............................................................................................6

    C.    THE PROPOSED SETTLEMENT ................................................................................7

       1.     Monetary Relief ......................................................................................................7

       2.     The Injunction and Changed Practices ...................................................................9

       3.     Release..................................................................................................................9

       4.     Administrative Expenses, Attorneys' Fees and Costs, Incentive Awards.....................10

       5.     Notice..................................................................................................................11

III.      ARGUMENT.................................................................................................................12

    A.    Final Approval Is Warranted ......................................................................................12

       1.     The Settlement Agreement Resulted from Arm's-Length Negotiations. .......................13

       2.     Substantial Benefits Are Provided To The Class. ..................................................13

       3.     There are Serious Risks of Further Litigation ........................................................14

       4.     The Experience And Views Of Counsel Favor Final Approval. .....................................15

       5.     The Reaction Of The Settlement Class Has Been Overwhelmingly Positive. ...............16

B.    Plaintiffs' Counsel Should Be Awarded Attorneys' Fees And Expenses In The Amount of

$1,600,000. ............................................................................................................. 16

1.    Plaintiffs' Counsel's Requested Fee Is Reasonable When Using The Lodestar

Approach ........................................................................................................ 17

2.    Plaintiffs' Counsel's Requested Fee Is A Reasonable Percentage of The Total Benefit

Made Available To The Class. ........................................................................ 20

3.    Plaintiffs' Counsel Should Be Awarded Costs. ............................................ 21

C.    An Incentive Award To The Representative Plaintiffs Is Reasonable. ............................ 22

IV.    CONCLUSION .................................................................................................... 23

# TABLE OF AUTHORITIES

## CASES

*Beasley v. Wells Fargo Bank,* 235 Cal. App. 3d 1407 (1991) .................................................... 17

*Browning v. Yahoo! Inc.,* No. C04-01463 HRL, 2007 WL 4105971 (N.D. Cal. Nov. 16, 2007). ..................................................................................................................... 20

*Class Plaintiffs v. City of Seattle,* 955 F.2d 1268 (9th Cir. 1992) ............................................. 12

*Covillo v. Specialtys Café,* No. C-11-00594 DMR, 2014 WL 954516 (N.D. Cal. Mar. 6, 2014) ......................................................................................................................... 20

*Ellis v. Naval Air Rework Facility,* 87 F.R.D. 15 (N.D. Cal. 1980), *aff'd,* 661 F.2d 939 (9th Cir. 1981) .................................................................................................................. 13

*Gutierrez v. Wells Fargo Bank, N.A.*, No. C 07-05923 WHA, 2015 WL 2438274 (N.D. Cal. May 21, 2015) ...................................................................................................... 19

*Hanlon v. Chrysler Corp.*, 150 F.3d 1101 (9th Cir. 1998) ........................................................ 12

*Hartless v. Clorox Co.,* 273 F.R.D. 630 (S.D. Cal. 2011), *aff'd,* 473 F. App'x. 716 (9th Cir. 2012) .................................................................................................................... 20

*In re Mego Financial Corp. Sec. Litig.*, 213 F.3d 454 (9th Cir. 2000) ................................ 12, 14

*In re NVIDIA Corp. Derivative Litig.*, 2008 WL 5382544 (N.D. Cal. 2008) ........................... 16

*In re Optical Disk Drive Prod. Antitrust Litig.,* No. 3:10-MD-2143 RS, 2016 WL 7364803 (N.D. Cal. Dec. 19, 2016) ...................................................................................... 18

*In re Pacific Enterprises Securities Litig.*, 47 F.3d 373 (9th Cir. 1995) ................................... 12

*In re Washington Pub. Power Supply Sys. Sec. Litig.*, 19 F.3d 1291 (9th Cir. 1994) ............... 19

*Just Film, Inc. v. Merch. Servs., Inc.*, 474 F. App'x 493 (9th Cir. 2012) ................................ 3, 4

*Kelly v. Wengler*, 822 F.3d 1085 (9th Cir. 2016) ..................................................................... 17

*Kirkorian v. Borelli*, 695 F. Supp. 446 (N.D. Cal. 1988) ......................................................... 16

*Kumar v. Salov N. Am. Corp.,* No. 14-CV-2411-YGR, 2017 WL 2902898 (N.D. Cal. July 7, 2017) .............................................................................................................. 18

*Lealao v. Beneficial California, Inc.*, 82 Cal. App. 4th 19 (2000) ............................................ 17

*LeBlanc-Sternberg v. Fletcher,* 143 F.3d 748 (2nd Cir. 1998) ................................................. 19

*Linney v. Cellular Alaska Partnership*, 151 F.3d 1234 (9th Cir. 1998) ................................... 14

*Marshall v. Holiday Magic, Inc.,* 550 F.2d 1173 (9th Cir. 1977) ............................................. 15

*McLaughlin v. Wells Fargo Bank, N.A.*, No. C 15-02904 WHA, 2017 WL 994969 (N.D. Cal. Mar. 15, 2017) ...................................................................................................... 19

*Missouri v. Jenkins*, 491 U.S. 274 (1989)................................................................. 19

*Nat'l Rural Telecomm. Coop. v. DIRECTV, Inc.*, 221 F.R.D. 523 (C.D. Cal. 2004) ............... 14

*Nwabueze v. AT&T, Inc.*, No. C 09-01529 SI, 2014 WL 324262 (N.D. Cal. Jan. 29, 2014) ........................................................................................................... 17, 20

*Officers for Justice v. Civil Serv. Comm'n of San Francisco*, 688 F.2d 615 (9th Cir. 1982), *cert. denied*, 459 U.S. 1217 (1983) ................................................ 12, 13, 14, 15

*Perdue v. Kenny A. ex rel. Winn*, 559 U.S. 542 (2010) ............................................. 17

*Ramos v. Countrywide Home Loans, Inc.*, 82 Cal. App. 4th 615 (2000) ................................ 17

*Schuchardt v. Law Office of Rory W. Clark*, 314 F.R.D. 673 (N.D. Cal. 2016)...................... 19

*Serin v. N. Leasing Sys., Inc.*, No. 7:06-CV-1625, 2011 WL 1467560 (S.D.N.Y. Apr. 19, 2011), *aff'd*, 501 F. App'x 39 (2d Cir. 2012) ........................................... 20

*Serrano v. Priest*, 20 Cal. 3d 25 (1977)................................................................. 17

*Six Mexican Workers v. Arizona Citrus Workers*, 904 F.2d 1301 (9th Cir. 1990) .................... 21

*Smith v. CRST Van Expedited, Inc.,* 2013 WL 163293 (S.D. Cal. Jan. 14, 2013)..................... 23

*Staton v. Boeing Co.,* 327 F.3d 938 (9th Cir. 2003) ................................................. 20

*Torrisi v. Tucson Elec. Power Co.*, 8 F.3d 1370 (9th Cir. 1993), *cert. denied*, 512 U.S. 1220 (1994)..................................................................................... 12, 13, 14

*Van Vranken v. Atl. Richfield Co.*, 901 F. Supp. 294 (N.D. Cal. 1995) ............................ 21, 22

*Vincent v. Hughes Air West*, 557 F.2d 759 (9th Cir. 1977) ......................................... 22

*Walsh v. Kindred Healthcare*, No. C 11-00050 JSW, 2013 WL 6623224 (N.D. Cal. Dec. 16, 2013)............................................................................... 20

*Wehlage v. Evergreen at Arvin LLC*, No. 4:10-CV-05839-CW, 2012 WL 4755371 (N.D. Cal. Oct. 4, 2012)............................................................................. 20

*Williams v. MGM-Pathe Commc'ns Co.*, 129 F.3d 1026 (9th Cir. 1997) ............................... 21

*Williams v. Vukovich*, 720 F.2d 909 (6th Cir. 1983) ............................................... 13

*Young v. Polo Retail, LLC*, No, C-02-4546 WRW, 2007 WL 951821 (N.D. Cal. Mar. 28, 2007)............................................................................... 21

## OTHER AUTHORITIES

Fed. R. Civ. P. 12(b)(6) ........................................................................................... 4

Fed. R. Civ. P. 23 ................................................................................................... 11

Fed. R. Civ. P. 23(e) ............................................................................................. 12

28 U.S.C. § 1332(d) ......................................................................................... 3, 11

*Managing Class Action Litigation:  A Pocket Guide For Judges* § IV(F) ................................ 21

*Manual For Complex Litigation (Third)* § 30.42 .................................................. 14

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

MOTION FOR FINAL APPROVAL OF CLASS ACTION SETTLEMENT

## NOTICE OF MOTION AND MOTION

**PLEASE TAKE NOTICE** that on November 28, 2017, at 2:30 p.m., or as soon thereafter as the matter may be heard, in the United States District Court for the Northern District of California, Oakland Division (courtroom number not yet set), before the Honorable Claudia Wilken, Plaintiffs will and hereby do move the Court for an order of:

(1) Final approval of the settlement of this class action as set forth in the class action settlement agreement dated July 5, 2017 (Dkt. # 684-3), as amended on August 2, 2017 (Dkt. # 690-1);

(2) Final certification of the proposed Settlement Class as defined in the Settlement Agreement;

(3) Entry of final judgment;

(4) An award of $ 1,600,000.00 in attorneys' fees and in expenses; and

(5) An incentive award of $5,000.00 to each of the class representatives: Rainbow Business Solutions LLC and Jerry Su, collectively; Volker Von Glasenapp; Terry Jordan and Dietz Towing, collectively; and Erin Campbell.

This Motion is based on Federal Rule of Civil Procedure 23, this notice, the supporting Memorandum of Points and Authorities, the Declaration of Adam Gutride, and the pleadings and papers on file in this action and any other matter of which this Court may take notice.

1    <u>**MEMORANDUM OF POINTS AND AUTHORITIES**</u>

2    **I.    INTRODUCTION**

3        On August 3, 2017, this Court preliminarily approved this class action settlement between

4    Plaintiffs (on behalf of the certified classes) and the Leasing Defendants. The Court scheduled a

5    final approval hearing for November 28, 2017 to determine: (a) whether the proposed settlement

6    should be finally approved as fair, reasonable, and adequate and (b) whether Class Counsel's

7    application for attorneys' fees, costs, and a payment to the Class Representative should be

8    approved. (Dkt.# 692.)

9        This case has been pending for over seven years against Defendants Northern Leasing

10   Systems, Inc.; MBF Leasing LLC; Northern Funding LLC; Jay Cohen; Leonard Mezei; Sara

11   Krieger; Sam Buono; and SKS Associates (collectively the "Leasing Defendants"). The Court

12   already certified the SKS Post-Lease Expiration Class and the Property Tax Equipment Cost Basis

13   Class, and it appointed Plaintiffs Rainbow Business Solutions, d/b/a/ Precision Tune Auto Care;

14   Dietz Towing, Inc.; Volker Von Glasenapp; Jerry Su, Terry Jordan, and Erin Campbell as Class

15   Representatives.

16       The proposed settlement will entitle every SKS Post-Lease Expiration Class member to a

17   full refund of the amounts collected as part of the challenged activities, less any refund received by

18   such class member in the prior New York Attorney General Settlement, plus an additional $41.75.

19   Members of the SKS Class from whom such monies were not successfully collected shall be

20   entitled to receive an additional $15. Members of the Property Tax Equipment Cost Basis Class

21   will be entitled to receive $14.25 for each year after March 26, 2006 that they paid Leasing

22   Defendants property taxes based on a cost greater than the "equipment cost." The Leasing

23   Defendants also agreed to improved business practices. A copy of the Settlement Agreement was

24   attached as Exhibit 2 to the Declaration of Seth A. Safier in Support of Motion for Preliminary

25   Approval of Class Action Settlement ("Safier Decl.") (Dkt. # 684).

26       Plaintiffs seek an award of $1,600,000.00 in attorneys' fees and in costs, and a $5,000

27   incentive award to each Class Representative. (*Id.*)  None of these sums comes at the expense of

28   money set aside for the class. While Plaintiffs and their Counsel received $923,000 in fees and

costs in 2013 when some defendants settled, that amount accounts for only a small portion of the fees and costs accrued. Over the last seven years, they collectively expended more than 8580 hours to reach this settlement, equating to more than $5.35 million in fees if calculated using the lodestar method, and they incurred more than $125,000 in out-of-pocket expenses. Thus, the requested amount is still significantly less than Class Counsel's unpaid lodestar and unreimbursed expenses.

The Settlement is the product of a non-collusive, adversarial negotiation, and it is fair, reasonable and adequate. The request for fees, costs and incentives also is fair and reasonable. Plaintiffs respectfully requests that this motion be granted.

## II.    BACKGROUND FACTS AND DETAILS OF SETTLEMENT

### A.    Litigation History

#### 1.    Overview of The Certified Classes.

Plaintiffs allege that Leasing Defendants, in conjunction with various sales agents and independent sales organizations, enroll small merchants into "non-cancellable" leases for credit card processing equipment. Because the leases contain purported authorizations to directly debit the merchants' bank accounts, Leasing Defendants have been able to collect trumped-up property taxes and fees during the term of the leases, as well as after the leases expired.

On December 20, 2013, this Court entered an Order granting in part Plaintiffs' Motion for Class Certification, certifying the nationwide Property Tax Equipment Cost Basis Class and the California-only SKS Post-Lease Expiration Class. (Dkt.# 581.) On March 17, 2014, this Court granted Plaintiffs' Motion for Reconsideration and certified the nationwide SKS Post-Lease Expiration Class. (Dkt.# 592.) The Property Tax Equipment Cost Basis Class is defined as "All persons and businesses who from March 26, 2006 to the present paid any Leasing Defendants property taxes based on a cost greater than the 'equipment cost.'" The SKS Post-Lease Expiration Class is defined as "All persons and businesses whose lease numbers appeared on Schedule 1."

The Property Tax Equipment Cost Basis Class was certified to pursue claims for breach of contract and breach of the duty of good faith and fair dealing on the theory that that Defendants inflated the cost of the equipment before assessing property taxes, resulting in merchants paying more taxes than were due. The SKS Post-Lease Expiration Class was certified to pursue claims

under RICO and the UCL over a 2011 scheme, whereby Leasing Defendants conspired to collect money from former lessees by falsely asserting that the lessees owed unpaid property taxes and fees and by making unauthorized debits from bank accounts.

**2.      The Litigation Was Lengthy and Complex.**

This litigation commenced on March 26, 2010, when a complaint was filed against multiple defendants in San Francisco Superior Court, Case No. CGC-10-498225. Plaintiffs pled the following claims: violations of the Racketeer Influenced and Corrupt Organizations Act ("RICO"); fraud, deceit and/or misrepresentation; negligent misrepresentation; breach of contract; breach of the duty of good faith; false advertising under California Business and Professions Code sections 17500, *et seq.*; breach of contract; false advertising; and unfair business practices under California Business and Professions Code sections 17200, *et seq.*

On May 11, 2010, several of the defendants removed this case to this Court, pursuant to the Class Action Fairness Act of 2005, 28 U.S.C. § 1332(d), *et seq.* (Dkt.# 1.) Following removal, a number of defendants, including Leasing Defendants, moved to dismiss. (Dkts.# 41, 45-52, 55, 58-61, 66-71.) In response to those motions, Plaintiffs filed an 89-page first amended complaint, adding a claim for fraudulent conveyance. (Dkt.# 91.) Leasing Defendants and other defendants moved to dismiss the first amended complaint. (Dkts.## 108-16, 120-24.) The Court granted those motions in part, with leave to amend. (Dkt.# 179.) In March 2011, Plaintiffs filed a 120-page second amended complaint, which re-pled all of the above claims except the claim for fraudulent conveyance and added common law claims for conversion and abuse of process, and claims under the Fair Credit Reporting Act ("FCRA"). (Dkt.# 207.) The second amended complaint also added the claims involving SKS described above.

In March 2011, Plaintiffs moved for issuance of a temporary restraining order, and shortly thereafter, a preliminary injunction. (Dkt. # 208-10, 231.) Leasing Defendants opposed, but this Court granted Plaintiffs' requests. (Dkt. # 237, 278.) Leasing Defendants filed a motion to compel arbitration, (Dkts.# 238), which this Court denied. (Dkt.# 253, 278.) Leasing Defendants then appealed to the Ninth Circuit, which upheld this Court's orders. *See Just Film, Inc. v. Merch. Servs., Inc.*, 474 F. App'x 493 (9th Cir. 2012). Discovery later revealed that the preliminary

injunction prevented Leasing Defendants from collecting at least $7 million from class members, and perhaps as much as $12.3 million. (See *infra* note 5.)

While the briefing on the motion for a preliminary injunction and the motion to compel arbitration was pending, Leasing Defendants and other defendants moved to dismiss the Second Amended Complaint. (Dkts.## 245-49.) The Court granted the motions to dismiss in part, dismissing the abuse of process claim, and permitting each of the other above-listed claims to remain pending against one or more of the defendants. (Dkt.# 292.) Leasing Defendants twice moved to stay litigation pending the Ninth Circuit's decision on the motion to compel arbitration and the preliminary injunction, and this Court rejected both requests.

On August 23, 2013, Plaintiffs sought leave to file a 189-page third amended complaint, which pled new predicate acts under RICO, including obstruction of justice and witness tampering, and sought to reinstate certain claims against certain Defendants. (Dkt.# 383.) The Court instructed Defendants to include any Rule 12(b)(6) arguments in opposition to the motion for leave to amend. (Dkt. # 397.) They did so. (Dkt.# 401.) On December 6, 2012, the Court granted Plaintiffs' motion for leave to amend. (Dkt.# 425.)

Also on August 23, 2013, Plaintiffs filed a motion for class certification, which contained nearly 150 exhibits. (Dkt.## 386-87.)  The class certification motion was fully briefed by all parties. (Dkt.## 459-67, 469-71, 473, 474, 479.) This Court granted that motion in part, as discussed above. Leasing Defendants appealed this Court's order of certification, arguing that: (1) Plaintiffs did not establish typicality, commonality, and predominance for the SKS Post-Lease Expiration Class; and (2) Plaintiffs did not establish commonality, predominance, and superiority for the Property Tax Equipment Cost Basis Class.

On February 7, 2017, the Ninth Circuit affirmed in full this Court's orders, holding that this Court did not abuse its discretion in certifying either class. *See Just Film, Inc. v. Buono*, 847 F.3d 1108 (9th Cir. 2017). Defendants then petitioned for rehearing and hearing *en banc*, which requests both rejected on March 17, 2017.

In addition to the substantial motion practice discussed above, the parties engaged in extensive discovery. After significant discovery battles, including seven motions to compel and a

motion for sanctions, voluminous discovery was taken from all defendants. Plaintiffs received and reviewed over 300,000 pages of documents and 30GB of databases from Leasing Defendants, plus another 700,000+ pages of documents from other defendants. (Safier Decl., ¶ 5.) Plaintiffs also subpoenaed and reviewed documents from more than 23 third parties, including Visa, MasterCard, Experian, processors, banks, the governing body for ACH transactions, and some of Defendants' contractors. (Id.) Plaintiffs took eighteen days of depositions in San Francisco, Irvine, Los Angeles, New York, and Phoenix. (Id.) Defendants also deposed each Plaintiffs and Plaintiffs' expert, for a total of eleven days of depositions in San Francisco and Ontario, California. (Id.). The Parties also have exchanged written responses, under oath, to questions posed by the other parties. (Id.)

### 3.    Related Litigation by the New York Attorney General.

In April 2012, a year after Plaintiffs began pursuing the SKS claims, the New York Attorney General ("OAG") filed a lawsuit against Leasing Defendants, alleging a "gross disregard for fair and honest business practices" in connection with the SKS scheme. The OAG based its allegations largely on those in Plaintiffs' Second Amended Complaint and on the facts and arguments in the related briefing in this case on the preliminary injunction. On February 28, 2013, two weeks after Plaintiffs submitted their reply in support of class certification in this case, Defendants entered into a consent decree with the OAG, effectively making permanent the preliminary injunction obtained by Plaintiffs in this case. Defendants also agreed to provide refunds to SKS class members who filed a claim (and in some cases, to provide automatic refunds); as a result of this process, they paid 9,497 victims a total of $1,015,640.79. (Dkt # 668-4, Simplicio Decl. ¶ 11.)[1]

On April 13, 2016, the OAG filed a new lawsuit against various Leasing Defendants and associated entities and individuals for their fraudulent and deceptive practices, which mirrors many of the allegations in Plaintiffs' second amended complaint, including allegations on which this Court denied certification. Among other relief, the OAG seeks an order dissolving Northern

---

[1] The other approximately 27,000 victims who were debited did not receive refunds through the OAG settlement. (Safier Decl. ¶ 7.) No one was provided treble damages, which is one of the remedies sought in this case.

1    Leasing Systems, Inc.

2           **B.      Settlement Negotiations**

3           The proposed Settlement was reached following many rounds of arms-length talks

4    stretching over many years. (Dkt. # 684, Safier Decl., ¶ 7.) Settlement discussions began in the late

5    summer of 2012 after Plaintiffs filed their opening class certification brief and before Defendants

6    had filed their oppositions. (Id.) The parties agreed to retain Antonio Piazza of Mediated

7    Negotiations, who conducted two all-day mediations, on November 7, 2012 and March 20, 2013,

8    in San Francisco, California. Those mediations resulted in the class settlement with the Merchant

9    Services Defendants, which this Court approved on December 11, 2013. (Dkt.# 578.) Plaintiffs

10   were not able to reach agreement with the Leasing Defendants at that time.

11          In August 2014, the parties re-opened settlement discussions, utilizing the assistance of the

12   Ninth Circuit's mediation program. Over the next 18 months, the parties discussed settlement with

13   the assistance of Peter Sherwood of the Ninth Circuit.

14          On February 3, 2016, the parties met with a JAMS mediator, Mark Segall, in New York for

15   a day-long mediation session but were again unable to settle. The parties continued to work with

16   Mr. Segall telephonically over the next sixteen months while the appeal from class certification

17   was pending at the Ninth Circuit and, after that appeal was decided, they were eventually able to

18   reach the terms memorialized in the Settlement Agreement. (Dkt. # 684, Safier Decl., ¶ 7.)

19          At the time of settlement, all counsel had full knowledge of the strengths and weaknesses

20   of the claims and defenses due to the extensive discovery and motion practice that had preceded

21   the settlement talks. (Id., ¶ 9.) The parties did not have *any* discussion regarding attorneys' fees

22   until an agreement had been reached on all other material terms of settlement, including class

23   definition, method and form of notice, class benefits and claim process, and scope of releases. (Id.,

24   ¶ 7.)

25          Based on their reasoned judgment, Plaintiffs' Counsel believes the proposed Settlement is

26   fair and reasonable and should be approved by this Court. (Id., ¶¶ 10-11.) Plaintiffs believe the

27   evidence obtained in discovery showed that Leasing Defendants conspired to defraud the members

28   of the SKS Post-Lease Expiration Class by collecting purported taxes that were not actually due,

not paid to any taxing authority, and not authorized by the leases. Plaintiffs further believe that the evidence will show that Leasing Defendants overcharged the members of the Property Tax Equipment Cost Basis Class by using an inflated cost basis that improperly included commissions paid to the sales agents in addition to the value of the property. But there are risks associated with continued litigation. With respect to the SKS Post Lease Expiration Class, proving a RICO case is extraordinarily complicated and there was no guarantee a jury would find that Plaintiffs met their burden on all elements. With respect to the Property Tax Equipment Cost Basis Class, deciding the appropriate tax basis would essentially come down to a battle of the experts. Further, Leasing Defendants maintained that the one-year statute of limitation provisions in some class members' leases provided grounds to seek decertification and/or summary judgment. Any judgment in Plaintiffs' favor would likely be appealed. And collecting on a judgment may be difficult if not impossible, given Leasing Defendants' reliance on shell companies and the fact that Northern Leasing may be dissolved by the New York Attorney General. Thus, even in the best case, it could take years to get any relief for class members. (Id., ¶ 10.)

With this Settlement, Plaintiffs have achieved their desired goal in this litigation—i.e., obtaining significant refunds for class members and changes to the Leasing Defendants' business practices. (Id., ¶ 10.) While Plaintiffs would, of course, have liked to get more money, they still believe that the amounts obtained are a very good result. (Id., ¶¶ 10-11.)

Leasing Defendants, while continuing to deny all allegations of wrongdoing, also believe the Settlement is in their interest to avoid further expense, inconvenience, and interference with their ongoing business operations.

## C.   THE PROPOSED SETTLEMENT

The proposed settlement class is coextensive with the previously certified classes.[2]

### 1.   Monetary Relief

Each member of the SKS Post-Lease Expiration Class from whom monies were actually

---

[2] The following people are excluded: (1) the Honorable Judge Claudia Wilken and any member of her immediate family; (2) any government entity; (3) any ISO; (4) any of the Released Parties; (5) Antonio Piazza and Mark Segall and any members of their immediate families; and (6) any persons who timely opt-out of the classes.

collected in connection with the debt collection scheme and who submits a claim shall receive the full amount collected, less any refund received by such class member in the New York Attorney General Settlement, plus $41.75. The average amount collected from each class member in connection with the SKS scheme was $105.47, and thus class members who were not yet refunded will receive an average of $147.22, or approximately 140% of the amounts taken from them. Those already refunded will receive another payment equal to 40% of the amounts taken, again taking them to a total recovery of 140%. While class members would be eligible to receive treble damages if Plaintiffs are successful on their RICO claims, in light of the risks described above, the settlement reflects an excellent compromise. Further, each member of the SKS Post-Lease Expiration Class from whom monies were not actually collected (for example, because their bank accounts were already closed) shall receive $15 to compensate them for any incidental damages they may have incurred in investigating or disputing the claims that they owed back taxes. As this amount will be difficult to prove at trial and there may be challenges in recovering such damages on a classwide basis, this result may be better than what could be obtained at trial. The total made available to the SKS class members is approximately $5.6 million, which is an average of $50.76 per class member.[3] Had Plaintiffs proceeded to trial, their best case class recovery was likely treble the $3.5 million actually debited, or a total of $10.5 million, less the $1 million refunded in the OAG settlement, or a total of $9.5 million.  This means that the cash recovery here is approximately 60% of the best-case recovery at trial, an excellent result given the risks. And this computation does not include the value of the injunctive relief already obtained, as discussed in the next section. (Dkt. # 684, Safier Decl., ¶ 8; Dkt. # 693, p. 1-2.)

Each member of the Property Tax Equipment Cost Basis Class who submits a claim shall receive $14.25 for each year after March 26, 2006 that he, she or it paid any Leasing Defendants

---

[3] This amount is computed as follows: There were approximately 27,800 SKS class members who paid an average of $105.47 and got no refund; they are eligible to receive an average of $147.22 each, for a total of approximately $4.10 million. There were just under 9,500 class members who paid an average of $105.47 and got the money refunded; they are eligible to receive $41.75 each, for a total of approximately $394,500. There were approximately 73,000 class members who did not pay; they are eligible to receive $15.00 each, for a total of approximately $1.09 million. (Dkt. # 684, Safier Decl., ¶ 8; Dkt. # 693, p. 1-2.)

property taxes based on a cost greater than the "equipment cost." The average difference between the tax paid and the tax actually due was $19.42 per year. The recovery of $14.25 per year, or 73% of the likely recovery at trial, is excellent given the risks. The total made available to the Property Tax class members is approximately $3.6 million, which is an average of $26.05 per class member.[4] (Id.) Thus, the total monetary benefits made available to Settlement Class members exceed $9.2 million.

### 2. The Injunction and Changed Practices

Plaintiffs obtained an early victory when they filed for and obtained a temporary restraining order and preliminary injunction, which halted the SKS debt collection scheme. Before the TRO was entered, Defendants had collected approximately $3.6 million from 37,000 merchants. Had Defendants been able to continue their scheme, they could have collected another at least $7 million in connection with the remaining 80,000 expired leases listed on Schedule 1, and perhaps as much as $12.3 million.[5]

Leasing Defendants shall continue to abide by the terms of the Preliminary Injunction and the New York Attorney General Settlement. Thus, they are barred from collecting the amounts on Schedule 1 and from making other ACH debits on expired leases.

### 3. Release

The classwide release is narrow and limited only to claims arising from the property tax

---

[4] This amount is computed as follows. There were a total of approximately 137,000 persons who paid taxes during after March 26, 2006 on the higher cost basis. Of these, approximately 54,500 paid for one year, 55,000 paid for two years, 24,000 paid for three years, and 3,400 paid for four years. (Id.)

[5] Schedule 1 listed 107,000 merchants who were claimed to owe approximately $10.4 million. (Dkt. # 510, Ex. RRR) Defendants attempted to debit 36,791 accounts through their first payment processor (dkt. # 668-4, Simplicio Decl., ¶ 12); the debits were successful as to approximately 27,000, from whom they collected approximately $3.5 million.   The TRO thus prevented the collection of a minimum of approximately $7 million. The actual number that might have been collected could have been higher, as just hours before the Temporary Restraining Order was issued, Leasing Defendants informed their bank that they were in the process of debiting 128,353 accounts. (Id., Ex. 3.)  If Defendants' statement that they intended to debit 128,353 merchants was *in addition* to the 36,791 already debited, the total number of persons to be debited would have been as high as 165,144. At the same average amount per person, the total amount to be debited would have been $15.9 million, so by ending the debits after $3.5 million was taken, the TRO would have saved the class approximately $12.3 million. (Id.)

basis and the SKS scheme. (Safier Decl. Ex. 2, §§ 1.6, 1.7, 8.3.) Class members who wish to pursue individual or class claims based on other issues, such as fraud in the enrollment of the lease, violations of debt collection laws, or contractual violations of other provisions in the leases, will be free to do so. The settlement explains that such other claims are released only by the named Plaintiffs, not by members of the Settlement Class (id. §§ 1.5, 8.2; cf. id. § 8.3), and the class notice makes clear that such other claims are "not part of the class action" and lists the allegations supporting such unreleased claims. (Id. Ex. 2-B, p.7 & n.1)

After notice of the settlement was distributed, Plaintiffs counsel was contacted by the OAG, who raised questions about the scope of the release being granted by absent class members. To avoid any perceived ambiguity, make clear that the release does not exceed the release granted in section 8.3, and conform to the explanation in the class notice, Plaintiffs have proposed additional language in the proposed final approval order submitted herewith.  That proposed order is identical to the proposed order that was attached as Exhibit D to the settlement agreement (id. Ex. 2-D), except for the changes shown in redline.

### 4.   Administrative Expenses, Attorneys' Fees and Costs, Incentive Awards

As noted above, all costs of notice and administration of the settlement—which are estimated at $800,000 are being paid by Defendants, which is itself a substantial settlement benefit in light of the nature of the claims asserted in this case. (Safier Decl. Ex. 2, § 4.8; Gutride Decl. ¶ 79.)

Plaintiffs' Counsel request, and Leasing Defendants will not object to, payment of $5,000 to each Class Representative to compensate them for (1) the time and risk they took in prosecuting this action (including the risk of liability for Leasing Defendants' costs); and (2) agreeing to a release broader than the one that will bind Class Members, including a release of their individual claims.[6] (Id. § 6.2.) Class Counsel also requests that the Court enter an award of Attorneys' Fees

---

[6] As this Court declined to certify classes to pursue many of the Plaintiffs' claims, those claims would be pursued only on an individual basis. All plaintiffs, including those not named as class representatives, have agreed to settle those individual claims as part of the settlement. As explained in section 1.5 of the settlement agreement and on page 7 & footnote 1 of the class notice, Plaintiffs allege in these individual claims that Leasing Defendants assist purported independent sales organizations ("ISOs") to induce merchants to accept the expensive equipment leases by (1) using a contract that appears to be one-page in length, with signatures on the first

1  and Costs in a total amount not to exceed $1,600,000, which is an amount less than their present

2  unreimbursed lodestar and expenses. These amounts are disclosed in the proposed notices. The

3  reasonableness of these requests is discussed in more detail *infra* in Section III(B).

**5.    Notice**

5  The Notice Plan was designed to provide the best notice practicable and satisfies all

6  applicable requirements of law, including, but not limited to, Rule 23 and constitutional due

7  process.

8  The claim administrator (A.B. Data Ltd.) will file a declaration no later than 14 days prior

9  to the final approval hearing to establish that it has complied with the notice plan approved by this

10  court at the time of preliminary approval. Among other things, notice was required to be sent by

11  first-class mail to all settlement class members and to the governmental officials entitled to notice

12  under the Class Action Fairness Act.  A settlement website was to be established at http://

13  http://www.northernleasingsettlement.com, which contains the settlement notices, a contact

14  information page that includes address and telephone numbers for the claim administrator and the

15  parties, the settlement agreement, the signed order of preliminary approval, online and printable

16  versions of the claim form and the opt out forms, and answers to frequently asked questions. In

17  addition, this motion for final approval and application for attorneys' fees, costs, and incentive

18  awards are to be placed on the website upon filing. (Dkt # 692, ¶¶ 10-12; Safier Decl. Ex. 2, §§

19  page, when in fact there are three subsequent pages of small print not shown to the merchant; (2)
20  failing to engage in effective verification procedures to ensure that the merchant knowingly signed
the lease and creating incentives for the ISOs to commit fraud by allowing them to set high
monthly lease fees and paying large commissions based on the amount of the monthly lease fee;
21  (3) rejecting claims by merchants of fraudulent inducement, regardless of the facts presented;
(4) hiding their identities from merchants and using shell companies to hide assets and evade
22  liability; (5) including in the equipment lease unconscionable terms, including excessive monthly
lease fees for equipment, one-sided statutes of limitations, foreign forum-selection provisions,
23  foreign choice-of-law provisions, class action waivers, and arbitration provisions; (6) charging
merchants "administrative fees," typically of $25 per year, in connection with the purported
24  computation of personal property taxes on leased equipment, even when the leases did not provide
for collection of such administrative fees and when the fee amounts were unreasonable; (7)
25  engaging in abusive tactics to collect on the amounts purportedly owed on the equipment leases,
including aggressively monitoring and improperly accessing consumer credit reports, making false
26  reports to credit bureaus, filing unsupportable collection actions in foreign forums, and obtaining
default judgments after failing properly to serve summonses in the collection actions; and (8) using
27  the mail and wires to commit the above-described acts. (Safier Decl. Ex. 2 § 1.5; id. Ex. 2-B, p. 7
& n. 1.) Bae and Baumgartner, the two plaintiffs who are not class representatives, will be paid
28  $2500 each for the release of their individual claims. (Id. § 6.7.)

5.1-5.3.) The claim form was simple. (Safier Decl. Ex.2-A.) Class members need not provide any supporting documentation to receive benefits. (Id. Ex. 2, §§ 4.2, 4.3.) The claim form can be submitted by mail or online at the Settlement Website.  (Id. §4.2.)

## III.   ARGUMENT

### A.   Final Approval Is Warranted

Settlement is a strongly favored method for resolving disputes, particularly "where complex class action litigation is concerned." *Class Plaintiffs v. City of Seattle,* 955 F.2d 1268, 1276 (9th Cir. 1992); 4 Herbert B. Newberg & Alba Conte, *Newberg on Class Actions* (4th ed. 2002) § 11:41 ("*Newberg*"); *In re Pacific Enterprises Securities Litig.*, 47 F.3d 373, 378 (9th Cir. 1995); *Officers for Justice v. Civil Serv. Comm'n of San Francisco*, 688 F.2d 615, 625 (9th Cir. 1982), *cert. denied*, 459 U.S. 1217 (1983). Under Rule 23 (e), a court should approve a settlement if it is fair, reasonable, and adequate. *See In re Mego Financial Corp. Sec. Litig.*, 213 F.3d 454, 458 (9th Cir. 2000); *Torrisi v. Tucson Elec. Power Co.*, 8 F.3d 1370, 1376 (9th Cir. 1993), *cert. denied*, 512 U.S. 1220 (1994).

As the Ninth Circuit has explained, a decision "to approve or reject a settlement is committed to the sound discretion of the trial judge because [s]he is exposed to the litigants, and their strategies, positions, and proof." *In re Mego Financial Corp,* 213 F. 3d at 458.  The Court must consider whether the settlement as a whole is reasonable; it stands or falls in its entirety. *See Hanlon v. Chrysler Corp.*, 150 F.3d 1101, 1026 (9th Cir. 1998) ("*Hanlon*"); *Class Plaintiffs*, 955 F.2d at 1276; *Officers for Justice*, 688 F.2d at 628.

"The settlement or fairness hearing is not to be turned into a trial or rehearsal for trial on the merits." *Officers for Justice*, 688 F.2d at 625. Instead, the Court should explore and balance "all the relevant factors" bearing on approval of a class action settlement, including:

> the strength of the plaintiffs' case; the risk, expense, complexity, and likely duration of further litigation; the risk of maintaining class action status throughout the trial; the amount offered in settlement; the extent of discovery completed and the stage of the proceedings; the experience and views of counsel; the presence of a governmental participant; and the reaction of the class members to the proposed settlement.

*Hanlon,* 150 F.3d at 1026. *Accord In re Mego Financial Corp*, 213 F.3d at 458; *Torrisi*, 8 F.3d at 1375; *Officers for Justice*, 688 F.2d at 625. "The relative degree of importance to be attached to

any particular factor will depend upon and be dictated by the nature of the claim(s) advanced, the type(s) of relief sought, and the unique facts and circumstances presented by each individual case." *Officers for Justice*, 688 F.2d at 625. Due regard should be given to what is otherwise a private consensual agreement between the parties. *Id*. The inquiry "must be limited to the extent necessary to reach a reasoned judgment that the agreement is not the product of fraud or overreaching by, or collusion between, the negotiating parties, and that the settlement, taken as a whole, is fair, reasonable and adequate to all concerned." *Id*. "Ultimately, the [trial] court's determination is nothing more than 'an amalgam of delicate balancing, gross approximations and rough justice." *Id* (citation omitted). Here, all the relevant factors support final approval.

### 1.    The Settlement Agreement Resulted from Arm's-Length Negotiations.

This Settlement is the product of arm's-length negotiations over the course of many years between counsel for Plaintiffs and counsel for Defendants, including three full-day mediation sessions and countless telephonic sessions, before well-respected mediators including Antonio Piazza and Mark Segall. (Gutride Decl., ¶¶ 70-77.) Fees were not negotiated until all other settlement terms had been agreed. (Id. ¶ 77.) There is an initial presumption that a proposed settlement is fair and reasonable when it is the result of arm's-length negotiations between experienced counsel. *See Williams v. Vukovich*, 720 F.2d 909, 922-923 (6th Cir. 1983) ("The court should defer to the judgment of experienced counsel who has competently evaluated the strength of his proofs."); *see also 4 Herbert Newberg & Alba Conte, Newberg on Class Actions* §11.41; *Manual For Complex Litigation (Third)* § 30.42. The non-collusive nature of the negotiations and the stature of counsel have often been recognized as important factors in the final approval of class action settlements. *See Ellis v. Naval Air Rework Facility*, 87 F.R.D. 15, 18 (N.D. Cal. 1980), *aff'd*, 661 F.2d 939 (9th Cir. 1981) ("the fact that experienced counsel involved in the case approved the settlement after hard-fought negotiations is entitled to considerable weight").

### 2.    Substantial Benefits Are Provided To The Class.

The Court should next "assess the consideration obtained by the class members in a class action settlement." *Nat'l Rural Telecomm. Coop. v. DIRECTV, Inc.*, 221 F.R.D. 523, 527 (C.D.

Cal. 2004). "[I]t is the complete package taken as a whole, rather than the individual component parts, that must be examined for overall fairness." *Officers for Justice*, 688 F.2d at 628. "In this regard, it is well-settled law that a proposed settlement may be acceptable even though it amounts to only a fraction of the potential recovery that might be available to the class members at trial." *DIRECTV*, 221 F.R.D. at 527, (citing *Linney v. Cellular Alaska Partnership*, 151 F.3d 1234, 1242 (9th Cir. 1998)).

Here, the benefits to Settlement Class Members are clear, demonstrable, and immediate. Separate from the costs of notice and claim administration (estimated at $800,000), and the requested $1.6 million in attorneys' fees and expenses (discussed *infra* in Section III(B)), Defendants agreed to make at least $9.2 million to pay class member claims. Of that amount, $3.6 million is being made available to members of the Property Tax Class, representing approximately 73% of the likely recovery at trial (*see supra* section I(C)(1)), an excellent result given the risks. An addition $5.6 million is being made available to members the SKS Class, in addition to the approximately $1 million in refunds already provided under the OAG Lawsuit, which is approximately 60% of the likely recovery at trial. (*See supra* section I(C)(1).) Given the difficulties and risks in proving plaintiffs' case, this result is excellent. Moreover, this amount does not include the value of the injunctive relief, estimated to be at least $7 million and possibly as much as $12.3 million, obtained by Plaintiffs on behalf of the SKS class, as explained in more detail in Section I(C)(2), *supra*.

### 3. There are Serious Risks of Further Litigation

The Court must next assess the risks of continued litigation. Generally, the principal risks to be assessed are the difficulties and complexities of proving liability and damages. *See, e.g., In re Mego Financial Corp*, 213 F.3d at 458-59 (assessing risk of inability to prove fraudulent scheme in affirming settlement); *Linney*, 151 F.3d at 1240-1241 (assessing risks involving fraudulent concealment and ability to obtain damages in affirming settlement); *Torrisi*, 8 F.3d at 1376 (approving settlement based in part on "inherent risks of litigation"); *Class Plaintiffs*, 955 F.2d at 1292 (approving settlement based on uncertainty of claims and avoidance of summary judgment); *Officers for Justice*, 688 F.2d at 625 (approving settlement based in part on the

possibility that a judgment after a trial, when discounted, might not reward class members for their patience and the likely delay reflected in the "track record" for large class actions).

Here, there are numerous risks in continuing with this Litigation. The litigation has been highly contentious since the outset, and the parties continued to strongly disagree on Plaintiffs' ability to prove liability and damages. Defendants have also argued that some of the leases in the class waived trial by jury and the ability to participate in class actions and others had shorter statutes of limitations, so Defendants may have sought to decertify the class and/or seek summary judgment as to their contract defenses. On the merits, Defendants continued to argue that their tax collection assessment and collection from both classes was consistent with what the leases permitted and was proper. The facts and law were complex and trial could easily come down to a battle of experts.

While Class Counsel are confident in their positions and believe Plaintiffs' claims are strong, Class Counsel are also experienced and realistic enough to know that the recovery and certainty achieved through settlement, as opposed to the uncertainty inherent at the summary judgment stage and in the trial and appellate process and through collection of a judgment, weighs heavily in favor of settlement, particularly given the above risks. (Gutride Decl., ¶¶ 75-81, 90-91; Safier Decl. ¶ 10.) There is a significant advantage of receiving a benefit now as opposed to later, especially given the risks in collecting. *See Officers for Justice*, 688 F.2d at 625; *Marshall v. Holiday Magic, Inc.,* 550 F.2d 1173, 1178 (9th Cir. 1977).

### 4.    The Experience And Views Of Counsel Favor Final Approval.

Plaintiffs' Counsel, who are experienced class action litigators, support the settlement as fair, reasonable, adequate and in the best interests of the Class. (Gutride Decl. ¶ 112; Safier Decl. ¶ 10.) Leasing Defendants are represented by Moses & Singer LLP and JRA Law Partners, LLC. They too support the settlement.

Plaintiffs' Counsel came to recommend this Settlement after over seven years of hard-fought litigation, during which it expended over 8580 hours. Class Counsel's work included extensive briefing on a variety of significant legal issues. It also included two successful appeals to the Ninth Circuit, concerning issues of (1) arbitrability, (2) preliminary injunction and (3) class

certification. Plaintiffs' Counsel took numerous fact and expert depositions and reviewed more than a million pages of documents, interrogatories, requests for admission, and third-party discovery. (Id., ¶¶ 28-46.)

In these circumstances, "[s]ignificant weight should be attributed to counsel's belief that settlement is in the best interest of those affected by the settlement." *In re NVIDIA Corp. Derivative Litig.*, 2008 WL 5382544 at *4 (N.D. Cal. 2008); *see also Kirkorian v. Borelli*, 695 F. Supp. 446, 451 (N.D. Cal. 1988) (opinion of experienced counsel is entitled to considerable weight).

### 5. The Reaction Of The Settlement Class Has Been Overwhelmingly Positive.

Although the periods to make claims, opt-out, or object are still open, the initial reaction to the Settlement has been positive. Although notices were sent to more than 200,000 putative class members, there have been fewer than 20 opt-outs and just one misdirected objection to the settlement, which will be addressed on reply. (Id., ¶ 79.)[7]

### B. Plaintiffs' Counsel Should Be Awarded Attorneys' Fees And Expenses In The Amount of $1,600,000.

The Settlement Agreement provides for the payment of attorneys' fees and expenses in the amount of $1,600,000, separate and apart from the money made available to the class for purposes of claims, notice and administration. Under Ninth Circuit standards, in cases such as this, it is appropriate for a District Court to analyze an attorneys' fee request and issue an award either based on (1) the "lodestar" method or (2) by making an award as a percentage of the total benefit made available to the settlement class, including costs, fees, and injunctive relief. *See, e.g.*, *Nwabueze v. AT&T, Inc.*, No. C 09-01529 SI, 2014 WL 324262, at *2-3 (N.D. Cal. Jan. 29, 2014). Plaintiffs' fee request is reasonable under either of these approaches.

---

[7] The exact number of notices mailed and re-mailed, claims, opt-outs and objections will be updated on reply in a declaration from the Claim Administrator.

1

### 1.    Plaintiffs' Counsel's Requested Fee Is Reasonable When Using The Lodestar Approach.

2

3       Under the lodestar approach, "[t]he lodestar (or touchstone) is produced by multiplying the

number of hours reasonably expended by counsel by a reasonable hourly rate." *Lealao v.*

4  *Beneficial California, Inc.*, 82 Cal. App. 4th 19, 26 (2000); *see also Kelly v. Wengler*, 822 F.3d

5  1085, 1099 (9th Cir. 2016) ("[A] court calculates the lodestar figure by multiplying the number of

6  hours reasonably expended on a case by a reasonable hourly rate. A reasonable hourly rate is

7  ordinarily the 'prevailing market rate [] in the relevant community.'") (alteration in original)

8  (internal citation omitted) (quoting *Perdue v. Kenny A. ex rel. Winn*, 559 U.S. 542, 551 (2010)).

9  Once the court has fixed the lodestar, it may increase or decrease that amount by applying a

10  positive or negative "multiplier to take into account a variety of other factors, including the quality

11  of the representation, the novelty and complexity of the issues, the results obtained and the

12  contingent risk presented." *Id.*; *see also Serrano v. Priest*, 20 Cal. 3d 25, 48-49 (1977); *Ramos v.*

13  *Countrywide Home Loans, Inc.* 82 Cal. App. 4th 615, 622 (2000); *Beasley v. Wells Fargo Bank*,

14  235 Cal. App. 3d 1407, 1418 (1991) (multipliers are used to compensate counsel for the risk of

15  loss, and to encourage counsel to undertake actions that benefit the public interest).

16       Plaintiffs' Counsel's lodestar through the date of this application is approximately $5.35

17  million. (Gutride Decl. ¶¶ 92-96 (tables showing hours worked by timekeeper)). Plaintiffs'

18  Counsel's efforts to date included, without limitation:

19       • Pre-filing investigation and preparing class action complaint and three amended

20         complaints;

21       • Briefing on motions to dismiss, for leave to amend, to compel arbitration, for a

22         temporary restraining order, for preliminary injunction; to transfer, to stay, for class

23         certification, for reconsideration, for award of interim fees, and for preliminary and

24         final approval, and attending hearings thereon;

25       • Drafting numerous case management conference statements and case management

26         stipulations;

27       • Meeting and conferring with Defendants' counsel regarding the scope of discovery,

28         the sufficiency of discovery responses and production, Defendants' searches for

–17–

electronically stored information, the terms and scope of a stipulated protective order, and the timing of production;

- Briefing seven motions to compel and a motion for sanctions;

- Reviewing in excess of a million pages of documents produced by Defendants;

- Subpoenaing and reviewing documents from over twenty third party witnesses;

- Taking eighteen days depositions in San Francisco, Irvine, Los Angeles, New York, and Phoenix;

- Defending the depositions of Plaintiffs, Plaintiffs' witness, and their expert over 11 days;

- Successfully opposing two Ninth Circuit appeals;

- Drafting mediation statements and participating in mediations before three different mediators;

- Negotiating and drafting the Settlement Agreement along with corresponding documents, including claim forms, summary notice, and long form notice, and amendments thereto;

- Personally responding to dozens of written and telephonic inquiries from Settlement Class Members; and

- Supervising the work of the Claims Administrator.

(Gutride Decl. ¶¶ 3-82.)

Plaintiffs' Counsel calculated their lodestar using Plaintiffs' Counsel's regular billing rates, which for the attorneys involved range from $616 to $950 per hour. (Gutride Decl., ¶ 92.)

These hourly rates are equal to market rates in San Francisco for attorneys of Plaintiffs' Counsel's background and experience. (Id., ¶¶ 93, 99-101); *see also Kumar v. Salov N. Am. Corp.,* No. 14-CV-2411-YGR, 2017 WL 2902898, at *7 (N.D. Cal. July 7, 2017) (finding Gutride Safier's 2016 hourly rates to be "reasonable and commensurate with those charged by attorneys with similar experience in the market"); *In re Optical Disk Drive Prod. Antitrust Litig.,* No. 3:10-MD-2143 RS, 2016 WL 7364803, at *8 (N.D. Cal. Dec. 19, 2016) (approving hourly rates of $205 to $950); *McLaughlin v. Wells Fargo Bank, N.A.*, No. C 15-02904 WHA, 2017 WL 994969, at *2

1  (N.D. Cal. Mar. 15, 2017) (approving an $850 hourly rate for partners); *Gutierrez v. Wells Fargo*

2  *Bank, N.A.*, No. C 07-05923 WHA, 2015 WL 2438274, at *5 (N.D. Cal. May 21, 2015), *appeal*

3  *dismissed* (Oct. 30, 2015) (approving hourly rates of $475 to $975). Plaintiffs' Counsel Adam

4  Gutride and Seth Safier are, respectively, graduates from Yale Law School 1994 and Harvard Law

5  School 1998, with 23 and 19 years of litigation experience. (Gutride Decl., ¶ 99.) Kristen

6  Simplicio is 2007 graduate of American University, Washington College of Law (10 years of

7  experience). (*Id.*)[8]

8        The rates used are the Class Counsel's standard 2017 rates, which is appropriate given the

9  deferred and contingent nature of counsel's compensation. *See LeBlanc-Sternberg v. Fletcher,* 143

10  F.3d 748, 764 (2nd Cir. 1998) ("[C]urrent rates, rather than historical rates, should be applied in

11  order to compensate for the delay in payment….") (citing *Missouri v. Jenkins*, 491 U.S. 274, 283-

12  84 (1989)); *In re Washington Pub. Power Supply Sys. Sec. Litig.*, 19 F.3d 1291, 1305 (9th Cir.

13  1994) ("The district court has discretion to compensate delay in payment in one of two ways:

14  (1) by applying the attorneys' current rates to all hours billed during the course of litigation; or

15  (2) by using the attorneys' historical rates and adding a prime rate enhancement.").

16        Class Counsel's attorneys' fee request of $1,526,537.66 (equal to $1,600,000 minus costs

17  and expenses of $73,462.34, discussed in Section III(B)(3) *infra*), comes in well *below* the fee

18  amount of $5.35 million calculated using the lodestar method. Thus, far from any "upward" or

19  "positive" multiplier, Class Counsel's requested fee actually results in a fractional (a.k.a

20  "negative" or "downward") multiplier of 0.29. Therefore, it is appropriate to award Class Counsel

21  requested attorneys' fees. *See, e.g.*, *Schuchardt v. Law Office of Rory W. Clark*, 314 F.R.D. 673,

22  690-91 (N.D. Cal. 2016) (holding negative lodestar multiplier to be indication of reasonableness of

23

24  [8] Adam Gutride and Seth Safier were previously attorneys at the San Francisco office of the law firm of Orrick Herrington & Sutcliffe, where litigators who graduated in 1994 and 1998

25  respectively currently bill at hourly rates of in excess of $900. (Gutride Decl. ¶ 99.) Furthermore, it is almost certain the rates paid by the Defendants to its firms in this case far exceed the rates

26  requested for Class Counsel. *See Managing Class Action Litigation:  A Pocket Guide For Judges*

27  § IV(F) (suggesting an examination of the defendant's attorney fee records as a measure of what might be reasonable.) Finally, the Gutride Safier firm's billing rates were recently approved by

28  other judges in this District as well as those in the Central District of California, Northern District of Illinois, and San Francisco Superior Court. (Gutride Decl. ¶ 100.)

–19–

1    fee request); *accord Covillo v. Specialtys Café*, No. C-11-00594 DMR, 2014 WL 954516, at *7

2    (N.D. Cal. Mar. 6, 2014); *Walsh v. Kindred Healthcare*, No. C 11-00050 JSW, 2013 WL 6623224,

3    at *3 (N.D. Cal. Dec. 16, 2013).; *Wehlage v. Evergreen at Arvin LLC*, No. 4:10-CV-05839-CW,

4    2012 WL 4755371, at *1 (N.D. Cal. Oct. 4, 2012)

5           Moreover, Plaintiffs' fee request is *lower* than what they could have obtained had they

6    prevailed on their Interim Fee Application (Dkt. # 668.), which was pending at the time of

7    settlement and which Class Counsel agreed to withdraw as part of the settlement. In that

8    Application, Plaintiffs sought approximately $2.3 million in fees and costs for work performed to

9    obtain and uphold the preliminary injunction. Had Plaintiffs prevailed on that application, they

10   would still have been entitled, after settlement or judgment, to seek additional fees and costs for

11   work on the claims that are now being settled.  For example, the application did not request fees

12   for the work on the second appeal (from class certification) or on negotiating and drafting this

13   settlement, nor did it seek fees for the work performed on behalf of the Property Tax Class, or

14   pursuing the Plaintiffs' individual RICO claims.[9]

15              **2.      Plaintiffs' Counsel's Requested Fee Is A Reasonable Percentage of The
                          Total Benefit Made Available To The Class.**
16

17          Whether as a cross-check or as an independent methodology, the Court can utilize the

18   percentage-of-recovery method to verify that Plaintiffs' attorneys' fee request of $1,526,537.66 is

19   reasonable. *See, e.g.*, *Nwabueze*, 2014 WL 324262, at *2-3. When determining the value of the

20   settlement, courts consider the non-monetary benefits conferred under the settlement terms. *See,*

21   *e.g.*, *Staton v. Boeing Co.,* 327 F.3d 938, 972-74 (9th Cir. 2003); *Hartless v. Clorox Co.,* 273

22   F.R.D. 630, 645 (S.D. Cal. 2011), *aff'd,* 473 F. App'x. 716 (9th Cir. 2012); *Browning v. Yahoo!*

23   *Inc.*, No. C04-01463 HRL, 2007 WL 4105971, at *14 (N.D. Cal. Nov. 16, 2007). Ninth Circuit

24   precedent requires courts to award class counsel fees based on the total benefits being made

25   available to class members rather than the amount actually claimed. *Young v. Polo Retail, LLC*,

26   _____

27   [9] Six years ago, another court awarded $594,359 in attorneys' fees and $43,006.46 in costs and
     expenses to six individual plaintiffs in a RICO lawsuit against these same Defendants, despite the
28   absence of class certification or class relief. *See Serin v. N. Leasing Sys., Inc.*, No. 7:06-CV-1625,
     2011 WL 1467560, at *1 (S.D.N.Y. Apr. 19, 2011), *aff'd,* 501 F. App'x 39 (2d Cir. 2012).

No, C-02-4546 WRW, 2007 WL 951821, at *8 (N.D. Cal. Mar. 28, 2007) (citing *Williams v. MGM-Pathe Commc'ns Co.*, 129 F.3d 1026 (9th Cir. 1997) ("district court abused its discretion in basing attorney fee award on actual distribution to class" instead of amount being made available)); *see also Glass v. UBS Fin. Servs., Inc.*, No. C-06-4068 MMC, 2007 WL 221862, at *16 (N.D. Cal. Jan. 26, 2007) ("The Ninth Circuit has held, however, that the district court must award fees as a percentage of the entire fund, or pursuant to the lodestar method, not on the basis of the amount of the fund actually claimed by the class.") (citing *Williams*), *aff'd*, 331 F. App'x 452 (9th Cir. 2009).

The benchmark for an attorney fee is 25% of the total settlement value, including the monetary and non-monetary recovery. *See Six Mexican Workers v. Arizona Citrus Workers*, 904 F.2d 1301, 1311 (9th Cir. 1990); *see also Glass*, 2007 WL 221862, at *14 ("The Ninth Circuit has repeatedly held that 25% of the gross settlement amount is the benchmark for attorneys' fees awarded under the percentage method . . ."). However, many cases have found that between 30% and 50% of the common fund is an appropriate range when the settlement fund is less than ten million. *See Van Vranken v. Atl. Richfield Co.*, 901 F. Supp. 294, 297-98 (N.D. Cal. 1995) (collecting cases).

Here, the total settlement value is between \$18.6 and \$23.9 million.[10]  The requested fee of \$1,526,537.66 is only 6.4 to 8.2% of this total. As courts have awarded fees in excess of the 25% benchmark where attorneys seek a "so-called negative [lodestar] multiplier," *e.g.*, *Young*, 2007 WL 951821, at *8, it is entirely appropriate to award the requested fees here, where Class Counsel is seeking less than its lodestar, and the requested fees come in well below the 25% benchmark.

### 3.    Plaintiffs' Counsel Should Be Awarded Costs.

Class Counsel requests that, in addition to reasonable attorneys' fees, the Court grant its application for reimbursement of \$73,462.34 in costs and expenses it incurred in connection with the prosecution of this Litigation. The expenses incurred are itemized in the Gutride Declaration.

---

[10] This total is the sum of (a) \$9.2 million in available cash benefits, (b) injunctive relief valued at between \$7 and \$12.3 million, (c) \$800,000 in costs of notice and administration, (d) \$1.6 million in fees and costs, and (e) \$25,000 in incentive awards.

(Gutride Decl. ¶ 106 & Ex. A.) Plaintiffs' counsel is typically entitled to reimbursement of all reasonable out-of-pocket expenses and costs in prosecution of the claims and in obtaining a settlement. *See Vincent v. Hughes Air West*, 557 F.2d 759, 769 (9th Cir. 1977). Here, since the requested sum of $1,600,000.00 is inclusive of both attorneys' fees *and* costs, should the Court choose to calculate the two totals separately, it should subtract the $73,462.34 in costs from that number and award $1,526,537.66 in attorneys' fees.[11]

### C. An Incentive Award To The Representative Plaintiffs Is Reasonable.

This Court should also approve a $5,000 incentive award to each Class Representative as it is just, fair and reasonable. In deciding whether to approve an incentive award, a court should consider: "(1) the risk to the class representative in commencing suit, both financial and otherwise; (2) the notoriety and personal difficulty encountered by the class representative; (3) the amount of time and effort spent by the class representative; (4) the duration of the litigation and; (5) the personal benefit (of lack thereof) enjoyed by the class representative as a result of the litigation." *Van Vranken,* 901 F. Supp. at 299. As a matter of public policy, incentive awards are necessary to encourage persons to step forward on behalf of other victims.

Plaintiffs took on substantial risk, most importantly the risk of bearing Defendants' costs. (Gutride Decl. ¶ 82.) Plaintiffs also worked with their counsel throughout the seven-year litigation. They responded to dozens of interrogatories and requests for production and attended their depositions, some of which lasted for two days. They conducted searches of their personal and business records and turned over sensitive financial data. They also remained actively involved in the litigation prior to and after settlement. (Id.)

Plaintiffs' Counsel respectfully requests that the Court approve the incentive award, which is reasonable in light of the Plaintiffs' efforts and the relief to the Settlement Class resulting from this Litigation. *See In re Mego Fin. Corp. Sec. Litig*., 213 F.3d at 463 (awarding the named plaintiff $5,000 involving a class of 5,400 people and a total recovery of $1.725 million); *Smith v. CRST*

---

[11] Should the Court deem any of the requested costs to not be reimbursable, Plaintiff requests that the Court increase the attorneys' fee award such that the net amount of $1,600,000 provided via the Settlement Agreement is awarded, as any increase to the attorneys' fee award would still result in a significant "negative" lodestar multiplier and, therefore, be reasonable.

*Van Expedited, Inc.,* 2013 WL 163293, *6 (S.D. Cal. Jan. 14, 2013) (finding the amount of the incentive payments requested, $15,000, is well within the range awarded in similar cases).

## IV.   CONCLUSION

For the reasons stated above, Class Representatives respectfully request that this Court grant preliminary approval to the proposed class action settlement.

Dated: October 11, 2017

**Respectfully submitted,**

**GUTRIDE SAFIER LLP**

By:  /s/ Adam J. Gutride
Adam J. Gutride
Seth A. Safier
Kristen Simplicio

*Counsel for Plaintiffs*